# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2017 OCT 30   AM 9: 03

OFFICE       HE CLERK

| | |
|---|---|
| ED TEAGUE, II,<br><br>             Plaintiff,<br><br>vs.<br><br>REGENT FINANCIAL GROUP, INC.; GINNIE MAE;<br>GINNIE MAE, as Trustee for Securitized Trust Ginnie Mae<br>REMIC 2011-066 Trust; FLAGSTAR BANK, FSB;<br>MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,<br>INC. ("MERS"); and PLANET HOME LENDING, LLC,<br><br>             Defendants. | **Case No:** 8:17CV416<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

COMES NOW the Plaintiff, Ed Teague, II, (hereinafter referred to as "Plaintiff"), who hereby sues Defendants REGENT FINANCIAL GROUP, INC.; GINNIE MAE; GINNIE MAE, as Trustee for Securitized Trust Ginnie Mae REMIC 2011-066 Trust; FLAGSTAR BANK, FSB; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"); and PLANET HOME LENDING, LLC; and in support of Plaintiff's claims avers the following:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

2. Venue is proper in the United States District Court for the District of Nebraska under 28 U.S.C. §1391(b)(2), which states that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

## PARTIES TO THE ACTION

3. Plaintiff is *sui juris* before this Court, and at all times relevant to this action, a resident of Scottsbluff County, Nebraska. At all times relevant to this action, Plaintiff owned and has superior claim to the property located at 635 Highway 26, E., Morrill, NE 69358 (hereinafter referred to as the "subject property"). *See Exhibit "A."*

4. Defendant, Regent Financial Group, Inc., (hereinafter referred to as "Regent") is a national banking association, a Non-Depository Payor Bank doing business in Scottsbluff County, Nebraska. Upon information and belief, Regent is the account debtor of the instant matter in a capacity of accommodated party in interest to a 26 U.S. Code § 1031– Exchange of property, held for productive use or investment warehouse line of credit, hereinafter more particularly described in this Complaint.

5. Defendant Ginnie Mae, (hereinafter referred to as "Ginnie Mae"), is a corporation, doing business in Scottsbluff County, Nebraska. Upon information and belief, Ginnie Mae is the "Sponsor/Seller" for bankruptcy remote Special Purpose Vehicle GNMA 2011-066 Trust. Plaintiff further alleges that Ginnie Mae was acting in the capacity of a qualified intermediary for credit swap conveyances associated with a 26 U.S. Code § 1031– Exchange of property held for productive use or investment warehouse line of credit, hereinafter more particularly described in this Complaint.

6. Defendant, Ginnie Mae, acting in the capacity of Trustee for the bankruptcy remote Special Purpose Vehicle Ginnie Mae REMIC 2011-066 (hereinafter referred to as "Trust") is a national banking association, doing business in Scottsbluff County, Nebraska. Upon information and belief, Trust, acting in the capacity as Junior Secured Party to Regent Financial Group, Inc. in the special purpose vehicle ("SPV") transaction

scheme, is offering securities to the secondary market for the purpose of obtaining certificate holder's acquired funds by Special Deposit to execute a 26 U.S. Code § 1031– Exchange of property held for productive use or investment warehouse line of credit, more particularly described in this Complaint.  See Exhibit I.

7. Defendant, Mortgage Electronic Registration Systems, Inc., (hereinafter referred to as "MERS"), is a for-profit entity conducting everyday business in Scottsbluff County, Nebraska.   Upon information and belief, MERS was acting in the capacity of an electronic agent as a purported Nominee/Beneficiary for Regent Financial Group, Inc. under the Deed; subsequently acting in a capacity of bailor/bailee for each successor defendant of bankruptcy remote Special Purpose Vehicle Trust associated with the 26 U.S. Code § 1031– Exchange of property held for productive use or investment warehouse line of credit, more particularly described in this Complaint.

8. Defendant Planet Home Lending, LLC, (hereinafter referred to as "Planet Home") is a for-profit lending institution, and is the foreclosing party and a limited liability company doing business in Scottsbluff County, Nebraska.

9. Upon information and belief, at all relevant times herein, Defendants were the agents, employees, servants and/or the joint-ventures of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

## GENERAL ALLEGATIONS

10. This is an action brought by Plaintiff for declaratory judgment, equitable relief, compensatory, special, general and punitive damages.

11. Plaintiff disputes any purported superior colorable claim to legal title and equitable title of the subject property asserted by Defendants, in so much that Plaintiff specifically pledged the subject property, collateral evidenced by the Warranty Deed and further clarified under the Deed of Trust as Real Property to The Accommodated Non Depository Payor Bank Regent (hereinafter referred to as "Accommodated Party") as Accommodation Party in the 26 U.S. Code §1031 – Exchange of property held for productive use or investment (hereinafter referred to as the "§1031 – Exchange").

12. Upon information and belief, Trust, as a Junior Secured Party to Regent in the §1031 – Exchange is attempting to make an unlawful claim to legal title through a fraudulent assignment of enforcement rights of the currently un-perfected underlying Deed of Trust and unlawful equitable claim to ownership to the subject property through the Regent hypothecated collateral purported after acquired "proceeds" of the subject property which through the Deed of Trust lien encumbering the subject property; which, is being unlawfully construed as the Intangible Payment Obligation Transferable Record Chattel Paper (hereinafter referred to as the "Payment Intangible"), the underlying intangible collateral to the Tangible Note for Accommodation or Bill of Exchange (hereinafter referred to as the "Tangible Note"). *See (Exhibit A) Quitclaim Deed and (Exhibit B) Deed of Trust.*

13. From 1998 until the financial crash of 2008-2009, over 60 million purported consumer credit mortgage loan transactions were purportedly sold by non-depository payor banks to Special Purpose Vehicles (hereinafter "SPV") via a 26 U.S. Code §1031 – Exchange of property held for productive use or investment.

14. Plaintiff's purported home loan was one of the 60 million scheduled for exchange.

15. Upon information and belief, a §1031 – Exchange is the mechanical transactional scheme whereby a purported Tangible Note is converted/exchanged for a Payment Intangible Asset to provide an alternative investment offering via special deposit to certificate or bond holders which were expected to be relatively safe.

16. These certificates or bonds were offered by Wall Street Firms to the secondary market through purported mortgage backed securities. *See (Exhibit C) OCC Asset Securitization Manual 1997, Pg. 23.*



17. Upon information and belief, certain tax laws known as the Real Estate Mortgage Investment Conduit (hereinafter referred to as "REMIC") Tax Reform Act of 1986 were to be observed, and whereby the non-depository payor banks and issuing entities would be protected from either entity going into bankruptcy. *See (Exhibit D) Real Estate and the Tax Reform Act of 1986.*

18. To achieve the desired "bankruptcy remoteness," purported numerous "True Sales" of Plaintiff's Tangible Note would have had to of occurred by operation of all applicable law.

19. Upon information and belief, there was no "True Sale" of Plaintiff's Tangible Note, a circumstance whereby Regent sold Plaintiff's Tangible Note to the "buyer/seller" Ginnie Mae by way of offer, acceptance, delivery and consideration given for full value of the entire instrument.

20. The Accommodated non-depository payor bank, Regent, purports to have negotiated the Tangible Note obligation to successor defendant Ginnie Mae.

21. Likewise, Regent has unlawfully purported to assign, transfer, or convey account debtor capacity as Accommodated Party to Ginnie Mae, successor and successor defendants in consideration for a service release premium received for Accommodated Party services rendered for Originating the §1031 – Exchange on or before closing date of the GNMA 2011-066 Trust.

22. Upon information and belief, Regent never negotiated the Tangible Note by operation of law for full value to Ginnie Mae.

23. Regent purports to have assigned/transfer a beneficial security interest over the subject property, evidenced by Regent's recorded Deed of Trust lien to successor defendants of the §1031 – Exchange.

24. Regent never negotiated the Tangible Note Bill of Exchange for full value in accordance to all applicable law.

25. At best, Regent delivered a converted and unsecured Tangible Note as "order paper" to Ginnie Mae for settlement for Accommodated Party services rendered associated with

originating the exchange transaction. Therefore, Regent could not negotiate, assign, nor transfer the underlying security intangible beneficial security interest enforcement right over the power of sale covenant in the currently un-perfected Deed of Trust lien encumbering the subject property.

26. As part of the transaction scheme of the §1031 – Exchange, Defendants deployed MERS as an electronic agent under the Constructive Deed of Trust as nominee/beneficiary for each successor Defendant as bailor/bailee to streamline a purportedly hypothecated security interest or "Secret Lien" over the Payment Intangible.

27. MERS only tracks and updates ownership of the Payment Intangible registered with the MERS database software system.

28. MERS cannot transfer the beneficial right to the Tangible Accommodated Note instrument; a legitimate "True Sale" of a Tangible Note instrument can only be transferred by proper negotiation for full value, transfer and delivery. *See (Exhibit E) MERS Procedural Manual and (Exhibit F) MERS Patent.*

29. A payment for **full value of the entire instrument** to Regent from Ginnie Mae for the Tangible Note for Accommodation at or before its maturity date destroys the Tangible Notes negotiability thus, no documents or records can be produced that demonstrate that prior to the May 27, 2011 closing date for the GNMA 2011-066 Trust, the Tangible Note was duly indorsed, transferred and delivered to GNMA 2011-066 Trust.

30. Nor can any documents or records be produced that demonstrate that prior to the May 27, 2011, the Deed of Trust was duly assigned, transferred and delivered to the Trust via the Custodian of Records, Ginnie Mae, including any and all "Secret Liens" purportedly securing the Payment Intangible intervening transfers/assignments.

31. Plaintiffs further allege that any documents that purport to transfer a hypothecated beneficial security interest over the Payment Intangible underlying collateral of the Tangible Note or Bill of Exchange to Trust after the Closing Date May 27, 2011 are void as a matter of law.

32. No security interest in the subject property was perfected in the name of any of the successor defendant to the §1031 - Exchange.

33. The alleged holder of the Tangible Note is not the beneficiary of the Deed of Trust. The alleged beneficiary of the Deed of Trust, MERS, does not have the requisite title, perfected security interest or standing to proceed in a foreclosure; and/or is not the real party in interest as agent or nominee to any action taken or to be taken against the subject property by successor Defendants to the §1031 – Exchange.

34. At all times herein mentioned, any assignment of a Deed of Trust **without proper transfer** of the Tangible Note that it secures is a legal nullity by operation of law.

35. Upon information and belief, the Trust, at all material times herein, had no officers or directors and no continuing duties other than to hold assets and to issue the series of certificates of SPV investments in mortgage backed securities as described in the Prospectus identified herein below.  A detailed description of the purported mortgage loans which form the GNMA 2011-066 Trust is included in Form 424B5 ("the Prospectus"), which has been duly filed with the SEC. *See (Exhibit G) GNMA 2011-066 424B5 Prospectus Supplement.*

https://www.ginniemae.gov/doing_business_with_ginniemae/investor_resources/Prospectuses/ProspectusesLib/2011May20-066.pdf

36. Defendants cannot establish possession, show proper receipt, transfer, negotiation, assignment and ownership of the Tangible Note or Deed of Trust, resulting in imperfect security interests and claims.

37. Therefore, none of the Defendants have perfected any colorable claim of title or security interest in the subject property.

38. Defendants cannot establish that the Deed of Trust, purportedly securing the Tangle Note, was/were legally or acquired properly.

39. Upon information and belief, none of the parties to the §1031 – Exchange transaction, nor any of the Defendants in this case, hold a perfected and secured claim in the subject property; and as a result, Defendants are equitably estopped and precluded from asserting an unsecured claim against the subject property.

40. An actual controversy has arisen and now exists between the Plaintiff and Defendants.

41. Plaintiff thus seeks a judicial determination and declaration of its rights about the subject property and the corresponding Tangible Note and Deed of Trust.

42. Plaintiff also seeks redress from Defendants identified herein for damages and for cancellation of written instruments based upon:

    a. An invalid and unperfected security interest in the subject property;

    b. Void "True Sales;" and

    c. An incomplete and ineffectual perfection of a security interest in the subject property.

## STATEMENT OF PERTINENT FACTS

43. On or about March 14, 2016, Plaintiff had a Forensic Chain of Title Securitization Analysis completed by qualified forensic loan expert Michael Carrigan to verify the claims of this complaint. *See (Exhibit H) Affidavit of Michael Carrigan.*

44. Plaintiff is the recorded owner of the subject property by virtue of QuitClaim Deed. *See (Exhibit A).*

45. Plaintiff was issued an Uncertificated Security to execute in the capacity of (Accommodation Party) to a Tangible Note Bill of Exchange on April 21, 2011 regarding a purported loan to (Accommodated Party) Regent for $121,512.00.

46. Regent is an account debtor Accommodated Party to a §1031 – Exchange of property held for productive use or investment.

47. Upon information and belief, the signatures on the Tangible Note Bill of Exchange instrument as the Accommodation Party constitutes a **statutory capacity as Surety** for the non-depository payor bank, the original Accommodated secured party of record, acting as Trustee/Account Debtor pursuant to a Special Deposit 26 U.S. Code § 1031 – Exchange of property held for productive use or investment.

48. Plaintiff pledged a Constructive Deed of Trust granting legal title to Regent, to file against Plaintiff's superior claim to title, duly filed in the Official Records of the Scottsbluff County Recorder's Office on September 24, 2011 as ins# 916. *See (Exhibit B) Deed of Trust.*

49. The purported Mortgage loan contracts between the parties are specific as to the duties of each party.

50. On November 30, 2015, MERS recorded an Assignment of Deed of Trust in the Scottsbluff County Recorder's Office as ins# 6691.

51. The November 30, 2015 Assignment was executed by Frances Y. King, on behalf of MERS.

52. The authenticity of Frances Y. King's signature is questionable. In fact, the signature of Frances Y. King on the November 30, 2015 Assignment does not match her signature on other, official documents and appears to be robo-signed or forged.

53. There is no record of any document which grants Frances Y. King the authority to execute assignment(s) or any other real estate documents on behalf of MERS.

54. Frances Y. King has never disclosed her true employment status or position with MERS.

55. Upon information and belief, Frances Y. King was not authorized to execute documents on behalf of MERS.

56. The November 30, 2015 Assignment purports to assign all right, title and interest in Plaintiff's Deed of Trust to Planet Home.

57. The November 30, 2015 Assignment occurred approximately four years **after** the Closing Date of the Trust, in violation of the terms of the Trust, and is therefore void as a matter of law.

58. Only the Depositor is the rightful party that can convey the asset into the trust pursuant to investor offering documents as filed with the Securities and Exchange Commission.

59. In spite of the broken chain of title and lack of standing to foreclose, on or about April 5, 2017, Planet Home initiated foreclosure proceedings against the subject property.

60. On May 18, 2017, Planet Home sold the subject property at foreclosure sale.

## COUNT I:

## WRONGFUL FORECLOSURE

61. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

62. An actual controversy has arisen and now exists between Plaintiff and Defendants regarding their respective rights and duties, in that Plaintiff contends that Defendants do not have an equitable right to foreclose on the subject property because Defendants have failed to perfect any security interest in the subject property collateral, and cannot prove to the court they have a valid interest as a real party in interest to the underlying Deed of Trust.   Thus, the purported power of sale, or power to foreclose judicially or non-judicially, by the above specified Defendants, no longer applies.

63. Standing is a fundamental element in a foreclosure action.

64. Plaintiff requests this Court find that the purported power of sale contained in the Deed of Trust is a nullity because Defendants' actions in the processing, handling and attempted foreclosure of this §1031 - Exchange involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of state laws designed to protect borrowers, which has directly caused Plaintiff to be at an equitable disadvantage to Defendants.

65. Plaintiff further requests that title to the subject property remain in Plaintiff's name during the pendency of this litigation, and deem that any attempted sale of the subject property is "unlawful and void."

66. MERS was named the "nominee beneficiary" of the Deed of Trust.

67. MERS lacks/lacked the authority under its corporate charter to foreclose a Deed of Trust, or to own or transfer an interest in a Tangible Note debt obligation because MERS charter limits MERS' powers and duties to functioning as an electronic registration

system of Payment Intangible Chattel Paper Transferable Records as the underlying collateral to the Tangible Note for Accommodation Bill of Exchange.

68. MERS did not have the authority to assign the Deed of Trust to Planet Home.

69. Planet Home thus gained no lawful interest in the subject property.

70. The Assignment from MERS to Planet Home is void as a matter of law.

71. To conduct a foreclosure action and seek possession of real property, a person or entity must have the legal authority to assert said interest.

72. The Tangible Note in this action identifies the entity to whom it accommodated, the Originator.

73. Therefore, the Tangible Note herein could not have been transferred **in an ordinary course of business**; the attachments to the notice of default do not establish that indorsements were made, nor are there any other notices which establish that Tangible Note negotiation was executed properly, nor are there any other notices which establish that the Originator sold the Tangible Note to another party for full value and consideration.

74. It is well established that the assignment of a Deed of Trust does not automatically assign the Tangible Note nor the underlying Payment Intangible Transferrable Record as the security interest is incident of the Tangible Note debt obligation.

75. A party asserting an interest in real property must be able to prove their capacity of holder of the Tangible Note as one with rights acquired to perfect the transfer of enforcement contract rights to the Deed of Trust instrument as collateral for a Tangible Note debt obligation.

76. Without proper negotiation and physical transfer, the "true sale" of the Tangible Note is invalid as a fraudulent conveyance.

77. MERS failed to submit documents authorizing MERS, as nominee beneficiary for the Originator, to assign the subject Deed of Trust to the SPV Trustee Planet Home.

78. Hence, MERS lacked authority as mere nominee beneficiary to assign the Deed of Trust, making any assignment from MERS void, as opposed to voidable.

79. Any attempt to transfer the beneficial interest of a trust deed without actual ownership of the underlying Tangible Note attached together in one with the underlying Payment Intangible Transferable Record, is void and not voidable under state and federal law.

80. Therefore, MERS cannot establish that it is/was entitled to assert a claim on the subject property.  For this reason, as well as the other reasons set forth herein below, MERS cannot transfer an interest in the subject property, and cannot recover anything from Plaintiff.

81. Defendants through the actions alleged above, claim the right to illegally commence foreclosure sale of the subject property under the Deed of Trust via an *in Rem* action supported by false or fraudulent documents.

82. Said unlawful foreclosure action has caused and continues to cause Plaintiff great and irreparable injury in that the subject property is unique and the homestead for Plaintiff and his family.

83. Defendants' wrongful conduct, unless restrained and enjoined by an Order of the Court, will continue to cause great and irreparable harm to Plaintiff.

84. Plaintiffs will not have the beneficial use and enjoyment of the Home and will lose the subject property.

85. Defendants knew, or should have known, that their asserted claims and interests in the subject property were fraudulent.

86. Defendants knew, or should have known, that the Assignment from MERS to Planet Home was void as a matter of law.

87. Defendants knew, or should have known, that Planet Home did not have a legal and equitable interest in the property at the time it initiated foreclosure proceedings.

88. Defendants knew, or should have known, that Planet Home lacked the requisite standing to foreclose on the subject property.

89. Defendants knew, or should have known, that Planet Home had no authority to sell the subject property at foreclosure sale to the highest bidder.

90. As a result of Defendants' willful conduct, Plaintiff has been emotionally and financially damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.


### COUNT II:
### FRAUDULENT CONCEALMENT

**(Against Defendant Regent Financial Group, Inc.)**

91. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

92. Regent concealed the fact that they were not a Federal Reserve Depository Bank.

93. The purported lender claims to have accepted by negotiation the issuer Plaintiff's negotiable instrument as debtor in a deposit account; Regent furthered their deception by

purporting to give consideration for an instrument Defendants purport to Plaintiff's issued Negotiable Instrument in the form of real money executing an underlying obligation (indebtedness) between the parties to the purported contract.

94. In or around 2011, Regent concealed in the presentation of the terms of the Mortgage contract a cross acceptance of which Plaintiff, the issuers of the negotiable instrument, would accept ownership of the real property collateral evidenced by the Warranty Deed for executing an accommodation negotiable instrument and pledged security agreement on behalf of Regent, the Accommodated Party, for the purpose of a material variation to the purported contract in which Plaintiff would be acting as a *Guarantor* for Regent to use Plaintiff's accommodation parties' promise to put the accommodated into funds as surety and a personal property security interest in Plaintiffs' pledged security instrument as collateral to secure their account debtor status for the purpose of a §1031 – Exchange (table funded) transaction for a service release premium shortly after the closing of the purported loan.

95. Regent concealed the fact that it acts as a third-party sponsor bank warehouse lender as well as material terms of Securitization Agreements including, *inter alia*: (1) Financial Incentives paid; (2) existence of Credit Enhancement Agreements, and (3) existence of Acquisition Provisions. By concealing the securitization, the true character of the purported loan in this way had a materially negative effect on Plaintiff that was known by Regent and yet not disclosed.

96. Regent knew or should have known that there was no meeting of the minds between Plaintiff and Regent regarding the true capacity of the parties and material facts of the

purported loan and that most importantly, it created no indebtedness underlying obligation between the Defendants and other parties to the §1031 – Exchange.

97. Regent knew or should have known that had the truth been disclosed, Plaintiff would not have pledged a security agreement to Regent.

98. Misleading partial disclosures, however, may constitute affirmative fraud, see *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 288 (Minn.1992), and fraudulent concealment, see *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 (8th Cir.1999) (discussing independent tort of fraudulent concealment).

99. Regent had a duty to fully disclose the true capacity of the parties and material facts of the purported loan.

100.    Regent failed in its duty to fully disclose the aforementioned to Plaintiff. *Haberle v. Buchwald*, 480 N.W.2d 351, 357 (Minn.Ct.App.1992) ("Central to the concept of fraud is a knowing and intentional statement, act, or refusal to act where a duty to act lies." (quoting trial court).

101.    Regent intended to induce Plaintiff based on these material misrepresentations and improper disclosures.

102.    Plaintiff's reasonable reliance upon the misrepresentations was detrimental. But for Regent's failure to disclose the true and material terms of the transaction, Plaintiff could have been alerted to issues of concern. Plaintiff would have known of Regent's true intentions and profits from the proposed purported loan. Plaintiff would have known that the actions of Regent would have an adverse effect on the value of the subject property by clouding the title.

103.     Regent's failure to disclose the material terms of the transaction induced Plaintiff to enter the §1031 – Exchange purported loan and accept the Services as an Accommodated Party.

104.     Regent was aware of the misrepresentations and profited from them.

105.     As a direct and proximate result of the misrepresentations and concealment, Plaintiff was damaged in an amount to be proven at trial, including but not limited to costs of the loan, damage to Plaintiff's financial security, emotional distress, and Plaintiff's incurred costs and attorney's fees.

106.     Regent's actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such, Plaintiffs are entitled to recover in addition to actual damages, punitive damages to punish Regent and to deter it from engaging in future misconduct.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Regent in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.


## COUNT III:
## FRAUDULENT MISREPRESENTATION (As to all Defendants)

107.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

108.     From 2011 through the present date, Defendants intentionally misrepresented to Plaintiff that Defendants were entitled to exercise the power of sale provision contained

in the Deed of Trust. In fact, Defendants were not entitled to do so and have no legal, equitable, or actual beneficial interest whatsoever in the subject property.

109.     From 2011 through the present date, Defendants intentionally misrepresented that they are the "holder and owner" of the Tangible Note and the beneficiary of the Deed of Trust. However, this was not true and was a misrepresentation of material fact.

110.     Documents state that the Originator allegedly sold the mortgage loan instrument to Trust.

111.     Defendants are attempting to collect on an intangible debt obligation via the §1031 – Exchange to which they have no legal, equitable, or pecuniary interest relating to the subject property.

112.     Defendants are fraudulently foreclosing on the subject property which they have no monetary or pecuniary interest, and are doing so with unclean hands.

113.     Defendant's failure to disclose the material terms of the transaction induced Plaintiff to enter the §1031 – Exchange and accept the Accommodated Services as alleged herein.

114.     The material misrepresentations were made by Defendants with the intent to cause Plaintiff to reasonably rely on the misrepresentation to induce Plaintiff to submit to the foreclosure on the subject property as opposed to recovering from predecessors in the § 1031 – Exchange on the Payment Intangible Obligation.

115.     Defendants were aware of the misrepresentations and profited from them.

116.     In order to maintain an action for fraudulent misrepresentation, a plaintiff must allege the following elements: (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or

made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that the plaintiff suffered damage as a result. *Cao v. Nguyen*, 258 Neb. 1027, 1031, 607 N.W.2d 528, 532 (2000).

117.    As a direct and proximate result of the false representations made by Defendants, Plaintiff was damaged in an amount to be proven at trial, including but not limited to costs of the loan, damage to Plaintiff's financial security, emotional distress, and Plaintiff's incurred costs and attorney's fees.

118.    Defendants' actions were malicious and done willfully in conscious disregard of the rights and safety of Plaintiff in that the actions were calculated to injure Plaintiff. As such Plaintiffs are entitled to recover in addition to actual damages, punitive damages to punish Defendants and to deter them from engaging in future misconduct.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Regent in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.

## COUNT IV:
## UNCONSIONABLE CONTRACT
### (Against Defendant Regent Financial Group, Inc.)

119.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

120.    The actions of Defendants as set forth herein, resulted in Plaintiff being forced, tricked, and mislead into parting with their property.

121.     Regent presented, in the origination of the purported loan, that specific criteria such as FICO score and other industry standard underwriting requirements must be met to qualify for a loan of money for the subject property from Regent.

122.     Regent presented, in the origination of the purported loan, that a preliminary signature on the Mortgage loan contract was required to "lock in" an interest rate regarding the terms of the purported loan.

123.     Regent failed to clarify in the terms of the Mortgage loan contract that Regent, the Originator on the contract, was in fact acting solely in the capacity as Accommodated Party account debtor beneficiary for a purported loan of money.

124.     Regent concealed they were financially benefitting by bargaining with a third party to acquire a service release premium via wire funds transfer to table fund the purported loan at the closing using a warehouse line of credit.

125.     Regent knew or should have known that through a consciousness of innocence Plaintiff was at a special disadvantage when attempting to grant an alternate means of collection via the Security Instrument real property lien Mortgage to Regent.

126.     Regent intended to exploit Plaintiff's special disadvantage and deny Plaintiff's superior rights to the subject property.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Regent in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.


**COUNT V:**
**BREACH OF CONTRACT**
**(Against Defendants Regent Financial Group, Inc. and MERS)**

127.     Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

128.     The terms of the mortgage contract, via the Deed of Trust, are clear.

129.     Pursuant to paragraph 23 – Release, Regent and MERS, their electronic agent, were obligated to satisfy, release and reconvey the beneficial security interest in Plaintiff's pledged Deed of Trust upon payment of all sums associated with the release premium to Regent for Accommodated Party services rendered.

130.     Regent was paid in full for their Accommodated capacity to the Tangible Note and Deed of Trust when it sold and relinquished its interest in the subject property to Depositor.

131.     Regent failed to satisfy, release and reconvey the security instrument, thus breaching the terms found in paragraph 23 of the Deed of Trust.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Regent and MERS in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.

## COUNT VI:
## BREACH OF FIDUCIARY DUTY

132.     Plaintiff re-alleges and incorporates herein by reference all previous paragraphs as though fully set forth herein.

133.     Defendants failed to disclose to Plaintiff that they were not the legitimate creditor but more accurately, were account debtors in the accommodated table funded 26 U.S.

Code § 1031 – Exchange of property held for productive use or investment to GNMA 2011-066.

134.    Regent, as beneficiary under the Mortgage having only an Accommodated personal property interest over the collateral failed to meet their fiduciary duty to satisfy, release and reconvey the Real Property Lien Deed of Trust and the beneficial security interest (personal property) therein after receiving payment for all sums represented as the service release premium.

135.    After April 21, 2011, and unknown to Plaintiff, Regent, for payment rendered through a service release premium, divested itself of their capacity under Accommodated Note but did not comply with the covenants of the Deed of Trust specifically, Covenant 23 – Release.

136.    Regent's acting not in the best interest of the grantor of the Deed of Trust failed to adhere to their Fiduciary Duties.

137.    Regent was to satisfy, release and reconvey the security instrument allowing Plaintiff to maintain clear and marketable title.

138.    Because of their failure to comply with the Mortgage, Defendants caused a cloud on Plaintiff's superior claim to title.

139.    Defendants owed a duty to be truthful to Plaintiff.

140.    Defendants failed in their duty to be truthful to Plaintiff.

141.    Defendants owed a duty to not make false representations concerning the terms of the Mortgage encumbering the subject property.

142.    Defendants failed in their duty by making several material misrepresentations of fact detrimental to Plaintiff.

143.     Defendants owed a duty to Plaintiff to not assert any interest or right in the subject property without proper authority to do so.

144.     Defendants failed in their duty by causing Planet Home to wrongfully foreclose, when it knew, or should have known, that Planet Home had no secured interest in the subject property.

145.     Defendants' breaches of fiduciary duty were intentional.

146.     Defendants' breaches of fiduciary duty were done solely for the purpose of their own material and monetary benefit.

147.     Defendants' breaches of fiduciary duty were detrimental to Plaintiff.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.


## COUNT VII:
## QUIET TITLE

148.     Plaintiff re-alleges and incorporates herein by reference all previous paragraphs as though fully set forth herein.

149.     "A quiet title action sounds in equity." *Rush Creek Land & Live Stock Co. v. Chain*, 255 Neb. 347, 586 N.W.2d 284 (1998).

150.     Defendants named herein claim an equitable interest and estate in the subject property adverse to Plaintiff in that Defendants assert it is the owner of the note secured by the Deed of Trust to the property the subject of this suit.

151.     Defendants named herein claim an interest and estate in the subject property

adverse to Plaintiff in that Defendants assert to be the owner of Tangible Note secured by the Deed of Trust to the subject property.

152.     The "purpose of [a quiet tile] action is to obtain complete determination of question of title between parties." *Dolen v. Black*, 48 Neb. 688, 67 N.W. 760 (1896).

153.     An actual controversy exists between Plaintiff and Defendants as to who has the legal and equitable right to assert an interest in the subject property.

154.     Defendants' claims to interest in the subject property are without any legal right whatsoever, and Defendants have no estate, title, lien or interest in or to the subject property, or any part of the subject property construed and hypothecated as "After Acquired Collateral" the Intangible Payment transferable record to the §1031 - Exchange.

155.     Defendants' claims constitute a cloud on Plaintiff's title to the subject property.

156.     None of the parties to the §1031 - Exchange transaction, nor any of the Defendants in this case hold a perfected and secured claim in the subject property.

157.     Defendants are estopped and precluded from asserting an unsecured claim against the subject property.

158.     Accordingly, Plaintiff requests a judicial decree which would permanently enjoin Defendants and all persons claiming under them, from asserting any adverse claim to Plaintiff's title to the property.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment quieting title in Plaintiff's name and award Plaintiff any other relief deemed just and proper.


## COUNT VIII:
## INFLICTION OF EMOTIONAL DISTRESS (As to all Defendants)

159.    Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

160.    Defendants' willful conduct, as more particularly described in this Complaint, has caused Plaintiff emotional harm.

161.    Defendants' conduct was willful and intentional.

162.    Under Nebraska law, a plaintiff must prove the following elements to make out a claim for intentional infliction of emotional distress: (1) intentional or reckless conduct; (2) so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community; (3) that caused emotional distress so severe that no reasonable person should be expected to endure it. *Schieffer v. Catholic Archdiocese of Omaha*, 244, Neb. 715, 718, 508 N.W.2d 907, 910 (1993).

163.    Plaintiff has suffered severe emotional distress over the past several years due to the conduct of Defendants.

164.    Plaintiff is in constant fear of losing his home, which has only exasperated his emotional distress.

165.    Defendants knew, or should have known, that their conduct would cause Plaintiff emotional distress.

166.    Defendants knew, or should have known, that their conduct was so outrageous that it goes beyond all bounds of decency.

167.    Defendants' conduct was done solely for the purpose of material and monetary benefit and to the detriment of Plaintiff.

168.     It is intolerable in a civilized society for a non-party to assert a claim in interest in real property.

169.     Defendants have done so anyway.

170.     It is intolerable for a party who has no claim or right to claim an interest in real property to foreclose and seek possession of real property.

171.     Defendant Planet Home has done so anyway.

172.     As a direct result of Defendants' outrageous conduct, Plaintiff has been emotionally and financially damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants in an amount of damages to be determined at trial of at least $75,000.00 and award Plaintiff any other relief deemed just and proper.

## COUNT IX:
## DECLARATORY RELIEF
## UNDER THE DECLARATORY JUDGMENT ACT
## (28 U.S.C.A. § 2201)

173.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

174.     The Declaratory Judgment Act is remedial in nature, and "It was the congressional intent to avoid accrual of avoidable damages to one **not certain of his**

**rights**..." *E. Edelmann & Co. v. Triple-A Specialty Co.*, 88 F.2d 852, 854, cert. denied, 300 U.S. 680, 57 S.Ct. 673, 81 L.Ed. 884 (7th Cir. 1937). (emphasis added).

175.     Additionally, The Declaratory Judgment Act is intended to provide a convenient method for affording relief from uncertainty and insecurity when the rights and liabilities of parties stand contingent or in abeyance, as is the case here.

176.     An actual controversy has arisen and now exists between Plaintiff and Defendants specified hereinabove regarding the respective rights and duties in the subject note and security instrument.

177.     As such, Plaintiff requests a judicial determination of the rights, obligations and interest of the parties regarding the subject property, and such determination is necessary and appropriate under the circumstances so that all parties may ascertain and know their rights, obligations and interests regarding the subject property.

178.     Plaintiff should be deemed the equitable owner of the subject property.

179.     Plaintiff seeks a judicial declaration that the title to the subject property is vested in Plaintiff alone and that the Defendants be declared to have no interest estate, right, title or interest in the subject property and that the Defendants, their agents and assigns, be forever enjoined from asserting any estate, right title or interest in the subject property subject to Plaintiff's rights.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter a declaratory judgment quieting title in Plaintiff's name, declaring that Defendants have no interest estate, right, title or interest in the subject property and award Plaintiff any other relief deemed just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff further demands a trial by jury on all triable issues herein.


Dated: October ___30___, 2017.          Respectfully submitted,


_____
Ed Teague, II
Pro Se Plaintiff
635 Highway 26, E.
Morrill, NE 69358

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ED TEAGUE, II

### DEFENDANTS

REGENT FINANCIAL GROUP, INC.; GINNIE MAE; GINNIE MAE, as trustee; FLAGSTAR BANK; MERS; and PLANET HOME LENDING

**(b)** County of Residence of First Listed Plaintiff   SCOTTSBLUFF
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   DOUGLAS
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
PRO SE.
635 HIGHWAY 26 EAST
MORRILL, NE 69358

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
IN PART (28 USC 2201) - DECLARATORY JUDGMENT ACT.
Brief description of cause:
WRONGFUL FORECLOSURE, BREACH OF CONTRACT, FRAUD, INFLICTION OF EMOTIONAL DISTRESS

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE   N/A                DOCKET NUMBER

DATE
10-30-17

SIGNATURE OF ATTORNEY OF RECORD
ED TEAGUE, II

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# EXHIBITS TO COMPLAINT

Exhibit A:     Quit Claim Deed

Exhibit B:     Deed of Trust

Exhibit C:     OCC Asset Securitization Manual, Pg. 23

Exhibit D:     Real Estate and the Tax Reform Act of 1986

Exhibit E:     MERS Procedural Manual

Exhibit F:     MERS Patent

Exhibit G:     REMIC 424B5 Prospectus Supplement

Exhibit H:     Certified Forensic Audit by Michael Carrigan

Exhibit I:     Special Purpose Vehicle Patent
               http://www.freepatentsonline.com/y2003/0105713.html

# Exhibit A

2017-5348

NEBRASKA DOCUMENTARY
STAMP TAX
Date  10-13-2017
$267.75  By  J. Bauer

RECORDED
SCOTTS BLUFF COUNTY, NE

Date 10-13-17  Time 4:18 pm
**INST.** 2017 **5348**
Jean A. Bauer

REGISTER OF DEEDS

NUM PAGES  3
DOC TAX  267.75  PD ✓  CHG ____  RET ____
FEES  22.00  PD ✓  CHG ____  RET ____
TOTAL  289.75 CR
REC'D  Ed Teague II
RET  Ed Teague II call for
pick up

COMPUTER  C H
PICTURED  C
IMAGED ____

# THIS PAGE INCLUDED FOR INDEXING PURPOSES

**INST.** 2017 **5348**

After Recording Return to:  )
Ed Teague  )
635 Highway 26 East  )
Morrill. Nebraska [69358]  )

*THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY*

## Quit Claim Deed

    This QUITCLAIM deed, executed this *1st* day of *October*, 2017, by the Grantor LIGHTING THE PATH CHRISTIAN TRUST, whose mailing address is Post Office Box 658 Torrington Wyoming [82240] to the Grantee, Ed Teague whose mailing address is 635 Highway 26 East, Morrill, NE 69358. It is agreed by both GRANTOR AND GRANTEE that this transfer will also act in the form of a rescission of INST. 2016 6971 filed on December 23, 2016 and INST. 2017 231 filed January 13, 2017 with the SCOTTS BLUFF COUNTY REGISTER OF DEEDS rendering both void nunc pro tunc as agreed by both parties.

    WITNESSETH. That the said Grantor for good consideration and for the sum of $ 10.00  paid, by the said Grantee, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the said Grantee forever, all the right, title, interest and claim which the said Grantor has in and to the following described parcel of land, and improvements and appurtenances thereto in the County of Scottsbluff, Nebraska to wit:

    Being known and designated as Government Lot 6 in Section 3, Township 23 North, Range 58 West of the 6th P.M., Scotts Bluff County, Nebraska, lying North of the Right-of-Way of the Chicago, Burlington, and Quincy Railroad as now laid out, EXCEPT a tract of land more particularly described as follows:

    Beginning at the center of Section 3 and extending thence in a Northwesterly direction along the Right-of-Way of State Highway Number 26 a distance of 726 feet, thence in a Northeasterly direction. 518 Feet to a point that is 817 feet North of the point of beginning, thence south 817 feet to the point of beginning: AND EXCEPT those parts deeded to the State of Nebraska in Book "30", of Deeds, Page 41 and in Book "86", of Deeds, Page 49, AND EXCEPT that part conveyed to the State of Nebraska Department of Roads as shown by a Warranty Deed recorded February 9, 2009 as Instrument No. 2009-564 all the records of Scotts Bluff County, Nebraska. (a/k/a Tax Lot 8)

IN WITNESS WHEREOF, The said Grantee has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in presence of:

*Edgar: Teague, II*

Edgar. Teague, II. as Trustee, Grantor
LIGHTING THE PATH CHRISTIAN TRUST

*Ed. Teague*

Ed Teague, Grantee

### ACKNOWLEDGEMENT

Nebraska State       }
                  } ss.
Scotts Bluff County  }

    On this *13th* day of *Oct.*, 2017, before me, the undersigned officer, personally appeared *Edgar Teague II* and *Ed Teague*  who satisfactorily proven to me to me to be the persons whose names is subscribed to within the instrument and acknowledged that they executed the same, for the purposes

Page 1 of 2

INST. 2017 5348

therein contained.

In witness hereof I hereunto set my hand and official seal

PRINT NAME                          *Notary Public*

Commission Expiration March 25, 2018

GENERAL NOTARY - State of Nebraska
FAITH A. CANTU
My Comm. Exp. March 25, 2018

# Exhibit B

2011-916

NUM PAGES 10
DOC TAX $0.00       CHG
FEES    $50.50      CHG
TOTAL   $50.50
REC'D  Thalken Title Co.
RET

NUM INDEX _____
COMPUTER _____
PICTURED _____
IMAGED _____

RECORDED
SCOTTS BLUFF COUNTY, NE

Date Feb 24, 2011 Time 10:57 AM

Inst. 2011-916

_Jean A. Bauer_

REGISTER OF DEEDS
ELECTRONICALLY RECORDED

After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-531-1

V2 WBCD LOAN # 502867920

———————— [Space Above This Line For Recording Data] ————————

## DEED OF TRUST

MIN 100052550286792063

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated FEBRUARY 22, 2011,         together with all Riders to this document.
(B) "Borrower" is Ed Teague and Dianna L Shoults, husband and wife..

Borrower is the trustor under this Security Instrument.
(C) "Lender" is REGENT FINANCIAL GROUP INC.

Lender is a CORPORATION                                        organized and existing
under the laws of NEBRASKA.                                     Lender's address is
1910 S 72ND ST, 103, OMAHA, NE  68124.

(D) "Trustee" is ~~THALKEN TITLE CO.~~    Jacob Mueller, Attorney at Law

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated FEBRUARY 22, 2011.       The Note states that Borrower owes Lender *****ONE HUNDRED TWENTY ONE THOUSAND FIVE HUNDRED TWELVE AND NO/100************************************** Dollars (U.S.  $121,512.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than MARCH 1, 2041.

NEBRASKA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.              Page  1  of 9

Initials: _ET_ _DS_
NEEDEED 0705
02-22-2011 13:12

2011-916

V2 WBCD LOAN # 502867920

(G) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Other(s) [specify]
☐ 1-4 Family Rider ☐ Biweekly Payment Rider
☐ V.A. Rider

(J) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "**Escrow Items**" means those items that are described in Section 3.
(N) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the   COUNTY
[Type of Recording Jurisdiction] of   SCOTTS BLUFF                                  [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF
APN #: 010074473

which currently has the address of   635 HIGHWAY 26 E, MORRILL,

                                                                                                    [Street] [City]
Nebraska    69358-7000    ("Property Address"):
              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

NEBRASKA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01                    Initials: ____
© 1999-2007 Online Documents, Inc.                    Page 2 of 9                              NEE DEED 0706
                                                                                                    02-22-2011 13:12

2011-916

V2 WBCD LOAN # 502867920

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender

NEBRASKA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.                      Page 3 of 9

Initials: CD  NS
NEEDEED  0705
02-22-2011 13:12

2011-916

V2 WBCD LOAN # 502867920

shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal

NEBRASKA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.                    Page  4  of  9

Initials: ____

NEEDEED 0705
02-22-2011 13:12

2011-916

V2 NBCD LOAN # 502867920

residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's

NEBRASKA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.                           Page 5 of 9

Initials: [signature]
NEEDEED  0705
02-22-2011 13:12

2011-916

V2 NBCD LOAN # 502867920

risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

NEBRASKA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.                    Page 6 of 9

Initials:

NEEDEED  0705
02-22-2011 13:12

2011-916

V2 WBCD LOAN # 502867920

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other

NEBRASKA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.                    Page 7 of 9

Initials: ___

NEEDEED  0705
02-22-2011 13:12

2011-916

V2 NBCD LOAN # 502867920

information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the power of sale is invoked, Trustee shall record a notice of default in each county in which any part of the Property is located and shall mail copies of such notice in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Upon receipt of payment of the price bid, Trustee shall deliver to the purchaser Trustee's deed conveying the Property. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of exercising the power of sale, and the sale, including the payment of the Trustee's fees actually incurred and reasonable attorneys' fees as permitted by Applicable Law; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to re-convey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

NEBRASKA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.                    Page   8   of   9

Initials: [signature]
NEEDEED  0705
02-22-2011 13:12

2011-916

V2 WBCD LOAN # 502867920

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Request for Notices.** Borrower requests that copies of the notice of default and sale be sent to Borrower's address which is the Property Address.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ED TEAGUE

_____ (Seal)
Dianna L Shoults

State of **NEBRASKA**
County of **SCOTTS BLUFF**

The foregoing instrument was acknowledged before me this 22nd day of February 2011
by Ed Teague and Dianna L Shoults, husband & wife

_____
(name of person acknowledged).

_____
(Signature of Person Taking Acknowledgement)

_____
(Title or Rank)

GENERAL NOTARY - State of Nebraska
SHERIAN K. TAYLOR
My Comm. Exp. April 7, 2012

_____
(Serial Number, if any)

NEBRASKA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3028 1/01
© 1999-2007 Online Documents, Inc.          **Page   9   of   9**

NEEDEED  0705
02-22-2011 13:12

2011-916

## EXHIBIT "A"

All that part of Government Lot 6 in Section 3, Township 23 North, Range 58 West of the 6th P.M., Scotts Bluff County, Nebraska, lying North of the Right-of-Way of the Chicago, Burlington and Quincy Railroad as now laid out, EXCEPT a tract of land more particularly described as follows:

Beginning at the center of Section 3 and extending thence in a northwesterly direction along the Right-of-Way of State Highway Number 26 a distance of 726 feet, thence in a northeasterly direction, 518 feet to a point that is 817 feet north of the point of beginning, thence south 817 feet to the point of beginning; AND EXCEPT those parts deeded to the State of Nebraska in Book "30", of Deeds, Page 41 and in Book "86", of Deeds, Page 49, AND EXCEPT that part conveyed to the State of Nebraska Department of Roads as shown by a Warranty Deed recorded February 9, 2009 as Instrument No. 2009-564 all of the records of Scotts Bluff County, Nebraska. (a/k/a Tax Lot 8)

## EXHIBIT "A"

Page 1 of 1

# Exhibit C

that are insulated from third-party risk and have higher rated subordinated classes because of the credit-wrap. The objective from an issuer's viewpoint is to find the most practical and cost-effective method of providing the credit protection necessary for the desired credit rating and pricing of the security.

Most securities also contain performance-related features designed to protect investors (and credit enhancers) against portfolio deterioration. These "performance triggers" are designed to increase the spread account available to absorb losses, to accelerate repayment of principal before pool performance would likely result in losses to investors, or both. The first (most sensitive) triggers typically capture excess spread within the trust (either additions to existing spread accounts or a separate reserve fund) to provide additional credit protection when a portfolio begins to show signs of deterioration. If delinquencies and loss levels continue to deteriorate, early amortization events may occur. Early amortization triggers are usually based on a three-month rolling average to ensure that amortization is accelerated only when performance is consistently weak.

The originator or pool sponsor will often negotiate with the rating agencies about the type and size of the internal and external credit enhancement. The size of the enhancement is dictated by the credit rating desired. For the highest triple-A rating, the rating agencies are likely to insist that the level of protection be sufficient to shield cash flows against circumstances as severe as those experienced during the Great Depression of the 1930s.

## Issuing Interests in the Asset Pool

On the closing date of the transaction, the receivables are transferred, directly or indirectly, from the seller to the special-purpose vehicle (trust). The trust issues certificates representing beneficial interests in the trust, investor certificates, and, in the case of revolving asset structures, a transferor (seller) certificate.

### Investors' Certificate

The investor certificates are sold in either public offerings or private placements, and the proceeds, net of issuance expenses, are remitted to the seller. There are two main types of investor interests in securitized assets — a discrete interest in

# Exhibit D

## General Explanation of the Tax Reform Act of 1986, Pub. L. 99-514; 99th Cong., H.R. 3838 (JCS-10-87)

Transfers of intangibles to related parties (sec. 1231 of the Act and secs. 367, 482, and 936 of the Code) *fn16 Prior Law and Background In general* A U.S. taxpayer may transfer intangible property or rights to use such property to a related corporation that is not subject to current U.S. tax because the related corporation is a foreign corporation or an electing section 936 corporation. (Foreign corporations generally are not subject to U.S. tax unless they receive U.S. source income or have a U.S. business; special rules are provided for electing section 936 corporations that allow them generally not to pay U.S. tax). Various provisions of the Code have attempted to limit the ability to obtain deferral or effective exemption of income attributable to the intangible by shifting the income from a U.S. taxpayer to a related entity not subject to U.S. tax.

### Section 482

A related party license or sale of rights to use property is generally subject to the provisions of section 482 of the Code. That section authorized the Treasury Department to allocate income among related parties as necessary to prevent the evasion of taxes or clearly to reflect the income of such parties. Treasury Regulations under section 482 have interpreted this provision by attempting to determine what an arm's length charge between unrelated parties would have been. Following this approach, the regulations have provided that appropriate allocations of income to reflect an "arm's length" consideration may be made if intangible property is transferred on other than arm's length terms. To determine an arm's length consideration, the regulations have looked to comparable transactions where they exist, and particularly to transfers by the same transferor to unrelated parties involving the same or similar property under the same or similar circumstances. Where a sufficiently similar transaction with unrelated parties cannot be found, prevailing rates in the industry and bids of other parties, as well as prospective profits to the transferee, are among the factors that may be considered under the regulations. None of the factors has been accorded special emphasis. Depending on the circumstances, an arm's length consideration may have taken the form of a stated royalty or lump sum payment. Other methods of allocation could also be appropriate, depending on the circumstances.

### Section 367

Where the U.S. taxpayer does not transfer the right to use the intangible to its foreign affiliate in the form of a license or sale, but rather as a transfer of the ownership of the intangible through a contribution to capital, the transfer is subject to section 367. Under that section, transfers of appreciated property, including intangibles, to related foreign corporations by a contribution to capital or similar transaction that would be tax free if made to a U.S. corporation were prior to 1984 generally treated as taxable sales where the transfer had as one of its principal purposes the avoidance of U.S. tax.

The Internal Revenue Service took the position that transfers to foreign corporations of patents, trademarks and similar intangibles for use in connection with a U.S. trade or business, or for use in connection with manufacturing for sale or consumption in the United States, generally had tax

avoidance as a principal purpose and would be subject to a "toll" charge under section 367. Rev. Proc. 68-23, 1968-1 C.B. 821. By negative implication, transfers for use purely in connection with a foreign trade or business or manufacturing might have been viewed as nontaxable. In response to the substantial tax advantages available to taxpayers if they could transfer intangibles to related foreign corporations without a toll charge, as a contribution to capital without the payment of any royalty or any allocation of income, Congress amended section 367(d) in 1984 to provide that except as provided in regulations, a transfer of intangibles to a foreign corporation as a contribution to capital under section 351 or in a reorganization under section 361 would be treated as a sale of the intangibles. Intangibles for this purpose include any (1) patent, invention, formula, process, design, pattern, or know-how, (2) copyright, literary, musical, or artistic composition, (3) trademark, trade name, or brand name, (4) franchise, license, or contract, (5) method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data, or (6) any similar item, which property has substantial value independent of the services of any individual. Section 367(d) has provided that the amounts included in income of the transferor on such a transfer must reasonably reflect the amounts that would have been received under an agreement providing for payments contingent on productivity, use, or disposition of the property. In general, the amounts are treated as received over the useful life of the intangible property on an annual basis. Thus, a single lump-sum payment, or an annual payment not contingent on productivity, use or disposition, cannot be used as the measure of the appropriate transfer price. Any amounts included in gross income by reason of this special rule are treated as ordinary income from sources within the United States. Section 367 does not apply to transfers to possessions corporations under section 936 because such corporations are U.S. rather than foreign corporations.

## Section 936

Because possessions corporations qualifying for the section 936 tax credit are U.S. rather than foreign corporations, section 367 has not applied to transfers of intangibles to possessions corporation by the their U.S. affiliates. Prior to statutory changes made in the 1982 Act, the appropriate treatment of transfers of intangibles to possessions corporations in the form of contributions to capital was not clear. Some taxpayers took the position that such transfers of intangibles could be accomplished without the payment of any consideration or any allocation of income to the U.S. transferor. The Internal Revenue Service challenged this treatment in a number of cases involving transfers of intangibles to possessions corporations that performed manufacturing functions using the intangibles and sold the products back to U.S. affiliates. The Service argues that these transactions in reality constituted contract manufacturing arrangements. Thus, it contends that the income attributable to the transferred intangible should be allocated entirely to the parent under section 482, with the possessions corporation retaining only a return on its manufacturing operations. In the one case decided on this question at the time of the Act, *Eli Lilly and Company and Subsidiaries,* 84 T.C. 996 (1985), the tax court took an intermediate position. While it noted the absence of any royalty or other payment for the intangible, it did not conclude that under the particular facts such a payment would be mandatory. However, on examination of the entire transaction, the court concluded that, taking into account the prices charged on sales of goods back to the U.S. parent, the allocation of income to the parent was too low and that a substantial portion of the profit from the goods manufactured and sold by the possessions corporation should be allocated to the U.S. parent.

If the cost-sharing option is elected, the possessions corporation is treated as the owner of the intangible. However, the principles of section 482 apply in determining the proper selling price of products it produces and sells to its mainland or other affiliate. The principles of section 482 also apply in distinguishing amounts that are attributable to marketing intangibles (such as trademarks, trade names, or corporate knowledge of and contacts with the marketplace) from amounts that are attributable to manufacturing intangibles (such as patents or know-how). *Reasons for Change* There was a strong incentive for taxpayers to transfer intangibles to related foreign corporations or possessions corporations in a low tax jurisdiction, particularly when the intangible has a high value relative to manufacturing or assembly costs. Such transfers could result in indefinite tax deferral or effective tax exemption on the earnings, while retaining the value of the earnings in the related group. Congress was concerned that the provisions of sections 482, 367(d), and 936 that allocate income to a U.S. transferor of intangibles may not have been operating to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles in these situations. Many observers have questioned the effectiveness of the "arm's length" approach of the regulations under section 482. A recurrent problem is the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables. A fundamental problem is the fact that the relationship between related parties is different from that of unrelated parties. Observers have noted that multinational companies operate as an economic unit, and not "as if" they were unrelated to their foreign subsidiaries. In addition, a parent corporation that transfers potentially valuable property to its subsidiary is not faced with the same risks as if it were dealing with an unrelated party. Its equity interest assures it of the ability ultimately to obtain the benefit of future anticipated or unanticipated profits, without regard to the price it sets. The relationship similarly would enable the parent to adjust its arrangement each year, if it wished to do so, to take account of major variations in the revenue produced by a transferred item. The problems have been particularly acute in the case of transfers of high-profit potential intangibles. Taxpayers may have transferred such intangibles to foreign related corporations or to possessions corporations at an early stage, for a relatively low royalty, and taken the position that it was not possible at the time of the transfers to predict the subsequent success of the product. Even in the case of a proven high-profit intangible, taxpayers frequently have taken the position that intercompany royalty rates may appropriately be set on the basis of industry norms for transfers of much less profitable items. Certain judicial interpretations of section 482 have suggested that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing Because of the substantial uncertainty in the area and because it considered the tax advantages claimed by certain taxpayers to be excessive, Congress amended section 936 in 1982 to provide specific rules for the allocation of intangibles income between a possessions corporation and a related entity that transfers intangibles to, or allows their use by, the possessions corporation. Generally, all income attributable to the intangible is taxed directly to the U.S. shareholders unless one of two specified options is elected. One option is a 50/50 profit split under which 50 percent of the profit is allocated to the U.S. parent. The other option is a cost-sharing option, under which the possessions corporation can claim a return on manufacturing (but generally not marketing) intangibles related to the products it produces if it makes a "cost-sharing" payment to its affiliates computed under a specified formula. *fn17 fn18 fn19*

This approach applies both to outright transfers of the ownership of the intangibles (whether by sale, contribution to capital, or otherwise), and to licenses or other arrangements for the use of

intangibles. In making this change, Congress intended to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor payment for related party intangibles transfers. Where taxpayers transfer intangibles with a high profit potential, the compensation for the intangibles should be greater than industry averages or norms. In determining whether the taxpayer could reasonably expect that projected profits would be greater than the industry norm, Congress intended that there should be taken into account any established pattern of transferring relatively high profit intangibles to U.S. possessions or low tax foreign locations. Congress did not intend, however, that the inquiry as to the appropriate compensation for the intangible be limited to the question of whether it was appropriate considering only the facts in existence at the time of the transfer. Congress intended that consideration also be given to the actual profit experience realized as a consequence of the transfer. Thus, Congress intended to require that the payments made for the intangible be adjusted over time to reflect changes in the arrangements, even though there are significant differences in the volume and risks involved, or in other factors. *See, e.g., United States Steel Corporation v. Commissioner,* 617 F. 2d 942 (2d Cir. 1980). While Congress was concerned that such decisions may unduly emphasize the concept of comparables even in situations involving highly standardized commodities or services, it believed that such an approach is sufficiently troublesome where transfers of intangibles are concerned that a statutory modification to the intercompany pricing rules regarding transfers of intangibles was necessary. In many cases firms that develop high profit-potential intangibles tend to retain their rights or transfer them to related parties in which they retain an equity interest in order to maximize their profits. The transferor may well be looking in part to the value of its direct or indirect equity interest in the related party transferee as part of the value to be received for the transfer, rather than to "arm's length" factors. Industry norms for transfers to unrelated parties of less profitable intangibles frequently are not realistic comparables in these cases. Transfers between related parties do not involve the same risks as transfers to unrelated parties. There is thus a powerful incentive to establish a relatively low royalty without adequate provisions for adjustment as the revenues of the intangible vary. There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. Congress thus concluded that it is appropriate to assure that the division of income between related parties reasonably reflect the relative economic activities undertaken by each. Congress believed that payments made on a transfer of intangibles to a related foreign corporation or possessions corporation should be commensurate with the income attributable to the intangible. With respect to possessions corporations electing the cost-sharing option under section 936, Congress was concerned that the cost-sharing payment computed under prior law may not always have allocated sufficient income to mainland affiliates with respect to manufacturing intangibles the possessions corporations were treated as owning under that option. The option looks to a sharing of costs that may be insufficiently related to the highly profitable intangible actually transferred. Congress believed that an appropriate floor for the cost-sharing payment is the royalty the possessions corporation would pay under section 482 or 367 principles, were they applicable with respect to such manufacturing intangibles.

### Explanation of Provisions

The basic requirement of the Act is that payments with respect to intangibles that a U.S. person transfers to a related foreign corporation or possessions corporation be commensurate with the income attributable to the intangible. This requirement is established to fulfill the objective that

the division of income between related parties reasonably reflect the relative economic activity
underken by each.

income attributable to the intangible. The Act is not intended to require annual adjustments when
there are only minor variations in revenues. However, it will not be sufficient to consider only
the evidence of value at the time of the transfer. Adjustments will be required when there are
major variations in the annual amounts of revenue attributable to the intangible. In requiring that
payments be commensurate with the income stream, the Act does not intend to mandate the use
of the "contract manufacturer" or "cost-plus" methods of allocating income or any other
particular method. As under prior law, all the facts and circumstances are to be considered in
determining what pricing methods are appropriate in cases involving intangible property,
including the extent to which the transferee bears real risks with respect to its ability to make a
profit from the intangible or, instead, sells products produced with the intangible largely to
related parties (which may involve little sales risk or activity) and has a market essentially
dependent on, or assured by, such related parties' marketing efforts. However, the profit or
income stream generated by or associated with intangible property is to be given primary weight.
The requirements of the Act apply when intangibles of the type presently subject to section
367(d) are transferred by a U.S. person to a related foreign entity or to a possessions corporation
that elects the cost-sharing option, or are licensed or otherwise used by such entity. Thus, the
standard that payments must be commensurate with the income attributable to the intangible
applies in determining the amounts to be imputed under section 367(d) and in determining the
appropriate section 482 allocation in other situations. The standard also applies in determining
the minimum amount of the "cost-sharing payment" to be made under the cost-sharing option in
the case of an electing section 936 corporation. As discussed in greater detail in connection with
the changes made by the Act affecting possessions corporations, the Act requires that the cost-
sharing payment be at least as great as the royalty the possessions corporation would have to pay
to an affiliate under section 367 or 482 with respect to manufacturing intangibles the possessions
corporation is treated as owning by virtue of electing the cost-sharing option. In view of the fact
that the objective of these provisions - that the division of income between related parties
reasonably reflect the relative economic activity undertaken by each - applies equally to inbound
transfers, Congress concluded that it would be appropriate for these principles to apply to
transfers between related parties generally if income must otherwise be taken into account.
Congress did not intend to affect present law concepts of what constitutes a single "license", to
the extent those concepts are not inconsistent with the purposes of the new provision. Thus, for
example, in the case of continuous transfers of technology under a continuing license agreement,
the adequacy of the royalty may, in appropriate cases, be determined by applying the appropriate
standards under the Act on an aggregate basis with respect to the profitability and other relevant
features of the transferred intangibles as a whole. Similarly, Congress did not intend to change
principles that would permit offsets or other adjustments to reflect the tax impact of the
taxpayer's transactions as a whole. Congress was also aware that many important and difficult
issues under section 482 are left unresolved by this legislation. Congress believed that a
comprehensive study of intercompany pricing rules by the Internal Revenue Service should be
conducted and that careful consideration should be given to whether the existing regulations
could be modified in any respect. In revising section 482, Congress did not intend to preclude the
use of certain bona fide research and development cost-sharing arrangements as an appropriate
method of allocating income attributable to intangibles among related parties, if and to the extent
such agreements are consistent with the purposes of this provision that the income allocated
among the parties reasonably reflect the actual economic activity undertaken by each. Under
such a bona fide cost-sharing arrangement, the cost-sharer would be expected to bear its portion

of all research and development costs, on unsuccessful as well as successful products within an appropriate product area, and the costs of research and development at all relevant development stages would be included. In order for cost-sharing arrangements to produce results consistent with the changes made by the Act to royalty arrangements, it is envisioned that the allocation of R&D cost-sharing arrangements generally should be proportionate to profit as determined before deduction for research and development. In addition, to the extent, if any, that one party is actually contributing funds toward research and development at a significantly earlier point in time than the other, or is otherwise effectively putting its funds at risk to a greater extent than the other, it would be expected that an appropriate return would be provided to such party to reflect its investment. *Effective Date* Under the Act, the new provisions generally apply to taxable years beginning after December 31, 1986, but only with respect to transfers after November 16, 1985, or licenses granted after such date (or before such date with respect to property not in existence or owned by the taxpayer on such date). Congress intended to substitute August 16, 1986 for the November 16, 1985 date in the case of certain transfers not affected by the House bill. *fn20* No inference is intended as to whether the same result could nevertheless be reached under prior law for transfers prior to these effective dates. For purposes of section 936, the new provisions apply to taxable years beginning after December 31, 1986, without regard to when any transfer (or license) was made. *Revenue Effect* This provision, apart from its application to possessions corporations, is estimated to increase fiscal year budget receipts by $24 million in 1987, $59 million in 1988, $82 million in 1989, and $108 million in 1990, and $137 million in 1991.

**Footnotes:**

*fn16* For legislative background of the provision, see H.R. 3838, as reported by the House Committee on Ways and Means on December 7, 1985, sec. 641; H.Rep. 99-426, pp. 420-427; and H.Rep. 99-841, Vol. II (September 18, 1986), pp. 637-638 (Conference Report).

*fn17* These provisions are discussed in greater detail in connection with the amendments dealing with section 936 possessions corporations (sec. 1231 of the Act).

*fn18* See, *e.g.,* U.S. General Accounting Office, *IRS Could Better Protect U.S. Tax Interests in Determining the Income of Multinational Corporations* (GGD-81-81, September 30, 1981); Schindler and Henderson, Intercorporate Transfer Pricing 1985 Survey of Section 482 Audits (1985) and materials cited therein. Cf. Department of the Treasury, Internal Revenue Service, *IRS Examination Data Reveal an Effective Administration of Section 482 Regulations,* Report prepared by The Assistant Commissioner (Examinations). April, 1984.

*fn19* Schindler and Henderson, *supra* n.18, at p. 6. See GAO report, *supra* n.18.

*fn20* H.R. 3838, as reported by the Committee on Ways and Means of the House of Representatives on December 7, 1985. A technical correction may be needed so that the statute reflects this intent.

# Exhibit E



# Procedures Manual

Release 19.0 June 14, 2010

# Transfer of Beneficial Rights to Member Investors

## Overview

Although MERS tracks changes in ownership of the beneficial
rights for loans registered on the MERS® System, MERS cannot
transfer the beneficial rights to the debt. The debt can only be

transferred by properly endorsing the promissory note to the transferee. As a MERS Member you have two options for registering a transfer of beneficial rights to another Member: Option 1 and Option 2. The determination of whether Option 1 or Option 2 is used is based on the Membership Profile of the purchasing investor.

## Option 1


An Option 1 transfer can be created in either flat file/EDI X12 mode or online.

In an Option 1 transfer, the Investor transfers beneficial rights on a system other than MERS (example: MORNET) and that system then initiates the MERS transaction.

Loans in an Option 1 batch that have not been registered are automatically reprocessed (—cycledǁ) until the loans have been registered, up to ten (10) calendar days from the Transfer Date. Option 1 investors receive notification when MIN cycling begins through the *Transfer of Beneficial Rights Reject Report.*

If you include MINs that are not registered in your agency transmission (e.g. MORNET), you will receive an abbreviated version of the *Transfer of Beneficial Rights Reject Report* listing these unregistered MINs. It is your responsibility to register these MINs immediately, entering your MERS Org ID in the Investor field. If you register them after the 10 day cycling process is over, you must name the Agency in the Investor field.

An Option 1 Transfer of Beneficial Rights will replace any Option 2 investor on the loan. The investor that was removed during the Option 1 process is notified of its removal by the *Investor Removed by Option 1 TOB report.* Additionally, Interim Funder and Warehouse Gestation Lender interests are released automatically in an Option 1 beneficial rights transfer. No confirmations are required for Option 1 transfers.

**MERS**®

## TERMS AND CONDITIONS

1.  MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request.    The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.

2.  The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. **MERS agrees not to assert any rights** (other than rights specified in the Governing Documents) with respect to such mortgage loans or

mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.

3. MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes. In the absence of contrary instructions from the note holder, MERS shall comply with instructions from the Servicer shown on the MERS® System in accordance with the Rules and Procedures of MERS.

4. No rights or obligations of the Member with respect to any data or information supplied to MERS by or on behalf of the Member shall be altered or affected in any manner by the provision of such data or information to MERS (except as otherwise specifically provided in these Terms and Conditions or the Rules of Membership).

5. If the Member uses MERS as Original Mortgagee (MOM) on the security instrument, the loan must be registered on the MERS® System within 10 days of the Note Date.

6. **MERS and the Member agree that: (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans**, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System.

7. If the Member has a third-party register loans (the "Registrar") on the MERS® System on behalf of the Member, the Registrar shall not be deemed an agent of MERS. The Registrar shall be solely an agent for the Member, and MERS is only giving consent to the Member to use a Registrar to enter information on the MERS® System on behalf of the Member. The Member agrees that MERS is not liable to the Member for any errors and omissions, negligence, breach of confidentiality, breach of the Rules and Procedures, or willful misconduct of the Registrar, or any employee, director, officer, agent or affiliate of the Registrar in performing its services to the Member.

8. The Member shall promptly pay to MERS the compensation due it for transactions registered on the MERS® System and other services rendered to the Member based on the then current MERS fee schedules, which may change from time to time. The Member shall promptly pay to MERS any interest and penalties on delinquent fee payments at the rate set by MERS from time to time. MERS shall have the authority to impose reasonable penalties and fines on Members for breach of the Governing Documents, and the Member shall promptly pay such fines in accordance with the terms of their imposition.

9. MERS shall indemnify and hold harmless the Member, and any employee, director, officer, agent or affiliate of the Member ("Member Party"), from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses ("indemnified Payments") that the Member Party may sustain directly from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, breach of the Rules and Procedures, or willful misconduct of MERS, or any employee, director, officer, agent or affiliate of MERS ("MERS Indemnified Claim"). Notwithstanding the foregoing, MERS shall not be liable or responsible under the terms of this Paragraph for any losses or claims

VC10052000VA

resulting from the actions or omissions of any person other than an employee, director, officer (who is also an employee of MERS), agent or affiliate of MERS.

The Member shall indemnify and hold harmless MERS, and any employee, director, officer, agent or affiliate of MERS ("MERS Party"), for any Indemnified Payments which do not result from a MERS Indemnified Claim and which such MERS Party incurs (i) from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, Rules and Procedures, or willful misconduct of a Member Party, (ii) with respect to a transaction on the MERS® System initiated by such Member, or (iii) as a result of compliance by MERS with instructions given by the Member, or its designee, as beneficial owner, servicer or secured party shown on the MERS® System ("Member Indemnified Claim").

MERS shall promptly notify the Member if a claim is made by a third party against either MERS or the Member with respect to any mortgage loan registered on the MERS® System in which the Member is shown on the MERS® System as beneficial owner, servicer or secured party in accordance with the Rules and Procedures. The Member shall promptly notify MERS if a claim is made against the Member that may be subject to the indemnification provisions of this Paragraph.

The obligations of MERS and the Member under this Paragraph shall survive the termination of the Member's use of the MERS® System.

10. MERS and the Member shall maintain appropriate insurance coverage that shall include an errors and omissions insurance policy and a fidelity bond.   MERS shall not be required to maintain coverage for persons who may be appointed at the request of the Member as certifying officers of MERS.  The Member's policies shall protect and insure MERS against losses in connection with the release or satisfaction of a mortgage loan without having obtained payment in full of the indebtedness secured thereby.  Upon request, MERS or the Member shall cause to be delivered to the other a certified true copy of such errors and omissions insurance policy and fidelity bond.

In the event  of any loss of  principal or  interest on  a mortgage loan or any Indemnified Payments for which reimbursement is received from a fidelity bond or any errors and omissions insurance policy or other insurance policy, the proceeds from any such bond or insurance shall be held in trust for and be promptly paid to the Member who is shown as the servicer on the MERS® System on behalf of the beneficial owner unless otherwise requested by the beneficial owner.

11. Any notice or other communication which is required or permitted to be given or made to MERS pursuant to any provision of the Governing Documents shall be given or made in writing and shall be sent by nationally recognized overnight courier, or facsimile followed by delivery of the original via first class mail, addressed as follows: MERS, Corporate Secretary, 1818 Library Street, Suite 300, Reston, Virginia, 20190.

12. These Terms and Conditions and all transactions effected by the Member with MERS shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

13. Neither the Member nor MERS shall institute a proceeding before any tribunal to resolve any controversy or claim arising out of or relating to these Terms and Conditions, Rules and Procedures, or the breach, termination or invalidity thereof (a "Dispute), before such party has sought to resolve the Dispute through direct negotiation with the other party. If the Dispute is not resolved within thirty (30) days after a written demand for direct negotiation, the parties shall attempt to resolve the Dispute through mediation.  If the parties do not promptly agree on a mediator, either party may request the then chief judge of the Circuit Court of Fairfax County, Virginia to appoint a mediator. All mediation proceedings hereunder shall be held in Washington, D.C.   If the mediator is unable to facilitate a settlement of the Dispute within a reasonable period of time, as determined by the mediator, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief in accordance with the arbitration provisions of this Paragraph. The fees and expenses of the mediator shall be paid by the party initiating the Dispute.

In the event that the Member and MERS are not able to resolve a Dispute in accordance with the mediation provisions of this Paragraph, such Dispute shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof; provided, however, that the place of arbitration shall be Washington, DC, and fees and expenses for the arbitration proceedings shall be paid by the party initiating arbitration.

# Exhibit F



+You   Search   Images   Maps   Play   YouTube   News   Gmail   Drive   Calendar   More -

mortgage securitization UCC Article                                                 deadlyclear1@gmail.com



Patents     Application   | Grant |   | English |   French   German          | Find prior art |   | Discuss this patent |         ⚙ ▾

# System and method for creating, vaulting, transferring and controlling transferable electronic records with unique ownership

## EP 1376311 B1

| | |
|---|---|
| Publication number | EP1376311 B1 |
| Publication type | Grant |
| Application number | EP20030291459 |
| Publication date | Jun 4, 2008 |
| Filing date | Jun 17, 2003 |
| Priority date | Jun 17, 2002 |
| Also published as | EP1376311A2 |
| | 3 More » |
| Inventors | Robert Al-Jaar |
| | Michael Laurie |
| | Oleksiy Savchenko |
| | Less « |
| Applicant | Silanis Technology Inc. |
| International Classification | G06Q10/00 |
| | 2 More » |
| Cooperative Classification | G06Q20/3821 |
| | 3 More » |
| European Classification | G06Q 10/10 |
| | 3 More » |
| External Links | Espacenet |
| | EP Register |

## DRAWINGS



## DESCRIPTION

### Field of the invention

[0001]  The present invention is directed to a system and method for creating, vaulting, transferring, and controlling transferable electronic records with unique ownership, such as chattel paper, notes, documents of title, and promissory notes.

### Description of the prior art

[0002]  The application of information technology in many industries over the past twenty years resulted in major improvements in cost reduction, operational efficiencies, customer service, and revenue generation. These benefits did not generally extend to certain key sectors in the finance and commerce industries such as home mortgages, auto financing, and equipment lending. This led to the enactment of laws that extended legal rights to electronic forms of financial and commercial records such as chattel paper, notes, and documents of title. It is expected that the removal of barriers to the adoption of electronic commerce in these industries will result in significant business benefits once archaic paper-based business processes are replaced with fully automated business information solutions that are based on Transferable Records Management Systems (TRMS). Some of these benefits include:

> Reduced cost structures due to the use of electronic documents instead of paper documents.
> Increased customer satisfaction due to shorter processing times of customer requests.
> Added revenue potential due to better customer-facing and internal processes.
> Improved overall operational efficiencies and quality of service.
> Reduced risk levels due to the use of secure electronic signature

## CLAIMS

1.  A system for securely vaulting, auditing, controlling and transferring electronic transferable records (TRs) with unique ownership, said electronic transferable record having been created with a secure document creation system, wherein said system comprises:

> at least one registry for registering said electronic transferable record with unique ownership in a TR registry record;

> at least one secure storage manager associated with said registry, said Secure Storage Manager (SSM) storing said transferable record registered in said registry as an authoritative copy, said authoritative copy being distinguishable from other copies of said transferable record, and said secure storage manager being distinct from said registry;

> means for registering participants with said system, said participants including said registry, said SSM and a plurality of secured parties, each of said secured parties being represented by at least one representative, each of said participants being provided with an access key pair;

> wherein said transferable record can be transferred in a transaction between an originating party and a receiving party with a transaction descriptor, said transaction descriptor including information about the parties involved in said transaction and an identification of said TR being transferred, said transaction descriptor being initially signed by said originating party with said TR, subsequently verified and countersigned by said registry and signed by said accepting party, said transaction descriptor, upon completion of said transaction, being stored in said TR registry record, an owner of a TR being the only party authorized by said

and digital certificate technologies.

Expanded partnering opportunities with leading technology vendors in the lending market.

**Legal Requirements**

[0003]   There are three primary laws that define the legal requirements for controlling ownership, rights, and obligations in financial and commercial transactions in the United States: the revised Article 9, Section 105 of the Uniform Commercial Code (UCC 9-105), Section 16 of the Uniform Electronic Transactions Act (UETA), and Title II of the Electronic Signatures in Global and National Commerce Act (E-SIGN). UCC 9-105 is a federal law that was enacted in 1998 and took effect on July 1, 2001. UETA is a uniform state law that was approved for enactment in July 1999. E-SIGN is a federal law that was enacted on June 30, 2000.

[0004]   The legal requirements as mandated in UCC 9-105, UETA Section 16, and E-SIGN Title II describe how to handle and maintain control over transferable electronic records such as electronic chattel paper and mortgage notes. Precise definitions of these terms are provided below. UCC 9-105 introduced the concept of an electronic chattel paper and set legal requirements for the control of electronic chattel paper including its assignment, in electronic form, from one party to another. UETA Section 16, referencing similar language and concepts as UCC 9-105, introduced a similar but limited concept of transferable records as electronic records that are equivalent to either paper promissory notes (i.e. negotiable instruments) or paper documents of title. E-SIGN Title II, referencing transferable records under UETA Section 16, narrowed the scope of transferable records to promissory notes that are secured by real property and allowed for the use of electronic signatures to execute such transferable records.

[0005]   Figure 1 summarizes the interrelationships among the key legal terms used in the present application. Transferable records are depicted as just one type of electronic chattel paper. UETA includes promissory notes and documents of title in its definition of transferable records. E-SIGN strictly defines transferable records as promissory notes relating to a loan secured by real property.

[0006]   Legal definitions and brief overviews of the three laws to aid in the understanding of the requirements and concepts of the present invention are presented below.

**The Uniform Commercial Code (UCC)**

[0007]   The following definitions were extracted from the UCC text:

Record means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

Promissory note means an instrument that (i) evidences a promise to pay a monetary obligation, (ii) does not evidence an order to pay, and (iii) does not contain an acknowledgment by a bank that the bank has received for deposit a sum of money or funds.

Document means a document of title.

Chattel paper means a record or records that evidence both a monetary obligation and a security interest in or a lease of specific goods or of specific goods and software used in the goods. If a transaction is evidenced both by a security agreement or lease and by an instrument or series of instruments, the group of records taken together constitutes chattel paper.

Tangible chattel paper means chattel paper evidenced by a record or records consisting of information that is inscribed on a tangible medium.

Electronic chattel paper means chattel paper evidenced by a record or records consisting of information stored in an electronic medium.

Secured party means:

registry to transfer a document, said owner being identified by a Transfer Control Key of said owner, compared with data in said transaction descriptor;

wherein said system is adapted to display a rendered view of said TR, said TR being identified as said authoritative copy of said TR only when rendered to said owner accessing said TR in said SSM through said system, said TR being otherwise marked as a "Copy of an Authoritative Copy" using a visible or print-only watermark so that it is identified as not being said authoritative copy.

2.   A system according to claim 1 wherein said system further includes means for uniquely and securely identifying said participants, said means including a Transfer Control Key pair and a Transfer Control Certificate.

3.   A system according to claim 2 wherein said Transfer Control Key is a private key and said Transfer Control Certificate includes a public key, and wherein information relating to said party is associated and made part of said Transfer Control Certificate, and said private key and said public key form a cryptographic key pair.

4.   A system according to claim 1 wherein said TR registry record includes a TR transaction evidence for each transaction.

5.   A system according to claim 1 wherein said system further includes an interface for permitting secured parties to transfer, view, verify, control, transferable records that they own.

6.   A system according to claim 1 wherein critical information exchanged between said registry, said secure storage manager and said secured parties is encrypted.

7.   A system according to claim 1 wherein said authoritative copy of a TR includes

a hash of the transferable record and the unique ID that is assigned to that TR upon its initial registration with said system

an indication of a Secure Storage Manager where the TR is stored

a source of the provenance of said TR including said Secure Storage Manager and a custodian ID, and

a TR Chain of Ownership, represented by an up-to-date TR registry record.

8.   A system according to claim 6 wherein said information exchanged between said registry, said secure storage manager and said secured parties is exchanged electronically using SSL.

9.   A system according to claim 1 wherein said transaction includes transfer in, transfer ownership, transfer registry, transfer custody, transfer ownership and registry, transfer ownership and custody, transfer registry and custody, transfer ownership, registry and custody, transfer end, transfer out, and transfer to paper.

10.   A system according to claim 3 wherein said private part of the Transfer Control Key is encrypted with a representative access key and stored in said registry.

11.   A system according to claim 4 wherein said TR transaction evidence includes type and status of transactions such as a TR origination evidence, a TR transfer evidence and a TR transfer

1. (A) a person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding;
2. (B) a person that holds an agricultural lien;
3. (C) a consignor;
4. (D) a person to which accounts, chattel paper, payment intangibles, or promissory notes have been sold;
5. (E) a trustee, indenture trustee, agent, collateral agent, or other representative in whose favor a security interest or agricultural lien is created or provided for; or
6. (F) a person that holds a security interest.

**Overview of Revised UCC 9-105**

[0008] The National Conference of Commissioners on Uniform State Laws (NCCUSL) revised UCC 9-105 to introduce the concept of an electronic chattel paper and to specify the legal requirements for having control over electronic chattel paper. The concept of having control over an electronic chattel paper is equivalent to the possession of a paper-based negotiable instrument under Article 3 of the UCC. However, since an electronic chattel paper is not "tangible" when compared to a paper chattel paper, UCC 9-105 imposes legal requirements to ensure that control can be asserted over a single "authoritative copy" of an electronic chattel paper. Since electronic records can be easily copied, UCC 9-105 established the legal foundation to ensure that the authoritative copy of an electronic chattel paper can be readily identified and that fraudulent copies cannot be easily transacted.

[0009] The legal requirements for electronic chattel paper as defined in UCC 9-105 are as follows:

**SECTION 9-105. CONTROL OF ELECTRONIC CHATTEL PAPER**

[0010] *A secured party has control of electronic chattel paper if the record or records comprising the chattel paper are created, stored, and assigned in such a manner that:*

*(1) a single authoritative copy of the record or records exists which is unique, identifiable and, except as otherwise provided in paragraphs (4), (5) and (6), unalterable;*

*(2) the authoritative copy identifies the secured party as the assignee of the record or records;*

*(3) the authoritative copy is communicated to and maintained by the secured party or its designated custodian;*

*(4) copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the participation of the secured party;*

*(5) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy; and*

*(6) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.*

**The Uniform Electronic Transactions Act (UETA)**

[0011] The following definitions were extracted from the UETA text:

Record means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

*Note: The broad definition of record is intended to encompass any and all means of communicating or storing information including electronic records and "writings".*

Electronic record means a record created, generated, sent, communicated, received, or stored by electronic means.

*Note: Examples of electronic records include information stored on computer disks, facsimiles, e-mail messages, voice mail messages, and audio/video tapes.*

Transferable record means an electronic record that:

1. (1) would be a note under [Article 3 of the Uniform Commercial Code] or a document under [Article 7 of the Uniform Commercial Code] if the electronic record were in writing; and
2. (2) the issuer of the electronic record expressly has agreed is a transferable record.

Electronic signature means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.

**Overview of UETA Section 16**

[0012] UETA Section 16 introduced the concept of a transferable record and leveraged the legal requirements for controlling an electronic chattel paper as defined UCC 9-105 to specify the legal requirements for having control over a transferable record. However, it restricted the scope of a transferable record to be an electronic record that is either a note under Article 3 of the UCC or a document of title (i.e. title) under Article 7 of the UCC. Hence, transferable records are electronic equivalents only to either paper promissory notes (i.e. negotiable instruments) or paper documents of title. UETA Section 16 also requires the issuer of the electronic record to explicitly agree that such a

pending evidence.

12. A system according to claim 1, wherein said TR chain of ownership is constructed with all TR transaction evidence records and stored in said registry.

13. A system according to claim 1, wherein said secured parties communicate with said system through a portal.

14. A system according to claim 1, wherein said system is further adapted to verify an ownership of said authoritative copy for a selected TR.

15. A system according to claim 1, wherein said system includes a plurality of said at least one registry and a plurality of said at least one secure storage manager.

16. A system according to claim 1, wherein said transaction descriptor uses a nested hierarchical structure.

17. A system according to claim 1, wherein said registry includes an administration module.

record is to be treated as a transferable record.

[0013]   The legal requirements for transferable records as defined in UETA Section 16 are as follows:

**SECTION 16. TRANSFERABLE RECORDS**

[0014]      *(a) In this section, **"transferable record"** means an electronic record that:*

*(1) would be a note under [Article 3 of the Uniform Commercial Code] or a document under [Article 7 of the Uniform Commercial Code] if the electronic record were in writing; and*

*(2) the issuer of the electronic record expressly has agreed is a transferable record.*

*(b) A person has control of a transferable record if a system employed for evidencing the transfer of interests in the transferable record reliably establishes that person as the person to which the transferable record was issued or transferred.*

*(c) A system satisfies subsection (b), and a person is deemed to have control of a transferable record, if the transferable record is created, stored, and assigned in such a manner that:*

*(1) a single authoritative copy of the transferable record exists which is unique, identifiable, and, except as otherwise provided in paragraphs (4), (5), and (6), unalterable;*

*(2) the authoritative copy identifies the person asserting control as:*

*(A) the person to which the transferable record was issued; or*

*(B) if the authoritative copy indicates that the transferable record has been transferred, the person to which the transferable record was most recently transferred;*

*(3) the authoritative copy is communicated to and maintained by the person asserting control or its designated custodian;*

*(4) copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the consent of the person asserting control;*

*(5) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy; and*

*(6) any revision of the authoritative copy is readily identifiable as authorized or unauthorized.*

*(d) Except as otherwise agreed, a person having control of a transferable record is the holder, as defined in [Section 1-201(20) of the Uniform Commercial Code], of the transferable record and has the same rights and defenses as a holder of an equivalent record or writing under [the Uniform Commercial Code], including, if the applicable statutory requirements under [Section 3-302(a), 7-501, or 9-308 of the Uniform Commercial Code] are satisfied, the rights and defenses of a holder in due course, a holder to which a negotiable document of title has been duly negotiated, or a purchaser, respectively. Delivery, possession, and endorsement are not required to obtain or exercise any of the rights under this subsection.*

*(e) Except as otherwise agreed, an obligor under a transferable record has the same rights and defenses as an equivalent obligor under equivalent records or writings under [the Uniform Commercial Code].*

*(f) If requested by a person against which enforcement is sought, the person seeking to enforce the transferable record shall provide reasonable proof that the person is in control of the transferable record. Proof may include access to the authoritative copy of the transferable record and related business records sufficient to review the terms of the transferable record and to establish the identity of the person having control of the transferable record.*

**The Electronic Signatures in Global and National Commerce Act (E-SIGN)**

[0015]   The following definitions were extracted from the E-SIGN text:

Record means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

Electronic record means a contract or other record created, generated, sent, communicated, received, or stored by electronic means.

Transferable record means an electronic record that

1. (A) would be a note under Article 3 of the Uniform Commercial Code if the electronic record were in writing;

2. (B) the issuer of the electronic record expressly has agreed is a transferable record; and

3. (C) relates to a loan secured by real property.

Electronic signature means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record.

**Overview of E-SIGN Title II**

[0016]   E-SIGN Title II uses the concept of a transferable record and the legal requirements for controlling a transferable record under UETA Section 16 (which references UCC 9-105) to allow for the legal execution of transferable records using an electronic signature. However, Title II further restricts the scope of a transferable record beyond what was specified in UETA to be an electronic record that is a promissory note secured by real property. Recall that UETA's definition of a transferable record applies to any promissory note (does not have to be secured by real property) and to documents of title. The E-SIGN restriction was added as the request of the mortgage industry in order to eliminate paper promissory notes from the real estate lending process and to accelerate the adoption of electronic commerce in the secondary mortgage market. Consequently, under E-SIGN, a transferable record is the electronic equivalent

of a promissory note (i.e. a negotiable instrument under Article 3 of the UCC) that can be transferred and held in electronic form. Following UETA, E-SIGN also requires that the issuer (i.e. borrower) to expressly agree that an electronic record is a valid transferable record. Therefore, E-SIGN does not legally permit the conversion of an existing paper promissory note to an electronic record.

[0017]   The legal requirements for transferable records as defined in E-SIGN Title II are as follows:

### TITLE II- TRANSFERABLE RECORDS

#### SEC. 201. TRANSFERABLE RECORDS

[0018]         *(a) DEFINITIONS.-For purposes of this section:*

           *(1) TRANSFERABLE RECORD.-The term "transferable record" means an electronic record that*

              *(A) would be a note under Article 3 of the Uniform Commercial Code if the electronic record were in writing;*

              *(B) the issuer of the electronic record expressly has agreed is a transferable record; and*

              *(C) relates to a loan secured by real property.*

           *A transferable record may be executed using an electronic signature.*

           *(2) OTHER DEFINITIONS.-The terms "electronic record", "electronic signature", and "person" have the same meanings provided in section 106 of this Act.*

        *(b) CONTROL.-A person has control of a transferable record if a system employed for evidencing the transfer of interests in the transferable record reliably establishes that person as the person to which the transferable record was issued or transferred*

        *(c) CONDITIONS.-A system satisfies subsection (b), and a person is deemed to have control of a transferable record, if the transferable record is created, stored, and assigned in such a manner that-*

           *(1) a single authoritative copy of the transferable record exists which is unique, identifiable, and, except as otherwise provided in paragraphs (4), (5), and (6), unalterable;*

           *(2) the authoritative copy identifies the person asserting control as-*

              *(A) the person to which the transferable record was issued; or*

              *(B) if the authoritative copy indicates that the transferable record has been transferred, the person to which the transferable record was most recently transferred;*

           *(3) the authoritative copy is communicated to and maintained by the person asserting control or its designated custodian;*

           *(4) copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the consent of the person asserting control;*

           *(5) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy; and*

           *(6) any revision of the authoritative copy is readily identifiable as authorized or unauthorized.*

        *(d) STATUS AS HOLDER.-Except as otherwise agreed, a person having control of a transferable record is the holder, as defined in section 1-201 (20) of the Uniform Commercial Code, of the transferable record and has the same rights and defenses as a holder of an equivalent record or writing under the Uniform Commercial Code, including, if the applicable statutory requirements under section 3-302(a), 9-308, or revised section 9-330 of the Uniform Commercial Code are satisfied, the rights and defenses of a holder in due course or a purchaser, respectively. Delivery, possession, and endorsement are not required to obtain or exercise any of the rights under this subsection.*

        *(e) OBLIGOR RIGHTS.-Except as otherwise agreed, an obligor under a transferable record has the same rights and defenses as an equivalent obligor under equivalent records or writings under the Uniform Commercial Code.*

        *(f) PROOF OF CONTROL.-If requested by a person against which enforcement is sought, the person seeking to enforce the transferable record shall provide reasonable proof that the person is in control of the transferable record. Proof may include access to the authoritative copy of the transferable record and related business records sufficient to review the terms of the transferable record and to establish the identity of the person having control of the transferable record.*

        *(g) UCC REFERENCES.-For purposes of this subsection, all references to the Uniform Commercial Code are to the Uniform Commercial Code as in effect in the jurisdiction the law of which governs the transferable record.*

#### SEC. 202. EFFECTIVE DATE.

[0019]   *This title shall be effective 90 days after the date of enactment of this Act.*

#### Authoritative Copy

[0020]   The central role that the term "authoritative copy" has in the three laws previously discussed and in the present invention warrants further discussion to ensure clarity. UCC 9-105 introduced the concept of an authoritative copy (AC) of electronic chattel paper (e-chattel). UETA Section 16 and E-SIGN Title II use the concept of the authoritative copy of the transferable record (TR). While none of these laws provided an explicit definition of the term "authoritative copy", they all require that a single authoritative copy be distinguishable from all other copies that may exist. Furthermore, these laws define the notion of "control" over a TR or a TR to be the equivalent of "possession"

of tangible chattel paper where the holder is the owner of, and has the rights embodied in, the TR or e-chattel. In other words, the concept of <u>having control</u> over a transferable record or an electronic chattel paper is equivalent to <u>possession</u> of a paper-based or a promissory note or chattel paper.

[0021]   It should be noted that the above is based on an interpretation of the statutes made by the Applicant, and should not be considered a legal opinion.

[0022]   In the electronic world, copies of an electronic record are indistinguishable - either there is no "original" or all copies are originals. Therefore, the mere possession of a TR or a TR cannot and does not prove ownership. It is not possible to know how many copies of that TR or e-chattel have been made prior to this possession, nor how many will be made after this possession. Furthermore, these copies are likely to have different owners and ownership chains, resulting in incomplete, conflicting, and erroneous records of ownership. Secure measures and procedures must be in place to establish with certainty that having control over a single, unique, and identifiable authoritative copy of a TR or a TR is tantamount to ownership of the authoritative copy of that TR or e-chattel.

[0023]   Consequently, there is a need for providing an electronic solution for transferable records which will meet the requirements of the above-mentioned U.S. laws, and other laws which are or may be enacted in other countries.

### Summary of the invention

[0024]   It is an object of the present .invention to provide a system which enables the electronic transfer of electronic transferable records with unique ownership. In accordance with the invention, this object is achieved with a system for securely vaulting, auditing controlling and transferring electronic transferable records (TRs) with unique ownership, said electronic transferable record having been created with a secure document creation system, wherein said system comprises:

> at least one registry for registering said electronic transferable record with unique ownership in a TR registry record;
> at least one secure storage manager associated with said registry, said Secure Storage Manager (SSM) storing said transferable record registered in said registry as an authoritive copy said authoritive copy being distinguishable from other copies of said transferable record, and said secure storage manager being distinct from said registry;
> means for registering participants with said system, said participants including said registry, said SSM and a plurality of secured parties, each of said secured parties being represented by at least one representative, each of said participants being provided with an access key pair;

wherein said transferable record can be transferred in a transaction between an originating party and a receiving party with a transaction descriptor, said transaction descriptor including information about the parties involved in said transaction and an identification of said TR being transferred, said transaction descriptor being initially signed by said originating party with said TR. subsequently verified and countersigned by said registry and signed by said accepting party, said transaction descriptor, upon completion of said transaction, being stored in said TR registry record.

### Brief description of the drawings

[0025]   The present invention will be better understood after reading a description of a preferred embodiment thereof, made with reference to the following drawings in which:

> Figure 1 is a schematic representation of the interrelationship of key legal terms used in the present description;
> Figure 2 is a schematic representation of the end-to-end loan process;
> Figure 3 is a schematic representation of the TRM operating model according to a preferred embodiment of the invention;
> Figure 4 is a schematic representation of the main components of a TRM solution according to a preferred embodiment of the invention;
> Figure 5 is a diagram showing the basic architecture of a complete system, including a TRM according to a preferred embodiment of the invention;
> Figure 6 is a diagram showing the security measures in place for insuring integrity of the system of the present invention; and
> Figure 7 is an example of a deployment model according to one embodiment of the invention.

### Description of a preferred embodiment of the invention

[0026]   The present invention establishes a new category of business information systems called the Transferable Records Management System (TRMS). The system of the present invention provides a reliable and secure TRMS solution for electronically creating, asserting ownership, and transferring ownership of legal financial and commercial instruments known as Transferable Records (TRs). It will be understood that in the present description, the expression TRM and TRMS are equivalent and designate the system of the present invention.

[0027]   The present invention replaces securitized paper documents such as chattel paper, notes, documents of title, and promissory notes backed by real property. A TRMS solution promises significant business advantages over today's use of paper in various sectors including the financial services, insurance, and commerce industries. A major application of the present invention with immediate return on investment is the electronic processing of promissory notes in the lending marketplace. Using the invention, lending institutions can seamlessly integrate this TRMS

solution into their existing infrastructure to securely manage promissory notes throughout their life cycle, totally in electronic form.

[0028]   This section provides discusses key drivers for using a TRMS solution, provides a brief overview of the legal requirements governing TRs and e-chattel, and defines the terms used in this document.

#### Document Terminology

[0029]   Notwithstanding the legal definitions provided previously, the following terms are defined herein below for the purpose of this document:

Electronic Chattel Paper (e-chattel) means an electronic record as governed by UCC 9-105.

Transferable Record (TR) means an electronic record as defined in UETA and E-SIGN. A TR is also governed by the same legal requirements of UCC 9-105. Under E-SIGN, a TR is the electronic equivalent to a promissory note secured by real property. Often, a TR is represented as a PDF file in the lending industry.

Loan contract means a record constituting a TR. It is equivalent to a promissory note under UCITA and E-SIGN.

TRM or TRMS means a Transferable Records Manager or Transferable Records Management System for processing TRs, whether they are notes, documents of title, or promissory notes secured by real property. One of the most important functions of a TRMS solution is to identify the Authoritative Copy of a particular TR and to distinguish it from all other copies. Notes, documents of title, and promissory notes secured by real property are identical from the functional and operational perspectives of the present invention.

[0030]   Since the legal requirements for a TR include the same requirements that apply to a TR under UCC 9-105, a TRMS can be used for processing and controlling e-chattel in the same way as for TRs.

Assignee means the party who has current control over a particular TR.

Owner means the current assignee of a particular TR.

Secured party also means the current assignee of a particular TR. A lender is an example of a secured party.

Transfer transaction means the process by which the current assignee (i.e. owner) of a TR initiates the transfer of ownership to the new owner of that particular TR.

Seller means the pre-transfer party of a TR. Seller is a role that only exists during a transfer transaction. Only owners or authorized representatives can be sellers.

Buyer means the post-transfer party of a TR. Buyer is a role that only exists during a transfer transaction.

Assigner means a seller of a particular TR. As with the term seller, the term assigner exists only during a transfer transaction. In contrast, the term assignee refers to the party that exerts control over that TR during the entire period of control. Therefore, the assignee (or owner) becomes the assigner (or seller) during the transfer transaction, while the accepting party becomes the assignee (or buyer or new owner) at the end of the transfer transaction.

#### An Example from The Mortgage Lending Industry

[0031]   This section provides the context needed to better describe the TRMS and its benefits by using the end-to-end loan process as an example from the mortgage lending industry and by highlighting the key differences between tangible chattel paper and transferable records (or electronic chattel paper).

#### Background

[0032]   An increasing number of lending firms are using electronic signatures to minimize the amount of paper documents in their loan processes. Once mortgages are approved and closed electronically, they have to be delivered to investors, archived by custodians, and serviced by servicing firms. To reap the full benefits from the use of electronic signatures, lenders need to be able to securitize, control, and transfer these loans in an automated fashion. Consequently, lenders can:

Become more responsive to customer needs and market changes.

Reduce operating costs by streamlining their lending business processes.

Capitalize on emerging opportunities due to market consolidation and deregulation.

Optimize their interactions with business partners including other lenders, originators, agents, recorders, custodians, investors, Government Supported Enterprises (GSEs) such as Fannie Mae and Freddie Mac, and other government agencies.

Operate in a world that is increasingly driven by real-time access to accurate data and information.

#### Today's Lending Environment

[0033]   Lenders often fund their lending activities by securitizing the loans they have made to their customers. Securitization allows the lender to take a group of loans and sell them to investors. However, to sell the loans to investors, the loan contracts and related documents are used as the proof of the loan and its collectability. These documents, known as chattel paper, can now also be created and processed electronically, and are referred to as electronic chattel paper (e-chattel). The loan contracts that constitute e-chattel or TRs must be signed using electronic signatures. There can be only one original or Authoritative Copy of chattel paper that gives the owner the rights to the proceeds from the loan. However, the owner or an appointed custodian must legally have control of the TR or e-chattel.

#### The End-to-End Loan Process

[0034]  Figure 2 depicts a generic, end-to-end loan process consisting of five stages: origination, closing, transfer, custody, and servicing. A system for obtaining and managing electronic signatures, such as the one commercialized by Silanis Technology Inc. under the name "ApproveIt[1] Web Server", hereinafter referred to as "AWS" is used in any of these five stages to obtain and manage electronic signatures and approvals.

[0035]  In a typical transfer process, loan contracts are prepared for the borrower by the lender's systems. The borrower then electronically reviews and signs the e-contracts using the ApproveIt® Web Server or any other appropriate software package. The resulting e-contracts are then transferred to the lender's repository for storage and further processing. At some later time, the lender may wish to "secure" (i.e. sell) the loan as part of a collection of loans. Preferably, all loans have been signed using the ApproveIt® Web Server, and are now stored in the repository of the lender. Thus, the TRM can be used to convert these loan-documents into TRs and then transfer the ownership from the seller, who is presently the lender, to a buyer who is generally an investor. The buyer can then verify that the transfer has actually occurred by querying the TRM.

[0036]  The TRM is targeted at the transferable records part of the loan process, addressing the business needs beyond electronic signatures and approvals of a loan origination application. Once a customer signs a loan application, several processes are triggered across various financial institutions for the purpose of securitizing and transferring the ownership of closed loans. The present invention is a secure TRMS solution that is specifically designed to automate transfers of ownership of transferable records and electronic chattel paper.

### The Paper World vs. the Electronic World

[0037]  To understand the basic operational concept of the invention, it is important to realize that one cannot directly and exactly map paper world artifacts and methods onto an electronic environment.

[0038]  Table 1 highlights the key differences between tangible chattel paper and electronic chattel paper. **Table 1 - Key Differences Between the Paper World and the Electronic World**

| The Paper World | The Electronic World |
|---|---|
| It is very difficult and costly to copy tangible chattel paper such as promissory notes or currency Tangible chattel paper usually has special features (e.g. special ink, colors, and invisible markings) that require a significant amount of expertise and cost to copy. | Electronic records can be easily and cheaply copied. An unlimited number of identical copies can be created. No special expertise is required beyond basic knowledge such as operating a personal computer. Since a TR is often an electronic document such as a PDF file, it is simple and easy to make copies of that TR. |
| It is somewhat simple and easy to distinguish an original tangible chattel paper from a copy. The use "wet ink on paper" is an indicator that a particular tangible paper chattel is the original, is unique, and is distinguishable from a copy of that original tangible chattel paper. | There is no simple or easy way to distinguish an electronic copy from the "original". The constituent computer bits of a TR are identical and indistinguishable from the constituent computer bits of a copy of that TR. A TR is usually created, stored, and transmitted many times across different systems - with a high likelihood that a copy is stored in each system. In fact, the intentional copying of TRs is required to satisfy legitimate business needs such as making a backup of a particular system for recovery in case of failure. |
| Proving ownership of tangible chattel paper is relatively easy - the owner is either the holder of, or the individual whose last signature appears on, that tangible chattel paper. | Proving ownership of a TR is very difficult, requiring a sophisticated secure system to unequivocally prove such ownership. |
| [1] ApproveIt is a registered trade-mark of Silanis Technology Inc. | |

[0039]  The TRM 10 of the present invention is designed to address the above challenges as described next.

### TRANSFERABLE RECORDS MANAGER CONCEPTS

[0040]  Figure 3 depicts the TRM 10 operating model. Each secured party (e.g. lender) can authorize one or more representatives to interact with the TRM 10 on behalf of that lender.

[0041]  The following concepts constitute the foundation for the TRM 10 of the present invention:

> Transfer Control Key
> Transfer Control Certificate
> TR Transaction Evidence
> TR Chain of Ownership
> TR Registry Record

### Transfer Control Key

[0042]  A Transfer Control Key is a private key that is securely created by the system of the secured party when registering with the TRM 10. This is done following established mathematical cryptographic techniques where the system of

the secured party interacts with the TRM 10 in a secure fashion. Each party or system participating in TRM 10 transactions must register with the TRM 10 and receive a unique Transfer Control Key. This Transfer Control Key belongs to the secured party, not to the representatives of that secured party. However, the TRM 10 allows the authorized representatives of a secured party to use the Transfer Control Key. Owners of TRs use their Transfer Control Keys to assert ownership of, exert control over, and sell their TRs that are registered with the TRM 10. Buyers use their Transfer Control Keys to accept ownership of TRs assigned to them. The TRM 10 securely stores and manages all Transfer Control Keys.

[0043]  It is important to note that the Transfer Control Key is, at all times, under the total and exclusive control of the party to whom it was issued. The explicit knowledge, consent, and confirmation of that party are required before the TRM 10 can use the Transfer Control Key in any TRM 10 transaction.

### Transfer Control Certificate

[0044]  A Transfer Control Certificate is a standard X.509 v3 certificate that is issued by the TRM 10. It contains the public key counterpart to the Transfer Control Key (i.e. the private key) in addition to identity and other information as needed by the TRM 10. Each secured party or system participating in TRM 10 transactions must register with the TRM 10 and receive a Transfer Control Certificate. As with the Transfer Control Key, the Transfer Control Certificate belongs to the secured party, not to the representatives of that secured party. However, the TRM 10 allows the authorized representatives of a secured party to use the Transfer Control Certificate. The TRM 10 controls and manages all Transfer Control Certificates, which are central to its secure and proper operation.

[0045]  The TRM 10 also uses the Transfer Control Certificate to access the respective public keys of the secured parties that are participating in TRM transactions when needed. This usage may or may not require the explicit knowledge, consent, or confirmation of the involved parties. In contrast, the Transfer Control Keys (which are private keys) can only be used with the explicit knowledge, consent, and confirmation of the secured parties involved in an TRM transaction and remain under their total and exclusive control at all times.

### TR Transaction Evidence

[0046]  A TR Transaction Evidence is a secure TRM electronic record that demonstrates the occurrence of a particular ownership transfer transaction. One may think of a TR Transaction Evidence as the secure audit trail or the electronic receipt evidencing the occurrence of that particular transaction. In addition to securely storing and keeping the TR Transaction Evidence, the TRM 10 sends it to the secured party for safekeeping if desired.

[0047]  Each electronic record representing a TR Transaction Evidence is securely stored in the TRM 10, not in the TR itself. This record or transaction descriptor, is preferably implemented using a standards-based XML structure that, within the TRM 10, is designed to comply with the legal requirements set forth in UCC 9-105, UETA Section 16, and E-SIGN Title II. The TRM 10 authenticates and secures this TR Transaction Evidence using advanced cryptographic techniques and electronic signature technology.

### Transaction Descriptor

[0048]  The Transaction Descriptor is used to construct the TR Transaction Evidence. It is used to securely execute transfer transactions. The syntax of this Transaction Descriptor is based on an XML structure. An example of the syntax structure follows. It will of course be understood that the principles of the present invention can be met with another XML structure, or any other structure which meets the objectives of the present invention.

```
- <transfer-transaction>
- <trm2-signed-transfer-transaction>
<trm2-timestamp> <ftrm2-timestamp>
<trm2-timezone> </trm2-timezone>
- <assignee-representative-info>
<name> </name>
<uid> </uid>
<certificate> </certificate>
</assignee-representative-info>
- <assignee-signed-transfer-transaction>
<assignee-timestamp> </assignee-timestamp>
<assignee-timezone> <lassignee-timezone>
- <assignor-signed-transfer-transaction >
<assignor-timestamp> </assignor-timestamp>
<assignor-timezone> </assignor-timezone>
- <trm1-signed-transfer-transaction>
<trm1-timezone> </trm1-timezone>
<transaction-uid> </transaction-uid>
<type-of-transfer> </type-of-transfer>
<comment> </comment>
- <assignor-info>
<name> </name>
<uid> </uid>
```

```
<certificate> </certificate>
</assignor-info>
- <assignee-info>
<name> </name>
<uid> </uid>
<certificate> </certificate>
</assignee-info>
- <assignor-representative-info>
<name> </name>
<uid> </uid>
<certificate> </certificate>
</assignor-representative-info>
- <document-list>
- <document>
<name> </name>
<uid> </uid>
<hash> </hash>
</document>
</document-list>
</trm1-signed-transfer-transaction>
- <trm1-signature>
- <ds:Signature>
- <ds:SignedInfo>
<ds:CanonicalizationMethod>
<ds:SignatureMethod>
- <ds:Reference>
<ds:DigestMethod>
<ds:DigestValue> </ds:DigestValue>
</ds:Reference>
</ds:SignedInfo>
<ds:SignatureValue> </ds:SignatureValue>
- <ds:KeyInfo>
- <ds:X509Data>
<ds:X509Certificate>
</ds:X509Certificate>
</ds:X509Data>
- <ds:KeyValue>
- <ds:RSAKeyValue>
<ds:Modulus> </ds:Modulus>
<ds:Exponent> </ds:Exponent>
</ds:RSAKeyValue>
</ds:KeyValue>
</ds:KeyInfo>
</ds:Signature>
</trm1-signature>
</assignor-signed-transfer-transaction>
- <assignor-signature>
- <ds:Signature>
- <ds:SignedInfo>
<:ds:CanonicalizationMethod/>
<ds:SignatureMethod/>
- <ds:Reference>
<ds:DigestMethod/>
<ds:DigestValue> </ds:DigestValue>
</ds:Reference>
</ds:SignedInfo>
<ds:SignatureValue> </ds:SignatureValue>
</ds:Signature>
</assignor-signature>
</assignee-signed-transfer-transaction>
- <assignee-signature>
```

- <ds:Signature>
- <ds:SignedInfo>
<ds:CanonicalizationMethod/>
<ds:SignatureMethod/>
- <ds:Reference>
<ds:DigestMethod/>
<ds:DigestValue> </ds:DigestValue>
</ds:Reference>
</ds:SignedInfo>
<ds:SignatureValue> </ds:SignatureValue>
</ds:Signature>
</assignee-signature>
</trm2-signed-transfer-transaction>
- <trm2-signature>
- <ds:Signature>
- <ds:SignedInfo>
<ds:CanonicalizationMethod/>
<ds:SignatureMethod/>
- <ds:Reference>
<ds:DigestMethod/>
<ds:DigestValue> </ds:DigestValue>
</ds:Reference>
</ds:SignedInfo>
<ds:SignatureValue> </ds:SignatureValue>
- <ds:KeyInfo>
- <ds:X509Data>
<ds:X509Certificate> </ds:X509Certificate>
</ds:X509Data>
- <ds:KeyValue>
- <ds:RSAKeyValue>
<ds:Modulus> </ds:Modulus>
<ds:Exponent> </ds:Exponent>
</ds:RSAKeyValue>
</ds:KeyValue>
</ds:KeyInfo>
</ds:Signature>
</trm2-signature>
</transfer-transaction>

[0049]   The Transaction Descriptor is designed in such as way so as to achieve the following:

The Transaction Descriptor is organized as a nested hierarchical structure at the core of which is the transaction content that lists multiple TRs that are participating in a transaction, the parties involved and their roles, as well as numerous other transaction attributes. TRs in a transaction are presented in a fashion that uniquely binds each TR to a TRM Registry Record. The Transaction Descriptor is initially signed by the transaction originator and, once content is validated, is countersigned by the TRM. The Transaction Descriptor ultimately becomes an instruction for the TRM. The TRM transaction is carried out by passing the Transaction Descriptor from one party to another in a sequence relevant for a particular transaction type. Each party affects the Transaction Descriptor in a way that clearly specifies the intension of a party with respect to a given transaction to be executed by the TRM.

Particular pieces of information are bound by digital signatures of the parties that are involved in a transaction, including the TRM system itself. Each transacting party populates the Transaction Descriptor with relevant information that is sufficient to fulfill a particular role, and then digitally signs the Transaction Descriptor in sequence. Each digital signature is validated and countersigned by the TRM system to ensure the integrity of the Transaction Descriptor, the associated information, and the overall transaction. The nested nature of the Transaction Descriptor allows it (the Transaction Descriptor) to grow while keeping the inner data intact without affecting any of the earlier digital signatures.

The Transaction Descriptors are eventually combined to create the TR Chain of Ownership. Since the TRM performs only commands represented by the Transaction Descriptor, each TR state change (i.e. initiated, pending, completed, cancelled, etc.) will have a corresponding Transaction Descriptor. The combination of Transaction Descriptors will produce the full TR Chain of Ownership. One could think of this as a graph where the nodes represent the Chain of Transaction Descriptors and the TR Chain of Ownership is the path that a

particular TR takes through these nodes.

Transaction Descriptors can recreate all of the ownership data in the TRM Registry. The Transaction Descriptors that are issued by the TRM contain all the information necessary to re-create the ownership data and transfer history for each TR in the associated TRM Registry. Transaction Descriptors that contain a particular TR history are sufficient to fully recover the TR's registry record. This property of the system minimizes risks of loss of this critical data.

Transaction Descriptor Example

[0050]   An example of a populated Transaction Descriptor XML structure, showing a transaction for a particular document, follows. It will of course be understood that the principles of the present invention can be met with another XML structure, or any other structure which meets the objectives of the present invention. In this example, Secured Party 1 assigns a TR represented by the document "test.pdf" to Secured Party 2.

```
<transfer-transaction id="transfer-transaction-5a2pWV2jvS/KzFmIAYzJTE3IXa=">
  <trm2-signed-transfer-transaction id="TRM2-transfer-transaction-
    5a2pWV2jvS/KzFmIAYzJTE3IXa=">
    <trm2-timestamp>2003-01-23T10:18:02Z</trm2-timestamp>
    <trm2-timezone>0</trm2-timezone>
    <assignee-representative-info>
      <name> Secured Party 1 AWS System</name>
      <uid> Secured Party 1 AWS System</uid>

        <certificate>MIIB2zCCAUSgAwIBAgIIAgAAAAAAAAEwDQYJKoZih
        vcNAQEFBQAwIjEgMB4GA1UEAxMXWERPWCBST09UIDogREVBI
        TEVSVFJBQ0swHhcNMDMwMTA2MjIwMjU0WhcNMDQwMTA2MjI
        wMjU0WjAqMSgwJgYDVQQDEx9EZWFaZXJJ0cmFjey8BV1MgU3Iz
        dGVtChhV2t6Hc3I6pMIGfMA0GCSqGSIb3DQEBAQUAA4GNADCBi
        QKBgQCyK5JgXznfhqfdf66fiLJ8nWHbwOhqOHMbuytpL8enRhv6T
        laBVDX5FG4VErtRfabjPZbIwVIPx+HauOo19ABBbwI1XGld2UOq4
        1kX+pAjYtZpPqcUzf2EZEupa8K4Q/pwNsyJc1KGaeOMfIKhAS3B
        STluMtzf7KPRoy3cgRK1wmeQfDAQABoxtwfEDAOBgNVHQ6BAf8

        EBAMCB8AwDQYJKoZIhvcNAQEFBQADgYEAFIuv/z00ZNMm56p
        2un+jK71cy09UWBeTvh59B9nNrPbgR900ZrAl2R3650VPn8z7s245
        XRYY6zH2kWWUKIYeRZ5r0ptEZbQSIWojCqFz2z9hTkzQYQSekCv
        0NTNyvec4Gxf5kSoytwtkPo/EtreW5BJPZAA0WVJ5V8QJYbWZSP
        U=</certificate>
    </assignee-representative-info>
  <assignee-signed-transfer-transaction id="ASSIGNEE-transfer-transaction-
    5a2pWV2jvS/KzFmIAYzJTE3IXa=">
    <assignee-timestamp>2003-01-23T10:18:00Z</assignee-timestamp>
    <assignee-timezone>0</assignee-timezone>
    <assignor-signed-transfer-transaction id="ASSIGNOR-transfer-
      transaction-5a2pWV2jvS/KzFmIAYzJTE3IXa=">
      <assignor-timestamp>2003-01-23T10:17:53Z</assignor-timestamp>
      <assignor-timezone>0</assignor-timezone>
      <trm1-signed-transfer-transaction id="TRM1-transfer-transaction-
        5a2pWV2jvS/KzFmIAYzJTE3IXa=">
        <trm1-timezone>-1</trm1-timezone>
        <transaction-uid>transfer-transaction-
          5a2pWV2jvS/KzFmIAYzJTE3IXa=</transaction-uid>
        <type-of-transfer>1</type-of-transfer>
        <comment>transfer</comment>
        <assignor-info>
          <name> Secured Party 1</name>
          <uid> Secured Party 1</uid>

            <certificate>MIIB0zCCATygAwIBAgIIAQAAAAAAA
            AMwDQYJKoZIhvcNAQEFBQAwIjEgMB4GA1UEA
            xMXWERPWCBST09UIDogREVBTEVSVFJBQ0swH
            hcNMDMwMTA2MjIwNjU3WhcNMDQwMTA2MjIwNjU7WjAj
            MSEwUwYDVQQDExhEZWFaZXXJ0cmFjeyA
            ob3du2XJzaGIwKTCBnzANBgkqhkiG9w0BAQEFA
            AOBjQAwgYkCgYEAyDMlZKRfWyBjgNbKbG+Q5A
            6z5VLhjBfZ5Cgj3L5nKTNfgfW08Q/yoVZ58oEuC9/
            elGa2T9kUbupy4fHj2jtkaE8CnT0U6D6jqOBX6AnS
            puDEn+g+/nyqFv8ufNcqwtVuGoqsA2Lybb33fnxX
            OAYBoMbZM7Lgah176yXBKrWDuzcCdz5S5/aMS
            MBAwDgYDVR0PAQH/BAQDAgbAMAGCSqI3Sib
            3DQEB8GUAA4GBAEAfjgGGP5IjUzLEhwWL1QJHs
            +CuZ1wTcNVgPtUe0nlX0OIIy37IKd5zwt+oZ63l5p
            2xrxCYhTaFoI3bk7WkqWK0N8LoPGQL3vmqnIYLY
```

66M1Y5O1FFHOflaxI1st5lZxhjdxgcSesobdB9n91F
eellwude7QX+PFmTsmbml1Mrd</certificate>
</assignor-info>
- <assignee-info>
  <name> Secured Party 2</name>
  <uid> Secured Party 2</uid>

    <certificate>AllB0zCCATygAwIBAgIIAQAAAAAAAA
    hwDQYJKoZihvcNAQEFBQAwljEgMB4GA1UEAxM
    XWERPWCBST09UIDogREVBTEVSVFJBQ0swHhc
    NMDMwMTA2MjIwNjU2WhcNMDQwMTA2MjIwNjU
    2WjAlMSAwHgYDVQQDExdBbWVyaWNhbgDwYRpdC
    Aob3duZXJzZGwKTCBnzANBgkqhkiG9w0BAQEF
    AAOBjQAwgYkCgYEAqFqU1o5mITWoQY6euxhPY
    bjo4b8XfdKt8ZrunvHot+f8x4zqz7KrXvZGQ/qU402l
    yUnZqyY/ZfvB2u69LA0BHmDO/f2hW0NOhzsST0+
    Jal8E7j1YQ3CV92UHPvpX8FQcBjLf3KNZSGXHYT
    9u2jZlrJC9YZo5p7iNalRQxrSFZDcCAwEAaaMSMB
    AwDgYDVR0PAQH/BAQDAgbAMA0GCSqGSIb3D
    QEBBQUAA4GBAJxDCegugvUE+Ev8uQJM3rw8xt
    U2ASm6zPSP7E+T9c9qJtIETfoWLur+1nxB10yK1S
    PQgTH5rX2iuhCkp5Q/RuTbY7C8vgaO/Olm8+KE24
    af1Kghkiozpuz9eUfEWUHjM11C2O/fT5Ed7QF00B4
    +ss3rBbxBNu0ptyXHBWzxYfpEa</certificate>
</assignee-info>
- <assignor-representative-info>
  <name> Secured Party 1AWS System</name>
  <uid> Secured Party 1AWS System</uid>

    <certificate>MlIB2zCCAUSgAwIBAgIIAgAAAAAAAA
    AEwDQYJKoZihvcNAQEFBQAwljEgMB4GA1UEAx
    MXWERPWCBST09UIDogREVBTEVSVFJBQ0swrH
    hcNMDMwMTA2MjIwNjU0WhcNMDQwMTA2MjIwNj
    U0WjAqMSgwJgYDVQQDEx9EZWFsZXJ0JocmFjayB
    BV1MgU3lzdGVtGVtChhY2Nlc3MpMlQfMA0GCSqGSI
    b3DQEBAQUAA4GNADCBiQKBgQCyK5JgXzuhqf
    dE566LjSnWHbwDhdOHMbuytpL8enRhv6TisBVD
    K5FG4VErNRsb/PZbIwViPx+HsuOo19ABBbwI1XGI
    d2UQq41kX+pAjYtZpPqcUzf2EZEupa8K4Q/pwNsy
    Jc1KGaaON9KhHAS3BSTIuMtzf7KPRoy3cgRK1w

meQIDAQABoxhwEDAOBgNVHQ8BAf8EBAMCBsA
wDQYJKoZIhvcNAQEFBQADgYEAFluv/z00ZNMm5
6p2un+jK71cy09UWBeTvh59B9nNrPbgR90oZrAj2
R3859VPn8z7s245XRYY6zH2kWWUKiYeRZ5r0ptt
ZbQSiWojCqFz2z9hTkzQYQSekCv0NTNyvec4Qxf5
kSoytwtkPo/EtreW5BJPZAA0WVJ5V8QJYbWZSPU
=</certificate>
      </assignor-representative-info>
    - <document-list>
      - <document>
          <name>test.pdf</name>

          <uid>test.pdfyf7sgs3ihFrntFfMiBGdG6TltyY=<
          /uid>                                    .

          <hash>AAECAwQFBgcICQoLDA0ODxAREgA
          =</hash>
        </document>
      </document-list>
    </trm1-signed-transfer-transaction>
  - <trm1-signature>
    - <ds:Signature
        xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
      - <ds:SignedInfo
          xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
          <ds:CanonicalizationMethod
            xmlns:ds="http://www.w3.org/2000/09/xmldsig
            #"
            Algorithm="http://www.w3.org/TR/2001/REC-
            xml-c14n-20010315" />
          <ds:SignatureMethod
            xmlns:ds="http://www.w3.org/2000/09/xmldsig
            #"
            Algorithm="http://www.w3.org/2000/09/xmldsig
            #rsa-sha1" />
        - <ds:Reference
            xmlns:ds="http://www.w3.org/2000/09/xmldsig
            #" URI="#TRM1-transfer-transaction-
            5s2pWV/2jvS/KzFmIAYzJTE3IXs=">

8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 76 of 137 - Page ID # 76

4/27/13                    Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

                    <ds:DigestMethod
                        xmlns:ds="http://www.w3.org/2000/09/xm
                        ldsig#"
                        Algorithm="http://www.w3.org/2000/09/x
                        mldsig#sha1" />
                    <ds:DigestValue
                        xmlns:ds="http://www.w3.org/2000/09/xm
                        ldsig#">LYEDWN+a3PLFuqR6nYsKwJfB
                        WbU=</ds:DigestValue>
                </ds:Reference>
            </ds:SignedInfo>
            <ds:SignatureValue
                xmlns:ds="http://www.w3.org/2000/09/xmldsig#">d
                Hr6XIO+0kP9iHXjqC+uHordBPPTNWeF6LOwz6bN
                a4j+x43NXN2ce3dfbbnEtqv10HzUWSwKkiNV
                o2nol5fACnY8bVfaXHrCNSMObkuGN2dl+vModIP7
                xU9J1s4Kn0SkmDcm2TPnMSkpYXu6I3mfao6V
                gtJXJ9ETb6uHeOMpqT8=</ds:SignatureValue>
          -   <ds:KeyInfo
                xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
            -   <ds:X509Data
                    xmlns:ds="http://www.w3.org/2000/09/xmldsig
                    #">
                <ds:X509Certificate
                    xmlns:ds="http://www.w3.org/2000/09/xm
                    ldsig#">MIIBzDCCATWgAwIBAgIBMTAN
                    BgkqhkiG9w0BAQUFADAiMSAwHgYDV
                    QQDExdYRE9YIFJPT1QgOIBE
                    RUFMRVJUUkFDDSzAeFw0wMzAxMDYy
                    MjA2NTNaFw0wNDAxMDYyMjA2NTNaM
                    CIxIDAeBgNVBAMTF1hE
                    T1ggUk9PVCA6IERFQUxxFUIRSQUNLMI
                    GfMA0GCSqGSIb3DQEBAQUAA4GNAD
                    CBIQKBgQDFCWe+xqsT
                    MQhStB1RKa3P6gjnpDBmjLTd0iyQ6k0Q
                    r4UeBAsi9XS5A6fQ6ayYgg2KOfPG5ifaG
                    jKUKTfR8mGs
                    LAO6j/zzIL/j0xWEyBR8zjWircGwMjpFxr
                    H6j/gTK860QunRj1J5/oOl8R77UNlBO7z
                    YheB6fy/v

4/27/13

8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 77 of 137 - Page ID # 77
Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

tZLUf0AhjQIDAQABoxIwEDAOBgNVHQ8
BAf8EBAMCBaAwDQYJKoZihvcNAQEF
BQADgYEAjwdK/OPI
ghlpKUTraNCoTZzHfZrib4FZptEbIKcHpK
5tYKFscBaNKohcxnzZzAzyOJxzxPkJ/dcw
R6m75VavQ
ZIRkCgtM8pt0X0uW4RwcNJy0r7l0cd/1v
SVdvEatW9HSJcnlJeeqJKkacGpJTbxs4
SKz8wHk4vx1
l9AMTNvGw+Icn</ds:X509Certificate>
</ds:X509Data>
- <ds:KeyValue
    xmlns:ds="http://www.w3.org/2000/09/xmldsig
    #">
- <ds:RSAKeyValue
    xmlns:ds="http://www.w3.org/2000/09/xm
    ldsig#">
<ds:Modulus
    xmlns:ds="http://www.w3.org/2000/0
    9/xmldsig#">xQInvsarEzEiebQdUSr
    Nz+ol56QwZoy03dCMkOpNEK+FH
    gQLIvV0uQOn0OmsmllNijnzxuYn2
    hoy
    iCk30fJhrCwDuo/9syC/49MVhMgUf
    M41oq3BsDi8Rcax+o/4EyvOtELp0
    Y9Sef6DpfEe+1DSATu8
    2IXgen8v75WS1H9AfY0=</ds:Modul
    us>
<ds:Exponent
    xmlns:ds="http://www.w3.org/2000/0
    9/xmldsig#">AQAB</ds:Exponent>
</ds:RSAKeyValue>
</ds:KeyValue>
</ds:KeyInfo>
</ds:Signature>
</frm1-signature>
</assignor-signed-transfer-transaction>
- <assignor-signature>
- <ds:Signature xmlns:ds="http://www.w3.org/2000/09/xmldsig#">


- <ds:SignedInfo
    xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
<ds:CanonicalizationMethod
    xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
    Algorithm="http://www.w3.org/TR/2001/REC-xml-
    c14n-20010315" />
<ds:SignatureMethod
    xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
    Algorithm="http://www.w3.org/2000/09/xmldsig#rsa-
    sha1" />
- <ds:Reference
    xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
    URI="#ASSIGNOR-transfer-transaction-
    5s2pWV/2jvS/KzFmIAYzJTE3lXss">
<ds:DigestMethod
    xmlns:ds="http://www.w3.org/2000/09/xmldsig
    #"
    Algorithm="http://www.w3.org/2000/09/xmldsig
    #sha1" />
<ds:DigestValue
    xmlns:ds="http://www.w3.org/2000/09/xmldsig
    #">Gh0sJLK42TjtOgPC1Fiq7xp+Fs4=</ds:Dig
    estValue>
</ds:Reference>
</ds:SignedInfo>
<ds:SignatureValue
    xmlns:ds="http://www.w3.org/2000/09/xmldsig#">f0yHxZ
    qhf2l6fQbJbwl/fMmsH9kh3x6xEjXQsc/3/3JoPw9U4uWGcqrL
    1W+ApGP5srqEsmyyiBNcK6Nplra2
    Cv/+ImNim1l9N16grZxlkcwOQOk+EtblzMUYxIdKXD17F
    Da8pSuYWK6ZF8Y/8Ry6NMX3AH7eKUfy5
    fEK2qTs3KSCAJrBWmSs=</ds:SignatureValue>
</ds:Signature>
</assignor-signature>
</assignee-signed-transfer-transaction>
- <assignee-signature>
- <ds:Signature xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
- <ds:SignedInfo xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
<ds:CanonicalizationMethod
    xmlns:ds="http://www.w3.org/2000/09/xmldsig#"

8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 78 of 137 - Page ID # 78

4/27/13                     Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

                    Algorithm="http://www.w3.org/TR/2001/REC-xml-c14n-
                    20010315" />
                <ds:SignatureMethod
                    xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
                    Algorithm="http://www.w3.org/2000/09/xmldsig#rsa-
                    sha1" />
              - <ds:Reference
                    xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
                    URI="#ASSIGNEE-transfer-transaction-
                    5s2pWV/2jvS/KzFmIAYzJTE3iXœ=">
                    <ds:DigestMethod
                        xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
                        Algorithm="http://www.w3.org/2000/09/xmldsig#sha
                        1" />
                    <ds:DigestValue
                        xmlns:ds="http://www.w3.org/2000/09/xmldsig#">qv
                        F8zTjMSP42mfQx//WEGG3IipA=</ds:DigestValue>
                </ds:Reference>
            </ds:SignedInfo>
            <ds:SignatureValue
                xmlns:ds="http://www.w3.org/2000/09/xmldsig#">fg3S5jJi4K9j
                ZlY8czS+bTHuoKzTanvabUSxZBC/50kzGWKY+yxIxthrWtLA
                K2dYj6SCchGu4oVb
                y6rpXjPazzICWp1lihcR21laREBNocY50sotNxt1v84vdcLaVKZ
                7Joih3wF1C1KCp802SfEd7Y7n
                FTHqEtlkfWUKUnScOws=</ds:SignatureValue>
        </ds:Signature>
    </assignee-signature>
</trm2-signed-transfer-transaction>
- <trm2-signature>
  - <ds:Signature xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
    - <ds:SignedInfo xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
        <ds:CanonicalizationMethod
            xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
            Algorithm="http://www.w3.org/TR/2001/REC-xml-c14n-
            20010315" />
        <ds:SignatureMethod
            xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
            Algorithm="http://www.w3.org/2000/09/xmldsig#rsa-sha1" />


      - <ds:Reference xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
            URI="#TRM2-transfer-transaction-
            5s2pWV/2jvS/KzFmIAYzJTE3iXœ=">
            <ds:DigestMethod
                xmlns:ds="http://www.w3.org/2000/09/xmldsig#"
                Algorithm="http://www.w3.org/2000/09/xmldsig#sha1" />
            <ds:DigestValue
                xmlns:ds="http://www.w3.org/2000/09/xmldsig#">h7XZV
                pWbQLd8fPGGfHZHMUYEd+U=</ds:DigestValue>
        </ds:Reference>
    </ds:SignedInfo>
    <ds:SignatureValue
        xmlns:ds="http://www.w3.org/2000/09/xmldsig#">Ht7ggUCxXzH6w
        DMzrLT9z4BzA/ysOGeO7IrOTnA8CVPywrzjLRqFwT+jRVtWf79wH
        BWo1l01qsBq
        5FMLMamYUVBKkZ9ULz+cbiZGHPNLUK/p7GVnbOW29siPn/WyE
        yDqhkkpPyvC0415T6ZHEe787BnA
        W6aWea6d1TnSpZajezE=</ds:SignatureValue>
  - <ds:KeyInfo xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
    - <ds:X509Data xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
        <ds:X509Certificate
            xmlns:ds="http://www.w3.org/2000/09/xmldsig#">MIIBzD
            CCATWgAwIBAgIBMTANBgkqhkiG9w0BAQUFADAiMS
            AwHgYDVQGDExdYRE9YIF/PT1OgOIBE
            RUFMHVJUU/kFDSzAeFw0wMzAzMDYyMjA2NTNaFw0w
            NDAxMDYyMjA2NTNaOiMCxfDAeBgNVBAMTF1hE
            T1ggUk9PVCA6IERFQUxxFUIRSQUNLMIGfMA0GCSqGS
            Ib3DQEBAQUAA4GNADCBIQKBgQDFCWe+xqaT
            MQh5tB1RKa3P6gjnpDBmjiLTd0lyQ6k9Qr4UeBAsi9XS5
            A6IQ6ayYgg2KOfPGSlfaGJKUKT1R9mGa
            LAO6j/2zlIJj0xWEyBR8x[WircGwMpPxzrH6j/gTK860Qun
            RjIJ5/oOI8R77UNIBO7zYheB6fylv
            IZLUl9lAhjQIDAQABoxHwEDAOBg4VHQ8BAf8EBAMCB
            sAwDQYJKoZIhvcNAQEFBQADgYEAjwrdK/OPi
            ghlpKUTraNCoTZ3ffZrIb8FZptEbiKcHpK5tYKFacBaNKo
            hcxnZZAzyOJkzxPiJ/dcwR8m75YavQ
            ZIRkCgtM8pt6X0uW4RwcNJy0r7l0cd/1vSVdvEstW9HSJ
            cnIJeeqJKlascGpJTbz4SKx6wHi4vz1
            l9AMTNvGw+k=</ds:X509Certificate>
    </ds:X509Data>

4/27/13
8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 79 of 137 - Page ID # 79
Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

- <ds:KeyValue xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
  - <ds:RSAKeyValue
      xmlns:ds="http://www.w3.org/2000/09/xmldsig#">
    <ds:Modulus
        xmlns:ds="http://www.w3.org/2000/09/xmldsig#">x
        QlnvsarEzElebOdUSrNz+oi56QwZoy03dCMkOpNE
        K+FHgQLhV0uQOn0OmsmilNijnzzuYn2hoy
        iCk30fJhrCwDuo/9syC/49MVhMgUfM41oq3BaDl6R
        cax+o/4EyvOtELp0Y9Sef6DpfEe+1DSATu8
        2IXgen8v75WS1H9AfY0=</ds:Modulus>
    <ds:Exponent
        xmlns:ds="http://www.w3.org/2000/09/xmldsig#">A
        QAB</ds:Exponent>
    </ds:RSAKeyValue>
  </ds:KeyValue>
  </ds:KeyInfo>
  </ds:Signature>
  </rm2-signature>
  <status>4</status>
</transfer-transaction>

## Types of TR Transfer Evidence

[0051]   There are three types of TR Transaction Evidence: a TR Origination Evidence, a TR Transfer Evidence, and a TR Pending Transfer Evidence.

### TR Origination Evidence

[0052]   A TR Origination Evidence clearly establishes which system originated a particular TR, for example the Approveit® Web Server. A TR Origination Evidence also indicates who is the first party to exert control over a TR upon its creation, identifying this party as the sole and rightful owner of that TR. A TR Origination Evidence is considered a complete electronic record only when it is: 1) signed by the system originating the TR using its own Transfer Control Key, and 2) verified and signed by the TRM 10. The TR Origination Evidence can then be seen as the transaction receipt evidencing the completion of the initial assignment process. The TR Origination Evidence also indicates to the initial assignee that the TR has been created by a secure system that is compliant with the legal requirements for TRs.

### TR Transfer Evidence

[0053]   A TR Transfer Evidence clearly establishes that a TR transfer transaction has occurred, marks the date and time that the transfer has occurred, and indicates that the transfer has occurred with the full consent and agreement of the seller (assigner) and the buyer (assignee).

[0054]   A TR Transfer Evidence also specifies who was the party that exerted control over a TR prior to the transfer transaction and who is the party that has control over that particular TR upon the completion of the transfer transaction. A TR Transfer Evidence is considered a complete electronic record only when: 1) the assigner (also referred to as seller, owner, or current assignee) applies its own Transfer Control Key indicating its intention and agreement to initiate the transfer transaction, 2) the assignee (also referred to as buyer or next owner) applies its own Transfer Control Key indicating its intention and agreement to accept the transfer transaction, and 3) verified and signed by the TRM 10. The TR Transfer Evidence can then be seen as the transaction receipt evidencing the completion of the TR transfer process. The new assignee can now maintain total and full control over that TR according to UCC 9-105 including any revisions and ownership transfers of that TR.

### TR Transfer Pending Evidence

[0055]   A TR Transfer Pending Evidence is a special type of a TR Transfer Evidence, indicating that a TR transfer transaction has been initiated by the seller (assigner) but has not yet been approved by the buyer (assignee). In fact, a TR Transfer Pending Evidence is an incomplete TR Transfer Evidence where the seller is still in control of that TR. Upon the completion of the transfer transaction, a TR Transfer Pending Evidence is augmented with the necessary information and signatures to become a TR Transfer Evidence.

### TR Chain of Ownership

[0056]   While a TR Transfer Evidence is the secure audit trail for a particular transfer transaction, a TR Chain of Ownership is the secure audit trail of the Authoritative Copy of a particular TR. It is the history that describes the origin of that TR and all its successive transfers. A TR Chain of Ownership is constructed using the TR Transaction Evidence records that are securely stored within the TRM 10.

### TR Registry Record

[0057]   A TR Registry Record is a secure electronic record representing a TR Transaction Evidence. All data relating to ownership and transfers of the Authoritative Copy of a particular TR is stored in one or more TR Registry Records and all related electronic signature tokens that were applied to the Authoritative Copy of that TR.

### TRM SOLUTION ARCHITECTURE

[0058]   The present invention is a secure TRMS solution that is used for controlling, processing, and managing TRs and their respective authoritative copies on behalf of the participating secured parties. This section provides an overview of the components and the high-level technical architecture of TRM 10, explains access control and security mechanisms used in TRM 10, and explains how TRM 10 identifies THE Authoritative Copy of a TR. It also

4/27/13
8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 80 of 137 - Page ID # 80
Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

demonstrates how the system of the present invention meets the legal requirements for TRs and authontative copies, and compares the TRM 10 distributed approach to the centralized vault approach.

### Components

[0059]   Figure 4 depicts the components of the TRM 10 solution along with the participating parties.

[0060]   The Registry 100 and the Secure Storage Manager (SSM) 200 are standalone components that represent the core of the TRM 10 of the present invention. The Authoritative Copy Module 301 is an add-on to the Approvelt® Web Server 300. It creates authontative copies of the e-contracts generated by the Approvelt® Web Server. The TRM Connector 401 is an add-on to portal applications 400 or other systems accessing the TRM 10. It uses a secure communications protocol to provide the connectivity required to integrate the target application or system into the TRM 10.

[0061]   The "portal" 400 represents either a user-accessible application or a backend system-to-system capability for interacting with the TRM 10. Any participating party - Originator, Registrar, Custodian, or other third-party - can operate this portal. A Lender may participate as the Originator, Registrar, and/or Custodian. As depicted in Figure 4, the Originator uses the Approvelt® Web Server 300 to generate e-contracts. The TRM 10 uses this e-contract to create an Authoritative Copy of a TR that is owned by a particular Lender or investor. This TR is securely stored with a Custodian designated by the Lender. Subsequent to the initial assignment of ownership, the Lender (current secured party) can transfer ownership of the Authoritative Copy of this particular TR to another Lender (new secured party).

### Registry

[0062]   The Registry 100 is the heart of the TRM 10 solution. It consists of all the necessary logic required to manage and control the execution of all TRM 10 transactions by authorized parties. It also includes a secure database for storing the records of all transfer transactions. In a typical deployment scenario, a Registrar operates the Registry 100 either on behalf of its owner (e.g. Lender or investor) or as a third-party provider of hosted registry services.

### Secure Storage Manager (SSM)

[0063]   The Secure Storage Manager (SSM) 200 stores the actual TRs under the control of the Registry 100. In a typical deployment scenario, a Custodian operates the Secure Storage Manager 200 either on behalf of its owner (e.g. Lender or investor) or as a third-party provider of hosted custodial services. The TRM 10 architecture separates the Registry 100 from the Secure Storage Manager 200. This separation provides a high level of deployment flexibility that enables the Secure Storage Manager 200 to be implemented using standard database or document management technologies that are likely to be already in use by the Custodian. Furthermore, the distributed nature of this architecture allows the Custodian to provide access to TRs in the same manner used for providing access to other documents without involving the Registry 100. However, the participation of the Registry 100 is required to establish THE Authoritative Copy of a particular TR. This is discussed in detail hereinafter.

### Authoritative Copy Module

[0064]   The Authoritative Copy Module 301 is an add-on to the Approvelt® Web Server 300 used to create an Authoritative Copy for a particular TR based on the e-contract generated by the Approvelt® Web Server. This is done in collaboration with, and under the control of, the TRM 10. The Authoritative Copy Module 301 is a system-to-system software that enables the Approvelt® Web Server and the TRM 10 to securely collaborate on the creation of authontative copies. In a typical deployment scenario, the Originator operates the Approvelt® Web Server 300 with its integrated Authoritative Copy Module 301 add-on.

### TRM Connector

[0065]   The TRM Connector 401 is used to securely interact with the Registry 100 and the Secure Storage Manager 200. The TRM Connector 401 software provides access to a set of transactions that can be used to interact with the TRM 10 either through a GUI-based application (e.g. a portal) that is used by the secured parties and their representatives, or through a system-to-system application.

### High-Level Architecture

[0066]   Figure 5 depicts the high-level architecture of the TRM solution of the present invention. Registered and authorized users participate in TRM transactions using a Web browser 500 only. Access to the Registry 100 and the Secure Storage Manager 200 uses secure communications (SSL, Secure Sockets Layer) over the Internet. In a typical scenario, the parties operating the Registry 100 (i.e. the Registrar) or the Secure Storage Manager 200 (i.e. the Custodian) deploy a portal application 400 to securely control access to the TRM 10 and to integrate it with other business applications. The Portal 400 can serve as a front-end to Web-based services accessible by users or can use backend system-to-system functionality to access the TRM 10. Figure 5 also shows how the Approvelt® Web Server 300, as a registered and authorized participant in the TRM 10, is integrated into a total solution that includes borrowers who access the Approvelt® Web Server 300 over secure Internet connections. Details on each element of the TRM 10 architecture are discussed later in this document.

[0067]   The primary characteristics of the TRM 10 architecture are:

A centralized Registry design to ensure the correctness and security of the electronic records relating to TRs. Storing all the TR Registry Records provides a simple approach for locating TRs and identifying their owners. A distributed design based on the Secure Storage Manager allows for multiple custodians to participate in the same TRM 10 deployment using the same Registry. The transfers of TRs among various

4/27/13
8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 81 of 137 - Page ID # 81
Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

custodians are significantly simplified because of the centralized design of the Registry.

The TRM 10 architecture recognizes the fact that there will be more than one deployed registry and, hence, provides well-defined protocols that enable secure TRM 10-to-TRM 10 connectivity.

Finally, and most importantly, the TRM 10 does NOT need the actual TR itself (e.g. the PDF document) to perform the transfer of ownership. This is a central feature since transfer transactions generally include thousands or tens of thousands of documents in each transaction. Having to open each TR (e.g. PDF document), extract and add information, and record the transfer would result in an extremely inefficient solution. The TRM 10 securely stores in the TR Registry all the information that is needed to execute a TR transfer and build the TR Chain of Ownership. This results in a scalable and responsive architecture. Optionally, the TRM 10 can embed all TR Chain of Ownership information in the TR if so required when transferring a particular TR out of the TRM 10.

### Authoritative Copy of a TR

[0068] The U.S. laws applying to authoritative copies left the exact definition, implementation, and identification of The Authoritative Copy to technology providers. The ease with which electronic records can be identically copied makes it insufficient to identify The Authoritative Copy by only examining characteristics within the record itself. A secure external mechanism needs to be implemented to achieve a positive identification of The Authoritative Copy. This is what the TRM 10 does. In this document, within the context of the TRM 10, The Authoritative Copy is referred to as the Authoritative Copy.

[0069] The two primary functions of the Registry are to identify and locate the party in control of the The Authoritative Copy of a particular TR. Identifying the party in control of the The Authoritative Copy of a TR is straightforward. It can be easily done using data in the TR Registry of the TRM 10. The challenge is to identify the single Authoritative Copy among possibly many identical electronic copies of the TR since neither the TR nor its Authoritative Copy are stored in the Registry. This operation is more involved in a distributed design than in a centralized one where no document is permitted to leave the vault at all.

### Elements of The Authoritative Copy

[0070] The Authoritative Copy is a virtual state of a particular TR whose validity and uniqueness are ensured by the TRM 10 based on data within the TR and on the relevant TR Registry Records that are associated with that particular TR. To determine the authoritativeness of a TR copy, a logical link must be established between that TR copy, the owners of that TR, and the TRM 10 with which the TR and its owner are registered. Therefore, The Authoritative Copy of a TR consists of the following elements:

> The "hash" of the TR and the unique ID that is assigned to that TR upon its initial registration with the TRM 10
>
> The Secure Storage Manager where the TR is stored and from where certification is sought
>
> The source of the TR's provenance including the Secure Storage Manager and custodian ID
>
> The TR Chain of Ownership

### Certifying The Authoritative Copy

[0071] The TRM 10 sets forth the following conditions that must be met in order to positively certify that a copy of a TR is indeed The Authoritative Copy of that TR:

> Condition 1: The TR has a unique ID assigned by the TRM 10 with which it is registered.
>
> Condition 2: The TR has not been modified or tampered with.
>
> Condition 3: The TR that is being presented for certification is stored at the same location that is accessible through the Secure Storage Manager that is recorded by the TR Registry.
>
> Condition 4: The party presenting the TR for certification as The
>
> Authoritative Copy is authorized to access the TRM 10.
>
> Condition 5: The party presenting the TR for certification is the actual current assignee (owner) of the TR, a trusted third-party acting on behalf of the current assignee, or an authorized designated representative of the current assignee.
>
> Condition 6: No other copy of that particular TR is being presented at the same time to the TRM 10 for validation or transfer.

[0072] The above strict conditions, executed based on a secure protocol, ensure that The single Authoritative Copy of a TR exists that is unique (conditions 3 and 5), identifiable (conditions 1 to 5), and unalterable (condition 4).

### The TRM Approach vs. a Vault Approach

[0073] The design of the TRM 10 is superior to design approaches that rely on a centralized vault to guarantee that a document is unique, identifiable, and unalterable. The key differentiators of the TRM 10 approach include the following:

> The distributed design of the TRM 10 architecture enables a party to act as a Registrar, a Custodian, or both since roles of the Registrar and the Custodian are decoupled. In a centralized vault approach, the functions of the Registrar and the Custodian are intertwined - an organization wishing to be a Registrar is forced to also become a Custodian, and vice versa. The flexibility of the TRM 10 distributed architecture also allows a large lender to own the entire solution or a small lender to acquire Registry and Custodian services from third parties on an outsourced basis.

Contrary to a system that is based on a centralized electronic vault where all TRs are stored, the TRM 10 does NOT store the actual TRs in the Registry but in any number of TR Repositories accessible through their respective Secure Storage Managers. Only data pertaining to the ownership history of a TR is stored as TR Registry Records in the TRM 10.

This allows for many custodians to participate in the same TRM 10, served by one centralized Registry. With the TRM 10, a TR can exist outside the TRM 10 environment and can be used for informational purposes without forcing the user to always return to the centralized vault when access to that TR is needed. The design of the TRM 10 ensures that any such use of a TR outside the secure TRM 10 environment results in the TR being marked as a "Copy of an Authoritative Copy" or "Not an Authoritative Copy". The ability to view, store, and transmit a TR (e.g. a PDF document that represents a TR) without being tied to a vault provides significant flexibility and ease of use. Hence, requiring the user to always connect to a centralized vault to access the TR is very inefficient, significantly increases the complexity of the TRMS solution, and negates the benefits of electronic automation of business processes.

The use of a centralized vault requires the use of an IT system that does not leverage the existing IT infrastructure. A centralized vault requires its own document management system and access control system. This results in duplicate systems being deployed since it is highly likely that a document management system and an access control system are already deployed. In contrast, the TRM 10 leverages the organization's existing document management system and access control system.

### Meeting UCC 9-105 Legal Requirements

[0074] The Transferable Records Manager of the present invention complies with the legal requirements under UCC 9-105 specifying the six conditions for a secured party to have control of a TR if the TR is created, stored, and assigned in such a manner that:

> "a single authoritative copy of the record or records exists which is unique, identifiable and, except as otherwise provided in paragraphs (4), (5) and (6), unalterable;"

[0075] The TRM 10 conditions described above for certifying a copy of a TR as the TRM 10 Authoritative Copy of that TR establishes compliance with this requirement where condition 1 ensures that it is unique and identifiable, while condition 2 detects if it has been altered. Furthermore, the data in the Registry identifies the location and current owner of The Authoritative Copy.

> "the authoritative copy identifies the secured party as the assignee of the record or records;"

[0076] The secured party is identified in the e-contract as generated by the Approvelt® Web Server. Furthermore, conditions 3 and 4 ensure that the TRM 10 complies with this requirement by identifying the secured party as the assignee of The Authoritative Copy using the TR's unique ID and the TR Chain of Ownership, in addition to the assignee's Transfer Control Key, Transfer Control Certificate, and access control certificate.

> "the authoritative copy is communicated to and maintained by the secured party or its designated custodian;"

[0077] Conditions 3, 4, and 5 ensure that the TRM 10 complies with this requirement by tracking the exact location where the TR is stored as indicated by the data in the Registry. The TRM 10 ensures that only the secured party or the designated custodian has access to maintain The Authoritative Copy using the TR Chain of Ownership and the secured party's or Custodian's Transfer Control Key, Transfer Control Certificate, and access control certificate.

> "copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the participation of the secured party;"

[0078] To add or change an identified assignee of The Authoritative Copy, the TRM 10 requires the participation and consent of the secured party as evidenced by the use of secured party's Transfer Control Key, Transfer Control Certificate, and access control certificate.

> "each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy; and"

[0079] If any of the conditions fails while attempting to identify a copy of a TR as The Authoritative Copy of that TR, the TRM 10 securely marks the copy as a "Copy of an Authoritative Copy" or "Not an Authoritative Copy".

> "any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision."

[0080] The TRM 10 applies advanced cryptographic technologies to secure and identify The Authoritative Copy. Any unauthorized revision of the TR will invalidate the identification of The Authoritative Copy and render it useless. Any authorized revision done by the consent of the concerned parties is indicated as such using commercially available electronic signature technology.

### TRM Key Features and Benefits

[0081] The present invention provides a secure TRMS solution that meets critical customer and market needs, enabling financial lending institutions and other organizations to reap significant business benefits including:

> The TRM 10 integrates with the commercially available Approvelt® web server.
> AWS customers can "bolt" the TRM 10 onto the deployed AWS system with relatively little effort.
> The TRM 10 is a secure and scalable closed registry system.
> The TRM 10 focuses on the control and transfer of <u>ownership</u>, not on the control and transfer of the <u>actual document</u>, resulting in a more efficient operating model that can process thousands or even tens of

8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 83 of 137 - Page ID # 83

4/27/13                    Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

thousands of transfers in a relatively short time.

e-Contracts do not have to be "locked up" in a centralized vault.

The TRM 10 uses a distributed vault to securely store the e-contracts, where this vault can be hosted anywhere and by any party.

The TRM 10 leverages the customer's existing infrastructure for storing documents (e.g. RDBMS, DMS, etc.).

The TRM 10 enables flexible deployment models due to its distributed design.

The TRM 10 provides business opportunities to interested parties that may not be possible with other solutions. A third-party can provide registrar services, custodian services, or both. A lender can be a registrar, a custodian, or both.

### Access Control and Security

[0082]    Access control and security are fundamental requirements for the TRM 10. The TRM 10 deploys several mechanisms to ensure both system-level security and transaction security. The design of the TRM 10 uses the following elements to deliver the required access control and security:

Access Control Certificates

[0083]    All parties accessing TRM 10 must have access control certificates (X.509, v3). This is required for human users as well as machines such as the Secure Storage Manager and the ApproveIt® Web Server. The access control certificates can be issued either by the operator of the TRM 10 using trusted third-party products such as Netegrity or Oblix, or by trusted third-party service providers such as VeriSign.

TRM User Registration

[0084]    All parties accessing TRM 10 must register as TRM 10 users. This is required for human users such as representatives of secured parties and system administrators. as well as machines such as the Secure Storage Manager and the ApproveIt® Web Server. The TRM 10 uses the access certificate to validate user identity in order to allow participation in TRM 10 transactions and to provide audit records asserting that a particular representative had executed a transaction on behalf of a secured party.

TRM Document Registration

[0085]    All documents that are to become TRs controlled by the TRM 10 must be registered with the TRM 10.

Transfer Control Keys

[0086]    The user's browser or system securely generates the private Transfer Control Key. The Transfer Control Key is then encrypted with the user's access control public key and is returned to TRM 10 for secure storage in the Registry. Subsequently, the encrypted Transfer Control Key is securely delivered to the party (human or machine) that will use it. Once downloaded, the Transfer Control Key is kept only in volatile computer memory - not stored anywhere on disk. The Transfer Control Key is decrypted with the user's access control private key while in volatile memory, used to sign a TRM 10 transaction, and then destroyed.

[0087]    Note that Transfer Control Keys are used to sign transfer transactions. Access control keys, on the other hand, are used to sign all communications between system components and to encrypt/decrypt the Transfer Control Key.

Transfer Control Certificates

[0088]    The TRM 10 issues a Transfer Control Certificate to each party accessing TRM 10. The TRM 10 manages these certificates throughout their life cycle, acting as a limited certificate services provider. Each Transfer Control Certificate includes the public key counterpart to the Transfer Control Key.

Secure Communications

[0089]    All communications with the TRM 10 occur over secure communication lines using the encryption and security capabilities of the Internet standard Secure Sockets Layer (SSL) protocol.

Hardware Security Appliances (optional)

[0090]    For added security, the TRM 10 is designed to use state-of-the-art hardware security appliances such as Chrysalis or Ncipher for securely generating, managing, storing, retrieving, and recovering TRM root keys and Transfer Control Keys. These appliances can further provide performance, scalability, and fault-tolerance capabilities. Finally, hardware security devices can also be used for signing and time-stamping transactions.

### System-Level Security

[0091]    The TRM 10 is a central point in establishing a Secure TRM Environment for conducting TR transactions using a combination of:

A secure ApproveIt® Web Server

A secure Registry and Secure Storage Manager

A secure buyer/seller access channel to the TRM 10

A secure communications channel among all participating systems (ApproveIt® Web Server, Registry, Secure Storage Manager, and Portal application)

A secure communications channel to other TRMs (if needed)

A secure communications channel to other ApproveIt® Web Servers (if needed)

[0092]    The TRM 10 protects its records of ownership from the moment they are created until they expire. All communication and exchanges among parties within the Secure TRM Environment occur over SSL. Transactions are further secured based on mutual authentication protocols using Transfer Control Keys and Transfer Control

8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 84 of 137 - Page ID # 84

4/27/13                          Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

Certificates. Once created, TRs remain "bound" to their original Secure TRM Environment. Even though the TRM 10 allows TRs to physically reside in any document management system outside the TRM 10, special secure mechanisms based on Transfer Control Keys and Transfer Control Certificates guarantee that any TR transfer is performed, only within the Secure TRM Environment. Conversely, the Secure TRM Environment also guarantees that non-authoritative copies of TRs that exist outside the Secure TRM Environment are distinctly watermarked as such. This enables the TRM 10 to guarantee the integrity and safekeeping of TRs from unauthorized use, to detect any tampering with TRs, and to provide actual proof of TR ownership.

**Transaction Security**

[0093]  Figure 6 depicts the key elements that ensure the security of the TRM 10. The private keys depicted in Fig. 6 are fundamental to the secure operation of the TRM 10. The Transfer Control Keys 501, 305 and 133 are private keys that are securely generated by representative's browser or system. They are used to sign the transfer transactions at each step of the way. The access control keys 503, 305, 135 are private keys that are securely generated by an external access control system. They are used to sign, encrypt, and decrypt all communications, as well as for representative authentication.

[0094]  As mentioned earlier, all users must register with the TRM 10 in order to participate in any TRM 10 transaction. This registration process requires the representative of the secured party to have an access control certificate. Once registered, and using a Web browser only, the representative can now access the TRM 10 by interacting with the portal application. Using the TRM Connector, the portal application interacts with the TRM in order to authenticate the user. Once authenticated, the TRM 10 uses the representative's access certificate and access private key to securely access the TR Certificate and Transfer Control Key in order to execute a TRM 10 transaction.

**Other Security**

[0095]  In addition to access control, system level, and transfer transaction security, TRM also provides audit trail, document, and approval security. The audit trail security proves that a particular transaction took place and asserts the participants in that transaction. Document security ensures that TRs are not tampered with, enabling detection if tampering occurs. Finally, approval security ensures that the approval itself cannot be tampered with without detection.

**TR Transfer Processes**

[0096]  The TRM 10 addresses various types of transfer processes that are an integral part of the business processes of lending organizations. The TR transfer process is basically an endorsement process that allows a seller of a TR to show her/his consent to transfer and to authenticate the assignment of ownership to the buyer.

[0097]  This section presents the types and examples of TR transfer processes as they relate to business processes. It also describes two transaction scenarios: validating The Authoritative Copy and transferring ownership of The Authoritative Copy from seller to buyer.

**Types of TR Transfer Processes**

[0098]  In a given transfer, there are potentially three parties involved: the owner of the TR, the registrar with which the TR is registered, and the custodian who is storing the TR on behalf of the owner.

[0099]  Table 2 lists the types of transfer processes. The Owner can be a lender or an investor. The Registrar is the party who is operating the TRM Registry. The Custodian is the party who is in charge of storing the actual TRs in the TR Repository on behalf of the owner using the Secure Storage Manager. Note that all Registrar or Custodian changes require the exchange of information and records among the impacted TRM systems. **Table 2 - Types of TR Transfer Processes**

| TRM Transfer Transaction | TRM Owner | TRM Registrar | TRM Custodian |
|---|---|---|---|
| Transfer In | New | New | New |
| This is the initial transaction where an electronically-signed TR is sent from an originating system (likely AWS) to be registered as an Authoritative Copy for the first time with TRM. This is an important transfer transaction since it completes the creation of the Authoritative Copy for that TR as initiated by an originating system like AWS. | | | |
| Transfer Ownership | Changes | Same | Same |
| This transaction represents a Secured Party transferring the ownership of the Authoritative Copy to another Secured Party without changing the Registry controlling the Authoritative Copy or the secure storage location of the Authoritative Copy. This is the most common type of transfer transaction where ownership changes but the registrar and custodian remain unchanged. It is essential in the sale or securitization of the loan or lease associated with the Authoritative Copy. This is an intra-registrar, intra-custodian transfer. | | | |
| Transfer Registry | Same | Changes | Same |
| This transaction represents a Secured Party transferring control of the Authoritative Copy to another TRM Registry. This transfer does not change ownership | | | |

4/27/13

8:17-cv-00416-JFB-MDN  Doc # 1  Filed: 10/30/17  Page 85 of 137 - Page ID # 85
Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

| | | | |
|---|---|---|---|
| (assignment) or location of custody. This is an infrequent transaction that is required if the Secured Party decides not to use the current Registry (e.g. a competitor started to use this Registry). This is an inter-registrar, intra-custodian transfer. | | | |
| Transfer Custody | Same | Same | Changes |
| This transaction represents a Secured Party transferring the custody of the Authoritative Copy to another storage location without changing ownership (the assignee) of the Authoritative Copy or the Registry controlling the Authoritative Copy. This transaction is used when a new assignee wants to store Authoritative Copies of TRs with a different custodian. The new custodian has a different secure storage location but uses the same Registry as the previous custodian to control the Authoritative Copies. This is an intra-registrar, inter-custodian transfer. | | | |
| Transfer Ownership & Registry | Changes | Changes | Same |
| This is a composite transaction that assigns ownership to another Secured Party while changing the Registry controlling the Authoritative Copy. The secure storage location of the Authoritative Copy remains the same. This is an inter-registrar, intra-custodian transfer. | | | |
| Transfer Ownership & Custody | Changes | Same | Changes |
| This is a composite transaction that assigns ownership to another Secured Party while moving the Authoritative Copy to another secure storage location. The Registry controlling the Authoritative Copy remains the same. This is an intra-registrar, inter-custodian transfer. | | | |
| Transfer Registry & Custody | Same | Changes | Changes |
| This is a composite transaction that changes the Registry controlling the Authoritative Copy while moving the Authoritative Copy to another secure storage location. Ownership assignment remains the same. This is an inter-registrar, inter-custodian transfer. | | | |
| Transfer Ownership & Registry & Custody | Changes | Changes | Changes |
| This is a composite transaction that assigns ownership to another Secured Party while changing the Registry controlling the Authoritative Copy and moving the Authoritative Copy to another secure storage location. The new owner also wants to change registrars and custodians. This is an inter-registrar, inter-custodian transfer. | | | |
| Transfer End | End | End | End |
| This transfer transaction is used when the term of the Authoritative Copy has ended and no longer requires to be legally controlled by the TRM Registry. An example is when a loan is paid off (either early or at term) and the Authoritative Copy ceases to be effective. | | | |
| Transfer Out | Same or Changes | None | None |
| This transaction represents a Secured Party moving the Authoritative Copy out of the control of the TRM Registry to a non-TRM-based system. This transaction is used when an Authoritative Copy is transferred to a Registrar or a Custodian that is not using TRM. An example is when loans are in default or the documentation is found to be defective and needs to be returned to the originating lender. When a Transfer Out occurs, the details of the transfer are recorded in the TRM Registry and marked as transferred out. The result in the TRM Registry is similar to a Transfer End. | | | |
| Transfer to Paper | Same or Changes | None | None |
| This is a special case of Transfer Out where the Authoritative Copy is converted to a paper original and the electronic Authoritative Copy ceases to exist. (Note: there is no concept of a paper authoritative copy). A special process to convert the Authoritative Copy to a paper original requires a secure printing of the Authoritative Copy with prior transactions listed and a final wet-ink endorsement by the assignee. This process will be useful when transferring assignment and custody to a party who cannot or will not access TRM. | | | |

**Examples of TR Transfer Processes**

[0100]  Table 3 provides examples of transfer processes that are associated with various business processes where TRs

are required. In addition to this list, there are other business processes that have specialized transfer processes. These business processes include:

Transfer Out

Spot delivery

Loan documentation review, approval, and booking

Trailing documents: matching and review

Auditing

Batch processing for custodial services

**Table 3 - Examples of TR Transfer Processes**

| Business process | Transfer Process |
|---|---|
| Assign from dealer to lender | Dealer to Lender |
| Other transfers | Closing to Lender, Lender to Secondary, Secondary to Market, and Market to Market |
| Store authoritative copy with trustee department or custodian | Internal or Lender to Custodian |
| Securitization assignment to investors | Internal Custodial via Pool |
| Transfer Out: Back out, buy back | Lender to Dealer |
| Transfer Out: Paid off | Lender Destroys |
| Swap (buy back and replace in pool) | Lender to Dealer, internal |

[0101]   There are four phases in which control of the TR must be maintained in accordance to UCC 9-105:

[0102]   Initially, e-contracts are created on a lender's system (or on a system authorized by the lender), which incorporates the Approveit® Web Server for signing these contracts. At this point, signed contracts are not yet authoritative copies. In order for these contracts to become authoritative copies, a Secure TRM Environment must be used. The TRM 10 converts the contracts to authoritative copies, groups them into a collection or pool if required, attaches images of the ancillary documents, and transmits them to the document repository. The TRM 10 also guarantees that each Authoritative Copy of the TR is unique and unaltered, identifies the lender as the sole assignee, and guarantees that the TR has been transferred to its rightful owner. In this phase, the first assignment of ownership occurs automatically through the collaboration of the TRM 10 and the Authoritative Copy Module of the Approveit® Web Server.

[0103]   For subsequent transfers of ownership from one lender or investor (current assignee or seller) to another (buyer) the original TRM 10 with which the TRs are registered must be used. The TRM 10 makes certain that the TR is unique, identifiable as being assigned to the lender as the first owner, that it has remained unaltered, and that it has been transferred to its present rightful owner. In addition, the transfer can only take place with the consent of the seller, a concern that was not as important during the first transfer but is of utmost importance for subsequent ones. In this phase, the TRM 10 provides secure transfer processes to ensure that control of the Authoritative Copy of that TR is maintained in accordance to UCC 9-105.

[0104]   Should the present rightful owner decide to trust a different custodian who uses another TRM 10 to store and maintain the authoritative copies that s/he owns, a transfer that does not involve a buyer and a seller will have to take place between two TRMs. Even during this type of transfer, the present owner must maintain control of the TRs in accordance to UCC 9-105.

[0105]   Users may query the TRM 10 about the content or status of a TR as well as perform batching actions on existing TRs. While verifications of TRs take place implicitly and in the background, viewers may explicitly request that the audit trail of a particular TR is verified and presented on the screen.

[0106]   To understand how one interacts with this Secure TRM 10 Environment, two scenarios are explored next: validating The Authoritative Copy and transferring ownership from seller to buyer.

**Scenario 1 - Validating The Authoritative Copy**

[0107]   The holder engages in the following process in order to validate that a particular TR copy is The Authoritative Copy:

The TR holder logs into the TRM 10 over a secure communications link. A successful login indicates that the TR holder is authorized to access the TRM 10.

The TR holder presents her Transfer Control Certificate to prove that she is the owner of that particular TR. The TRM 10 certifies the six conditions mentioned above. If these conditions are met, the TRM 10 notifies the holder that this TR copy is The Authoritative Copy. Otherwise, the TR is clearly marked as a "Copy of an Authoritative Copy" using a visible watermark. A print-only watermark can also be included.

[0108]   Note that the authoritative copy never leaves the SSM (vault). The TRM presents a rendered view of the TR but only for the authorized Secured Party (owner or assignee). The appearance of the TR will depend on the party requesting it. The TRM indicates that it is an "Authoritative Copy" when presented to the owner and "Non Authoritative Copy" when presented to the assignee.

**Scenario 2 - Transferring Ownership from Seller to Buyer**

[0109]   A TR owner engages in the following process in order to sell a particular TR to a buyer:

The seller (i.e. current assigned or owner) logs into the TRM 10 with a Web browser over a secure

8:17-cv-00416-JFB-MDN Doc # 1 Filed: 10/30/17 Page 87 of 137 - Page ID # 87

4/27/13                     Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

communications link. A successful login using her TR Access Certificate indicates that the seller is authorized to access the TRM 10. The TRM 10 then presents a list of TRs that are owned by the seller as determined from the TR Registry Records.

The seller selects that particular TR that she wants to transfer and identifies the buyer from a list of authorized participants that are registered in the TRM 10.

The seller then initiates the transfer process. This triggers an alert to the designated buyer indicating that a TR transaction is pending. To reach this point of the process, the TRM 10 would have certified that the conditions set forth previously are satisfied. This ensures that the seller has the right to transfer this TR based on the Transfer Control Certificate.

At a later time, the buyer logs into the TRM 10 using a Web browser over a secure communications link. A successful login indicates that the buyer is authorized to access the TRM 10 and that his private and secure identification credentials do identify him as a registered TRM buyer.

The buyer then accepts the transfer. The TRM 10 completes the transfer of ownership of that TR. As before, to get to this point of the process, the TRM 10 would have certified that the conditions set forth are satisfied. This ensures that the buyer of the TR has now control over The Authoritative Copy.

[0110]  Based on the above strict process, it is impossible for anyone - even the TR owner - to sell the same transferable record to more than one buyer using identical copies of that TR. Even if the seller attempts to do so, the moment the buyer accepts the transfer of ownership from the seller, the TRM 10 marks that TR as being owned by the buyer. If the previous owner attempts to transfer a copy of that TR, the TRM 10 asserts that she is not the owner of The Authoritative Copy.

**Deployment Models**

[0111]  Figure 7 depicts the various possible deployment models that can be used to implement the TR transfer processes discussed. The flexibility of the TRM 10 design enables various business relationships among Lenders, Registrars, and Custodians.

**TRM Functional Modules**

[0112]  The TRM 10 provides a highly reliable, available, scalable, and secure TRMS solution. The main functional modules of the TRM 10 are depicted in Figure 5.

*Approvelt® Web Server (A WS)*

[0113]  The Approvelt® Web Server collaborates closely with the TRM 10 to register and generate Authoritative Copies of TRs. The TRM 10 securitizes TRM-ready e-contracts that it receives from one or more Approvelt® Web Servers. In order to prepare and transmit these documents, the Approvelt® Web Server makes use of several modules, which are described next.

[0114]  It should be understood that although a preferred embodiment has been described herein with reference to the Approvelt® Web Server, other equivalent systems may be used, and the invention does not lie therein. The invention lies in the TRM 10 which is adapted to uniquely identify a transferable document, and to effect transfers thereof.

**Authoritative Copy Module**

[0115]  The Approvelt® Web Server uses the Authoritative Copy Module 301 to register an e-contract with the TRM 10 by receiving a unique ID from the TRM 10 and embedding it into the e-contract. The Authoritative Copy Module 301 is also responsible for establishing a secure and trusted protocol that enables the TRM 10 to communicate with the Approvelt® Web Server 300. The Approvelt® Web Server uses this protocol to transmit or present the prepared documents and accompanying ancillary documents to the TRM 10.

[0116]  The Authoritative Copy Module 301 is also responsible for the destruction of the e-contracts after they have been successfully transferred to the TRM 10. In the case that a contract is returned back to a dealer, the Authoritative Copy Module 301 receives the e-contracts and reassigns them for securitization by another lender. Note that, although in some cases the actual documents are transmitted to the TRM 10, these documents are only placed there temporarily for the purpose of completing a specific transfer process.

**Fax Management**

[0117]  Although this is not required for the operation of the TRM 10, the Approvelt® Web Server uses the Fax Management 303 to scan ancillary paper documents and associate them with an e-contract using the barcodes found on the paper documents.

*Transferable Records Manager - Registry*

[0118]  The TRM 10 implements a number of modules specifically designed to create, modify, and maintain TRs in a secure manner and in accordance with UCC 9-105 regulations. It is organized in four layers: TRM Interfaces, TRM Services, TRM Storage, and TRM Management.

**TRM Interfaces**

[0119]  The TRM 10 provides a set of interfaces to securely communicate with the various components that are present in a deployed solution. These interfaces use certificate-based authentication mechanisms to guarantee safe, secure, and trusted communications with the TRM 10.

AWS Interface

[0120]  The AWS Interface 101 is responsible for establishing secure communications with one or more Approvelt® Web Servers.

4/27/13                    Patent EP1376311B1 - System and method for creating, vaulting, transferring and controlling ... - Google Patents

8:17-cv-00416-JFB-MDN   Doc # 1   Filed: 10/30/17   Page 88 of 137 - Page ID # 88

Secure Storage Manager Interface

[0121]  The Secure Storage Manager Interface 103 is responsible for establishing secure communications with one or more Secure Storage Managers.

Web Interface

[0122]  The Web Interface 105 is responsible for establishing secure communications with one or more portal applications, systems, and Web browsers.

TRM-to-TRM

[0123]  The TRM-to-TRM Interface 107 is responsible for establishing secure communications between various TRM 10 systems.

**TRM Transaction Services**

[0124]  The TRM 10 provides an integrated set of services that enable it to securely execute TRM transactions.

Registration Services

[0125]  Registration Services 109 provide user, system, and document registration. All users, systems, and documents that need to take part in TRM transactions must be registered with the TRM 10.

Authentication Services

[0126]  Authentication Services 111 facilitate user and system authentication when requesting access to the TRM 10.

Certificate Services

[0127]  Certificate Services 113 issue Transfer Control Certificates to users and systems participating in TRM transactions. All requests for certificates are thoroughly checked out before the TRM 10 awards them. Using their Transfer Control Certificates, representatives of secured parties can access the TRM 10 from anywhere on the Internet using only a Web browser.

Transfer Services

[0128]  Transaction Services 115 manage all TRM 10 transfer transactions. They implement the required transaction logic to comply with the legal requirements of UCC 9-105, resulting in legally enforceable transfer processes.

**TRM Document Services**

[0129]  The TRM 10 provides an integrated set of secure document services in support of TRM transactions. The document services consist of customization, signing, validation, and presentment services.

Customization Services

[0130]  Customization Services 117 are used to insert in the e-contract (received from the ApproveIt® Web Server) the required watermarks, unique TRM ID, and other information necessary to register a TR with the TRM 10.

Signing Services .

[0131]  Signing Services 119 are responsible for electronically signing the transfer transactions using the Transfer Control Keys, providing transaction integrity and non-repudiation. They are also used to sign an e-contract after its customizations to attest that the changes were made under the secure control of the TRM 10.

Validation Services

[0132]  Validation Services 121 are responsible for verifying the authenticity of each transfer transaction and TR. They are also used to extract TR Transaction Evidence and construct the TR Chain of Ownership for an Authoritative Copy of a particular TR, serving as a secure audit trail history of ownership.

Presentment Services

[0133]  Presentment Services 123 are used to display The Authoritative Copy in a Web browser based on the conditions listed above. They also participate in implementing the "Transfer Out" functionality where The Authoritative Copy of a particular TR is converted from electronic form to paper chattel paper based on several formats including paper, active PDF file, inactive ("flattened") PDF file, GIF, and TIFF. The transfer out transaction is included in the TR Chain of Ownership.

[0134]  Note that if The Authoritative Copy is transferred out to paper, the TRM 10 will logically transfer the contract out of its system so that no electronic copy of the contract can be recognized as THE Authoritative Copy. Furthermore, the paper copy indicates that it was transferred from an electronic Authoritative Copy and should be endorsed by the assignee.

**TRM Database**

TR Registry

[0135]  The TR Registry is a database 125 that holds the transfer information for all the TRs registered with the TRM 10. All information pertinent to transfers of ownership is kept in the TR Registry database so that a complete trace of all transfer transactions can be built at all times.

Temporary TR Storage

[0136]  The Temporary TR Storage 127 is responsible for temporarily storing TRs if needed during the transfer of ownership or any other activities performed by the TRM 10. As discussed previously, the Secure Storage Manager is responsible for permanently storing the TRs in the TR Repository.

TR Storage Manager

[0137]  The TR Storage Manager 129 is responsible for managing the TR Registry database and the Temporary TR Storage. It also provides an interface for transmitting TRs from the TRM 10 to the TR Repository through the Secure Storage Manager, in addition to the controlled transfer to output devices such as tape and CD. The TR Database Manager is

also used when a transfer transaction requires the transfer of the TR from one TR Repository to another.

**TRM Management**

[0138]   TRM Management is responsible for managing all aspects of the TRM 10.

Administration Console

[0139]   The Administration Console 131 provides a Web-based graphical interface for managing all aspects of the TRM 10 including user enrollment and system administration.

Administration Module

[0140]   The Administration Module enables the administrator of a Secured party to enroll its Representatives in TRM using a Web browser. It also securely allows the creation and encryption of the Transfer Control Keys.

Creating the Transfer Control Key for a Secured Party

[0141]   An Administrator installs the Administration Module and uses a browser to initiate the process. The Administrator provides his access control certificate. The Administration Module automatically does the following: asks the browser to generate a key pair (this is the Transfer Control Key pair); encrypts the private part of the Transfer Control Key using the public part of the Administrator's access control key; sends the encrypted key to the TRM Registry for secure storage.

[0142]   Throughout the above process, the TRM does not see the private part of the Transfer Control Key in the clear. This ensures that only the Secured Party ever has access to it in the clear. Also, the invention never stores the private part of the Transfer Control Key in persistent storage.

Encrypting the Transfer Control Key for Use by a Secured Party's Representative

(This assumes that the Administrator already installed the Administration Module and will be using a browser).

[0143]   The Administrator receives the Representative's access control certificate and uses the Administration Module to automatically start the following sequence: retrieve the encrypted private part of the Secured Party's Transfer Control Key from the TRM Registry; decrypt the private part of the Transfer Control Key using the private part of the Administrator's access control key; encrypt the private part of the Transfer Control Key using the public part of the Representative's access control key; send the encrypted key to the TRM Registry for secure storage.

[0144]   Now, the encrypted private part of the Secured Party's Transfer Control Key is stored twice in the TRM Registry: the first is encrypted with the public part of the Administrator's access control key and the second is encrypted with the public part of the Representative's access control key. This process can be repeated, as many times as needed once for each Representative that needs to be registered with the TRM. As before, throughout the above process, the TRM does not see the private part of the Transfer Control Key in the clear in order to ensure that only the Secured Party ever has access to it in the clear. Also, the invention never stores the private part of the Transfer Control Key in persistent storage.

**Transferable Records Manager - Secure Storage Manager**

[0145]   The TRM 10 allows authoritative copies to be physically stored in TR Repository locations that are separate from the physical location of the Registry. This enables one or more interested parties to play the role of Custodian.

Registry Interface

[0146]   The Registry Interface 201 is responsible for establishing secure communications with one or more Registries. It uses certificate-based authentication mechanisms to guarantee safe, secure, and trusted communications between TRM Registries and Secure Storage Managers.

TR Repository Manager

[0147]   The TR Repository Manager 203 performs the necessary functions to store and retrieve TRs from a TR Repository 600. The database implementing the TR Repository must have a certificate-based interface to the TRM 10.

**Transferable Records Manager - TRM Connector**

[0148]   The TRM Connector 401 provides the necessary secure communications and protocol for third-party applications and systems to integrate with the TRM 10. In a typical deployment scenario, the TRM Connector is installed at the portal that is used to access the TRM 10.

[0149]   In summary, the present invention can create Transferable Records; present and review Transferable Records; verify the ownership of an Authoritative Copy for a particular Transferable Record; transfer the ownership of an Authoritative Copy of a particular Transferable Record to another party and provide evidence of the chain of ownership of an Authoritative Copy for a particular Transferable Record.

[0150]   The system of the present invention can have one or more registries, one or more vaults, and one or more secured parties with each secured party having one or more representatives.

[0151]   The system of the present invention can interact with one or more originating systems such as the Approvelt® Web Server (AWS) using the an Authoritative Copy Module for creating authoritative copies out of contracts signed by AWS. It can also accept authoritative copies by "uploading' them to it.

[0152]   For security, all access control certificates are registered with the TRM before being used. Also, all "users" are registered: secured parties, representatives of secured parties, documents, secure storage managers (vaults), originating systems such as AWS, and any portal application that will integrate the TRM into it.

[0153]   The TRM can also use hardware-based security devices.

[0154]   The TRM advantageously has multiple levels of security: access control security, transfer control security, audit trail security, document security, and approval security. All these levels of security use cryptography to ensure integrity

and non-repudiation.

[0155]  Access control security strictly controls access using standard X509 v3 certificates issued by any third party product.

[0156]  Transfer control security strictly controls participation in TRM transfer transactions to those who have Transfer Control Certificates and transfer Control Keys that are issued by the TRM, not by third-party vendors..

[0157]  An audit trail security strictly controls the record of each TRM transfer transaction in order to prove that a particular transaction took place and assert the participants in that transaction.

[0158]  Document security strictly controls the TR document preferably using Silanis Technology Inc.'s ApproveIt® technology to ensure that TRs are not tampered with and to detect when tampering occurs. This way, TRs cannot be altered without detection or authorization. In addition, secure watermark technology assures that a non-authoritative copy is always obvious and cannot be altered without invalidating the TR.

[0159]  Approval security strictly controls the approval itself so that it cannot be tampered with without detection.

[0160]  Of course, numerous changes could be made to the preferred embodiments disclosed hereinabove without departing from the scope of the invention as defined in the appended claims.

Data provided by IFI CLAIMS Patent Services
©2012 Google

# Exhibit G



**Certified Forensic Loan Auditors**

---

### CERTIFIED FORENSIC LOAN AUDITORS, LLC
13101 West Washington Blvd., Suite 140, Los Angeles, CA 90066
Phone:  888-758-2352 or 832-932-3951;
Sales@CertifiedForensicLoanAuditors.com
www.CertifiedForensicLoanAuditors.com

---

# *PROPERTY*
# *SECURITIZATION ANALYSIS REPORT*™

*Prepared for:*

## ED TEAGUE & DIANNA L. SHOULTS

*For Property Address*

***635 Highway 26 E.***
***Morrill, NE 69358***

*Preparedon:*
### *March 14, 2016*

---

Disclosure: You have engaged Certified Forensic Loan Auditors, LLC to examine your real estate documents.  This information is not to be construed as legal advice or the practice of law, pursuant to _Business and Professions Code § 6125 et seq_, it is the intent of CFLA, its members, auditors and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: *"...the doing and/or performing of services in a court of justice in any matter depending therein throughout the various stages and in conformity with the adopted rules of procedure. It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court."*

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## SECTION 1:   TRANSACTION DETAILS
## BORROWER & CO-BORROWER:

| BORROWER | CO-BORROWER |
|---|---|
| **ED TEAGUE** | **DIANNA L. SHOULTS** |
| CURRENT ADDRESS | SUBJECT ADDRESS |
| **635 Highway 26 E.** **Morrill, NE 69358** | **635 Highway 26 E.** **Morrill, NE 69358** |

## SECTION 2:   SECURITIZATION
## SECURITIZATION PARTICIPANTS:

| DEED | DATE | NOTE | DATE |
|---|---|---|---|
| **REGENT FINANCIAL GROUP INC.** 1910 s. 72nd Street, 103, Chaka, NE 68124 MIN #1000525-5028679206-3 | **APRIL 21, 2011** | **REGENT FINANCIAL GROUP INC.** 1910 s. 72nd Street, 103, Chaka, NE 68124 **Loan # 502867520** **FHA Case To Be Determined** | **APRIL 21, 2011** |
| | | **GINNIE MAE REMIC TRUST 2011-066** | **CLOSING DATE:** May 27, 2011 |

The DEED OF TRUST and the Note have taken two distinctly different paths.  The DEED OF TRUST was never transferred. The $121,512.00 note may have been however pooled, sold, transferred with other loans and mortgages and this pool of loans and mortgages in this security offering of $710,026,817.

http://www.ginniemae.gov/doing_business_with_ginniemae/investor_resources/Prospectuses/ProspectusesLib/2011May20-066.pdf

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## PARTIES/DEFENDANTS:

**Offering Circular Supplement**

**(To Multifamily Base Offering Circular dated April 1, 2008)**



## $710,026,817

## Government National Mortgage Association

# GINNIE MAE®

**Guaranteed REMIC Pass-Through Securities and MX Securities**
**Ginnie Mae REMIC Trust 2011-066**



**NOMURA**



**Loop Capital Markets, LLC**

**The date of this Offering Circular Supplement is May 20, 2011.**

The document is not available on the SEC web site. Following this section would normally be the "Assignment of Deed of Trust" type section of the Prospectus Supplement; but this security has no such verbiage. Furthermore, there is no pooling and servicing agreement (PSA) that is publically available. Thus, extracts of the "Conveyance of Loans" type section (normally Section 2.01) from any such PSA is not available.

http://www.ginniemae.gov/doing_business_with_ginniemae/investor_resources/Prospectuses/ProspectusesLib/2011May20-066.pdf

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

**Step 1** — The borrower obtains a loan from a Lender. This may be done with help from a MORTGAGE Broker. In many cases the Lender and the MORTGAGE Broker have no further interaction with the Borrower after the loan is made.

**Step 2** — The Lender sells the loan to the Issuer and the Borrower begins making monthly payments to the Servicer.

**Step 3** — The Issuer sells securities to the Investors. The Underwriter assists in the sale, the Rating Agency rates the securities, and the Credit Enhancement may be obtained.

**Step 4** — The Servicer collects monthly payments from the Borrower and remits payments to the Issuer. The Servicer and the Trustee manage delinquent loans according to terms set forth in the Pooling & Servicing Agreement

MORTGAGE Broker "Unknown"

Lender — REGENT FINANCIAL GROUP INC.

Borrower — ED TEAGUE & DIANNA L. SHOULTS

Servicer — Flagstar Bank, FSB

Custodian-Holds MORTGAGE Loan Documents on behalf of the Trustee

Underwriter

Rating Agency

Credit Enhancement Provider

Issuer/Trustee — GOVERNMENT NATIONAL MORTGAGE ASSOCIATION (Ginnie Mae)

Investors

**CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016**
-All Rights Reserved-



Certified Forensic Loan Auditors

# PROSPECTUS SUPPLEMENT

**Offering Circular Supplement**
**(To Base Offering Circular dated April 1, 2008)**

Ginnie Mae

## $710,026,817

## Government National Mortgage Association
## GINNIE MAE®

### Guaranteed REMIC Pass-Through Securities and MX Securities
### Ginnie Mae REMIC Trust 2011-066

**The Securities**

The Trust will issue the Classes of Securities listed on the front cover of this offering circular supplement.

**The Ginnie Mae Guaranty**

Ginnie Mae will guarantee the timely payment of principal and interest on the securities. The Ginnie Mae Guaranty is backed by the full faith and credit of the United States of America.

**The Trust and its Assets**

The Trust will own (1) Ginnie Mae Certificates and (2) certain previously issued certificates.

**The securities may not be suitable investments for you. You should consider carefully the risks of investing in them.**

**See "Risk Factors" beginning on page S-9 which highlights some of these risks.**

The Sponsor and the Co-Sponsor will offer the securities from time to time in negotiated transactions at varying prices. We expect the closing date to be May 27, 2011.

You should read the Base Offering Circular as well as this Supplement.

The securities are exempt from registration under the Securities Act of 1933 and are "exempted securities" under the Securities Exchange Act of 1934.

| Class of REMIC Securities | Original Principal Balance(2) | Interest Rate | Principal Type(3) | Interest Type(3) | CUSIP Number | Final Distribution Date(4) |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| [illegible] | $ [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | PT | FLT | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | PT | FLT | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | PT | FLT | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | PT | FLT | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| [illegible] | [illegible] | [illegible] | PAC I | FIX | [illegible] | November 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | November 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | November 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | November 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2040 |
| [illegible] | [illegible] | 4.0 | PAC I | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| [illegible] | [illegible] | (5) | NTL (PT) | INV/IO | [illegible] | May 2041 |
| LA | [illegible] | 4.0 | SUP | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | 4.0 | SUP | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | 4.0 | PAC II | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | 4.0 | SUP | FIX | [illegible] | November 2040 |
| [illegible] | [illegible] | 4.0 | SUP | FIX | [illegible] | March 2041 |
| [illegible] | [illegible] | 4.0 | SUP | FIX | [illegible] | May 2041 |
| [illegible] | [illegible] | 4.0 | PAC II | FIX | [illegible] | May 2041 |
| **Security Group 2** | | | | | | |
| [illegible] | [illegible] | 4.5 | [illegible] | FIX | [illegible] | September 2039 |
| [illegible] | [illegible] | 4.5 | [illegible] | FIX | [illegible] | September 2039 |
| [illegible] | [illegible] | 4.5 | [illegible] | FIX | [illegible] | June 2022 |
| [illegible] | [illegible] | 4.5 | [illegible] | FIX/Z | [illegible] | September 2039 |
| [illegible] | [illegible] | 4.5 | [illegible] | FIX | [illegible] | February 2038 |
| **Security Group 3** | | | | | | |
| [illegible] | [illegible] | 5.0 | [illegible] | FIX | [illegible] | May 2022 |
| [illegible] | [illegible] | 5.0 | [illegible] | FIX | [illegible] | February 2038 |
| [illegible] | [illegible] | 5.0 | [illegible] | FIX/Z | [illegible] | April 2039 |
| **Security Group 4** | | | | | | |
| [illegible] | [illegible] | 5.0 | [illegible] | FIX | [illegible] | May 2022 |
| [illegible] | [illegible] | 5.0 | [illegible] | FIX | [illegible] | February 2038 |
| [illegible] | [illegible] | 5.0 | [illegible] | FIX/Z | [illegible] | April 2039 |
| **Residual** | | | | | | |
| RR | 0 | 0.0 | NPR | NPR | [illegible] | May 2041 |

(1) These Securities may be exchanged for MX Securities described in Schedule I to this Supplement.
(2) Subject to increase as described under "Increase in Size" in this Supplement. The amount shown for each Notional Class (indicated by "NTL" under Principal Type) is its original Class Notional Balance and does not represent principal that will be paid.
(3) As defined under "Class Types" in Appendix I to the Base Offering Circular. The type of Class with which the Class Notional Balance of each Notional Class will be reduced is indicated in parentheses.
(4) See "Yield, Maturity and Prepayment Considerations — Final Distribution Date" in this Supplement.
(5) See "Terms Sheet — Interest Rates" in this Supplement.

NOMURA

Loop Capital Markets LLC

The date of this Offering Circular Supplement is May 20, 2011.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

### TERMS SHEET

This terms sheet contains selected information for quick reference only. You should read this Supplement, particularly "Risk Factors," and each of the other documents listed under "Available Information."

**Sponsor:** Nomura Securities International, Inc.

**Co-Sponsor:** Loop Capital Markets LLC

**Trustee:** Wells Fargo Bank, N.A.

**Tax Administrator:** The Trustee

**Closing Date:** May 27, 2011

**Distribution Date:** The 16th day of each month or, if the 16th day is not a Business Day, the first Business Day thereafter, commencing in June 2011.

**Trust Assets:**

| Trust Asset Group or Subgroup [2] | Trust Asset Type | Certificate Rate | Original Term to Maturity (in years) |
|---|---|---|---|
| 1A | Ginnie Mae I | 5.0% | 30 |
| 1B | Ginnie Mae I | 5.0 | 30 |
| 1C | Ginnie Mae I | 5.0 | 30 |
| 1D | Ginnie Mae I | 5.0 | 30 |
| 2 | Underlying Certificate | (1) | (1) |
| 3 | Underlying Certificates | (1) | (1) |
| 4 | Underlying Certificates | (1) | (1) |

[1] Certain information regarding the Underlying Certificates is set forth in Exhibits A and B to this Supplement.

[2] The Group 1 Trust Assets consist of four subgroups, Subgroup 1A, Subgroup 1B, Subgroup 1C and Subgroup 1D (each, a "Subgroup").

**Security Groups:** This series of Securities consists of multiple Security Groups (each, a "Group"), as shown on the front cover of this Supplement and on Schedule I to this Supplement. Payments on each Group will be based solely on payments on the Trust Asset Group with the same numerical designation.

S-3

http://www.ginniemae.gov/doing_business_with_ginniemae/investor_resources/Prospectuses/ProspectusesLib/2011May20-066.pdf

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

# SECTION 3:    FORECLOSURE

### Recorded Events on the Loan Including Foreclosure Issues and Securitization

| Recorded Chain of Deed of Trust Possession | | Chain of Note Possession | |
|---|---|---|---|
| **Date** | **Original Deed of Trust** | **Date** | **Note Holder** |
| September 24, 2011<br><br>Instrument # 916<br><br>Official Records,<br>Scotts Bluff County Nebraska | ED TEAGUE &<br>DIANNA L. SHOULTS<br>(Borrower)<br><br>REGENT FINANCIAL GROUP INC.<br>(Lender)<br><br>**MIN: 1000525-5028679206-3** | April 21, 2011 | REGENT FINANCIAL GROUP INC.<br>(Lender)<br><br>Principal Amount: $121,512.00<br><br>**Loan #502867520<br>FHA Case # To Be Determined** |
| November 30, 2015<br><br>Instrument # 6691<br><br>Official Records,<br>Scotts Bluff County Nebraska | ***ASSIGNMENT OF DEED OF TRUST #1***<br><br>*To: Wells Fargo Bank.*<br><br>*Document signed by Frances Y. King for MERS without disclosure of employment as agent of Assignee* | Closing Date:<br><br>May 27, 2011 | **GINNIE MAE REMIC TRUST 2011-066**<br><br>(Lender)<br>Principal Amount:<br>$121,512.00 |

*Only includes primary active loan.*
*Annotated Voluntary Lien Search included in Exhibit I.*



**Certified Forensic Loan Auditors**

# REPORT SUMMARY

**Deed of Trust:**

- On April 21, 2011, Debtors ED TEAGUE & DIANNA L. SHOULTS executed a negotiable promissory note and a security interest in the form of a DEED OF TRUST in the amount of $ 121,512.00. This document was filed as document number 916 in the Official Records of Scotts Bluff County. *The original lender of the promissory note is REGENT FINANCIAL GROUP INC.*
- *Mortgage Electronic Registration Systems, Inc. (hereafter "MERS") is not named as the payee of the note, but is named as acting solely as a "nominee" for the lender as the beneficiary of the security interest Security Deed.*

**Securitization (The Note):**

- The NOTE may have been sold, transferred, assigned and securitized into the GINNIE MAE REMIC TRUST 2011-066 with a Closing Date of May 27, 2011.

**Assignment of Deed of Trust # 1:**

- On November 30, 2015, an Assignment of Deed of Trust was recorded in the Official Records, Scotts Bluff County as instrument number 6691 to **Planet Home Lending, LLC**. Document was signed by Frances Y. King for Mortgage Electronic Registration Systems, Inc. without disclosure of employment in likely representing Assignee, not Assignor. **About four years** had gone by since note was originated and examiner therefore recommends immediate production of the then notarized bill of sale; note endorsement; and verifiable proof of funds among REGENT FINANCIAL GROUP INC.; Wells Fargo Bank; Flagstar Bank, FSB; the Government National Mortgage Association (Ginnie Mae); and any securitized trust into which loan may have been placed such as the qualified trust identified above. Examiner considers this a document of impropriety requiring rescission for rightful foreclosure to take place until actual purchase by relevant parties is verified.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

# ROBO SIGNING ANALYSIS AND FINDINGS

### ASSIGNMENT OF DEED OF TRUST # 1 - Recorded November 30, 2015

==Frances Y. King== signs for Mortgage Electronic Registration Systems, Inc., as Assistant Secretary without disclosure of likely employment by Assignee agent. This is an indication that ==Frances Y. King== attempted to assign the Mortgage to client Planet Home Lending, LLC without an Assignor. This position of unilateral transfer is further strengthened by the fact that here is no evidence of verified proof of funds; a note endorsement; a bill of sale; a declaration of value; or transfer taxes as having been paid to Scotts Bluff County, Nebraska "For Value Received".

Property Address:
**635 HIGHWAY 26 E**
**MORRILL, NE 69358-7000**
NE2M-ADT 34309737  E  11/30/2015  APO01

Columbus, SC 29410

MIN #:  10005255028679206J          MERS Phone #   888-679-6377

## ASSIGNMENT OF DEED OF TRUST

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (herein "Assignor"), whose address is P.O. Box 2026, Flint, MI 48501-2026, AS NOMINEE FOR REGENT FINANCIAL GROUP INC., ITS SUCCESSORS AND ASSIGNS hereby assign and transfer to PLANET HOME LENDING, LLC (herein "Assignee"), whose address is 321 RESEARCH PARKWAY, SUITE 303, and its successors and assigns all its right, title, and interest in and to a certain Deed of Trust described below.

Beneficiary:            MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE
                        FOR REGENT FINANCIAL GROUP INC., ITS SUCCESSORS AND ASSIGNS
Borrower(s):            ED TEAGUE AND DIANNA L SHOULTS, HUSBAND AND WIFE
Original Trustee:       JACOB MUELLER, ATTORNEY AT LAW
Date of Deed of Trust: 2/22/2011        Original Loan Amount: **$121,512.00**

Recorded in **Scotts Bluff County**, NE on: 2/24/2011, book N/A, page N/A and instrument number 2011-916

Property Legal Description:
ALL THAT PART OF GOVERNMENT LOT 6 IN SECTION 3, TOWNSHIP 23 NORTH, RANGE 58 WEST OF THE 6TH P.M., SCOTTS BLUFF COUNTY, NEBRASKA, LYING NORTH OF THE RIGHT-OF-WAY OF THE CHICAGO, BURLINGTON AND QUINCY RAILROAD AS NOW LAID OUT, EXCEPT A TRACT OF LAND MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CENTER OF SECTION 3 AND EXTENDING THENCE IN A NORTHWESTERLY DIRECTION ALONG THE RIGHT-OF-WAY OF STATE HIGHWAY NUMBER 26 A DISTANCE OF 726 FEET, THENCE IN A NORTHEASTERLY DIRECTION, 518 FEET TO A POINT THAT IS 817 FEET NORTH OF THE POINT OF BEGINNING, THENCE SOUTH 817 FEET TO THE POINT OF BEGINNING; AND EXCEPT THOSE PARTS DEEDED TO THE STATE OF NEBRASKA IN BOOK "30", OF DEEDS, PAGE 41 AND IN BOOK "86", OF DEEDS, PAGE 49, AND EXCEPT THAT PART CONVEYED TO THE STATE OF NEBRASKA DEPARTMENT OF ROADS AS SHOWN BY A WARRANTY DEED RECORDED FEBRUARY 9, 2009 AS INSTRUMENT NO. 2009-564 ALL OF THE RECORDS OF SCOTTS BLUFF COUNTY, NEBRASKA. (A/K/A TAX LOT 8)

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., AS NOMINEE FOR REGENT
FINANCIAL GROUP INC., ITS SUCCESSORS AND
ASSIGNS

By: _Frances Y. King_
Frances Y. King, Assistant Secretary
Date: 11/30/15

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

## ASSIGNMENT OF DEED OF TRUST # 1 - Recorded November 30, 2015 (cont.)

Lower portion of document

State of SC, County of **Richland**

·On **11/30/2015**, before me, **Donna B. Shaw**, a Notary Public, personally appeared **Frances Y. King**, Assistant Secretary of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR REGENT FINANCIAL GROUP INC.**, ITS SUCCESSORS AND ASSIGNS personally known to me, or proved to me on the basis of satisfactory evidence, to be the person(s) whose name(s) is/are subscribed to the within document and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the document the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Notary Public: **Donna B. Shaw**
My Commission Expires: **8/31/2017**

DONNA B SHAW
Notary Public, South Carolina
My Commission Expires
August 31, 2017

## SEPARATE CASES:

## Frances Y. King different TITLES and signatures:

| | |
|---|---|
| Original Lender: | **CITIMORTGAGE, INC.** |
| Made By: | **MAKAELA D. WALLIS AND RYAN J. SMITH, AS TENANTS IN COMMON** |
| Date of Mortgage: | **9/27/2007** |
| Loan Amount: | **$82,500.00** |

Recorded in **Pottawattamie County**, IA on: **10/2/2007**, book N/A, page N/A and instrument number **2007-015821**

IN WITNESS THEREOF, the undersigned has caused this Release of Mortgage to be executed on 2/8/2012

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

By: *Frances Y King* Electronic Signature
**Frances Y. King, Assistant Vice President**

State of SC, County of **Lexington**

http://www.pottco.org/deed_pdf/2012/2/0/9/2012-2096.pdf

| | |
|---|---|
| Original Lender: | **AMTRUST BANK** |
| Made By: | **AARON P AND ANDREA M LEGBAND** |
| Date of Mortgage: | **9/12/2008** |
| Loan Amount: | **$108,000.00** |

Recorded in **Pottawattamie County**, IA on: 9/18/2008, book N/A, page N/A and instrument number **2008-013362**

IN WITNESS THEREOF, the undersigned has caused this Release of Mortgage to be executed on **8/9/2011**

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

By: *Frances Y King*
**Frances Y. King, Assistant Vice President**

State of SC, County of **Lexington**

http://www.pottco.org/deed_pdf/2011/1/0/1/2011-10138.pdf

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

IN WITNESS THEREOF, the undersigned has caused this Discharge of Mortgage to be executed on **12/23/2014**

*Whose address is: ℗
1901 E. Voorhees Street, Suite C
Danville, IL 61834 and P.O. Box 2026
Flint, MI 48501-2026

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. (MERS), AS NOMINEE FOR CAPITAL
ONE, N.A., ITS SUCCESSORS AND ASSIGNS

By: _____

**Frances Y. King, Assistant Secretary**

State of **SC**, County of **Lexington**

On **12/23/2014**, before me, **Vanessa P. Burkett**, a Notary Public, personally appeared **Frances Y. King, Assistant Secretary** of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS), AS NOMINEE FOR CAPITAL ONE, N.A., ITS SUCCESSORS AND ASSIGNS personally known to me, or proved to me on the basis

https://sussex.landrecordsonline.com/sussex/search.do?indexName=susseximages&lq=Instrument%3A20141226010215080

Recorded in **Sussex** County, **NJ** on: 6/13/2006, book **7601**, page 273 and instrument number **00066380**

IN WITNESS THEREOF, the undersigned has caused this Discharge of Mortgage to be executed on ⎯ 11/28/12 ⎯

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. AS NOMINEE FOR SUNTRUST
MORTGAGE, INC., ITS SUCCESSORS AND/OR
ASSIGNS

By: _____

**Frances Y. King, Assistant Secretary**

State of **SC**, County of **Lexington**

On 11/28/12 , before me, **Laurel W. Keen**, a Notary Public, personally appeared **Frances Y. King, Assistant Secretary** of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR SUNTRUST MORTGAGE, INC., ITS SUCCESSORS AND/OR ASSIGNS personally known to me, or proved to

https://sussex.landrecordsonline.com/sussex/search.do?indexName=susseximages&lq=Instrument%3A20121206010266770

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

Recorded in **DESOTO County, MS** on: **5/16/2007**, book **2,718**, page **641** and instrument number **N/A**

Property Legal Description:
**LOT 188, SECTION E, FIRST REVISION, WELLINGTON SQUARE SUBDIVISION, SITUATED IN SECTION 28, TOWNSHIP 1 SOUTH, RANGE 8 WEST, AS SHOWN ON PLAT OF RECORD IN PLAT BOOK 51, PAGE 39 IN THE CHANCERY CLERK'S OFFICE OF DESOTO COUNTY, MISSISSIPPI.**

Indexing Instructions: Lot(s): **188** Block(s): **NA** Subdivision: **WELLINGTON SQUARE** Town: **1 SOUTH**

IN WITNESS WHEREOF, the undersigned has caused this Satisfaction of Deed of Trust to be executed on **1/24/2011**

> **MERS as Nominee for Nationstar**
>
> By: _Frances Y King_
> **Frances Y. King, Assistant Vice President**

State of SC, County of **Lexington**

The foregoing instrument was acknowledged before me, a Notary Public, on **1/24/2011** by **Frances Y. King, Assistant Vice President** of **MERS as Nominee for Nationstar** on behalf of the corporation.

http://deeds.desotocountyms.gov/T/T03267-00457.pdf

Original Lender:         **DITECH.COM, LLC F/K/A DITECH.COM, INC.**
Borrower(s):           **HOMA CLAYTOR AND BRENDA CLAYTOR, HUSBAND AND WIFE**
Date of Mortgage:      **4/10/2007**
Loan Amount:           **$96,000.00**
Recorded in Lincoln County, WY on: 5/4/2007, book 656, page 766 and instrument number 929047

IN WITNESS THEREOF, the undersigned has caused this Deed of Release to be executed on **12·11·12**

> **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE FOR DITECH.COM, LLC F/K/A DITECH.COM, INC.**
>
> By: _Frances Y King_
> **Frances Y. King, Assistant Secretary**

State of SC, County of **Lexington**

On this **12·11·12** before me personally appeared **Frances Y. King, Assistant Secretary** of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE FOR DITECH.COM, LLC F/K/A DITECH.COM, INC.** who provided satisfactory evidence of his/her identification to be the person whose

http://weblink.lcwy.org/WebLink8/0/doc/281181/Page1.aspx

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

<u>Frances Y. King</u> signs as a notary in a different state:

I request that this Certificate of Satisfaction be recorded and the above referenced security instrument be canceled of record.

**IN WITNESS WHEREOF,** the corporate maker has caused this instrument to be executed in its corporate name by its duly authorized officers, all by authority of its Board of directors, the day and year first below written.

Dated: **02/02/2007**                **MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC., AS NOMINEE FOR NOVASTAR MORTGAGE, INC.**

**Sharon Ramezani**
**Asst. Vice President**

State of SC

County of **Lexington**

I, a Notary Public of the County and State aforesaid, certify that **Sharon Ramezani**, personally came before me this day and acknowledged that s/he is the **Asst. Vice President** of **MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC., AS NOMINEE FOR NOVASTAR MORTGAGE, INC.,** being duly sworn and that by authority duly given and as an act of the corporation, the satisfaction of the provisions of the above-referenced Deed of Trust (Mortgage or other instrument) was signed in its name by its **Asst. Vice President**.

Witness my hand and official seal, this date of **02/02/2007**.

Notary Public: **Frances Y. King**
My Commission Expires: **06/21/2010**

Frances Y. King
Notary Public
State of South Carolina

http://www.forsythdeeds.com/view_image.php?file=/img/nc/forsyth/re/002729/000742.tif&type=pdf

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

Date of Deed of Trust: **12/20/2004**          Loan Amount: **$78,000.00**

Recording Date: **12/21/2004**     Book: **RE 2529**     Page: **180-191**     Document #: **2004086811 00094**
and recorded in **County of Forsyth**, State of **North Carolina**.

2. The Note or indebtedness has been lost and after the exercise of due diligence cannot be located, or, cannot
otherwise be presented.

3. The affiant certifies that all indebtedness secured by the Deed of Trust, Mortgage, or other instrument has been
satisfied and the affiant is responsible for cancellation of the same.

**MORTGAGE ELECTRONIC REGISTRATION
SYSTEM, INC., AS NOMINEE FOR NOVASTAR
MORTGAGE, INC.**

**Sharon Ramezani**
**Asst. Vice President**

Witness: **Natalie Hamilton**

State of **SC**
County of **Lexington**

Sworn to and subscribed before me this date of **02/02/2007**.

Notary Public: **Frances Y. King**
My Commission Expires: **06/21/2010**

Frances Y. King
Notary Public
State of South Carolina

http://www.forsythdeeds.com/view_image.php?file=/img/nc/forsyth/re/002729/000742.tif&type=pdf

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## One opinion: there are no employees of MERS.

### Is this the cycle?



@ 2010 FORECLOSURE FRAUD | by DinSFLA. All rights reserved. www.StopForeclosurefraud.com

## http://stopforeclosurefraud.com/mers-101/

Much of the "work" of MERS is, in fact, outsourced to the approximately 6,000 MERS members, in the observation of Examiner.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

**American Banker** states that foreclosure support documents (e.g. Assignments of Deed of Trust) should be prepared at time of transfer instead of by bank employees claiming to represent lenders that no longer exist:



Foreclosure Documents

by Kate Berry
AUG 31, 2011 5:47pm ET

🖨 Print   ✉ Email   ⊞ Reprints

(15) Comments

Tweet 66   Share 21   Like 76   +1

Some of the largest mortgage servicers are still fabricating documents that should have been signed years ago and submitting them as evidence to foreclose on homeowners.

The practice continues nearly a year after the companies were caught cutting corners in the robo-signing scandal and about six months after the industry began negotiating a settlement with state attorneys general investigating loan-servicing abuses.

Several dozen documents reviewed by *American Banker* show that as recently as August some of the largest U.S. banks, including Bank of America Corp., Wells Fargo & Co., Ally Financial Inc., and OneWest Financial Inc., were essentially backdating paperwork necessary to support their right to foreclose.

Some of documents reviewed by *American Banker* included signatures by current bank employees claiming to represent lenders that no longer exist.

**RELATED LINKS**

U.S. Bank Stands Out as a Mortgage Bond Trustee with Teeth

Robo-Signing Settlement Needs to Go All the Way

Are the State AG Mortgage Settlement Talks Falling Apart?

N.Y. AG Moves to Intervene in B of A-Bondholder Settlement

**RELATED GRAPHIC**

🔍 Enlarge This Image



http://www.americanbanker.com/issues/176_170/robo-signing-foreclosure-mortgage-assignments-1041741-1.html

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

# BLOOMBERG SEARCH SECTION

On **March 14, 2016**, I researched the Bloomberg online Database at the request of **Certified Forensic Loan Auditors, LLC** on behalf of **ED TEAGUE & DIANNA L. SHOULTS** whose property address is noted herein above. The Loan Level Data search conducted using Bloomberg's terminal did not reveal matching characteristics based on Original Amount: **$121,512.00**; Origination Date: **April 21, 2011**; Location of Property: **NE**; Property Type: **Single Family Residence**; Occupancy: **Owner Occupied**; Zip Code **69358**. Examiner did, however, locate a REMIC TRUST that matches the characteristics for securitizing this loan, namely the **GINNIE MAE REMIC TRUST 2011-066** issued **May 27, 2011**.

This is also Federal Housing Administration (FHA) loan.  Most of the loans Ginnie Mae insures are FHA or Veterans Administration (VA) loans.  Ginnie Mae is part of the Federal Government within the U.S. Department of Housing and Urban Development (HUD).

GINNIE MAE guarantees principal and interest of the securitized trusts that it formed.  This is an indication that the loan is securitized with Ginnie Mae as the sponsor of the mortgage backed securities (MBS) mortgage pool.

As with Fannie Mae and Freddie Mac, loan level detail is not available for Ginnie Mae MBS within Bloomberg and prospectuses and related investor information is not filed with the Securities and Exchange Commission.
http://www.ginniemae.gov/about/about.asp?Section=About

Although **REGENT FINANCIAL GROUP INC.,** originated the loan, any subsequent purchaser may not have properly endorsed the subject note nor perfected the security interest in the note pursuant to the Nebraska Uniform Commercial Code.  There is no known connection between the <u>original lender</u> and Wells Fargo Bank, NA.

**Identification of exact Ginnie Mae securitized or corporate portfolio may be gotten through a Qualified Written Request, a Request for Information under Regulations X or Z, voluntary lender disclosure, a Freedom of Information Act request as applicable, or discovery through litigation.**

Screen shots of this trust from the Bloomberg System follow:

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## DESCRIPTION OF SECURITY FROM BLOOMBERG





**Certified Forensic Loan Auditors**

## DEAL DESCRIPTION

| GNR 2011-66 FC Mtge ▾ | DES ▾ Related Functions Menu |  | Message ☆ |
|---|---|---|---|
| GNR 2011-66 FC | 100-13 /100-21 | CUSIP 38377VUU8 Disc Mrgn | 35.4/29.4 |
| As of 11 Mar Prepay 300PSA WAL 4.33 Collateral 100.0% GNSF | 5% | | BVAL |

| GNR 2011-66 FC Mtge | | | | | Security Description | |
|---|---|---|---|---|---|---|

CUSIP 38377VUU8  5.500(272)77    GNSF 5 S        95) Buy      96) Sell

| 1) Bond Summary | 2) Group Summary | 3) Deal Summary | 4) Comments |
|---|---|---|---|

Issuer   GOVERNMENT NATIONAL MORTGAGE ASSOCIATION          5) Prospectus
Series   2011-66   8) Collateral   193 Pools: GNSF 4.95 S   Group ALL collateral

| Deal (Mar 2016) | | Original Issue | | | Collat | PSA | CPR | GNSF 4.95 S | |
|---|---|---|---|---|---|---|---|---|---|
| Balance | 320,856,957 | Balance USD | 710,044,819 | 1 Month | 225 | 13.5 | – | – |
| Net Cpn | 4.95% | Net Cpn | 4.864% | 3 Month | 227 | 13.6 | – | – |
| WAC | 5.45% | WAC | 5.364% | 6 Month | 264 | 15.9 | – | – |
| WAM | 22:9  273 mo | WAM | 27:11  335 mo | 12 Month | 290 | 17.4 | – | – |
| Age | 6:6  78 mo | Age | 1:9  21 mo | Life | 264 | 15.5 | – | – |
| Next Pay | 03/16/2016 | 1st Pmt | 06/16/2011 | Collateral | | | Payment Details | |
| Rcd Date | 02/29/2016 | 1st Settle | 05/27/2011 | Country | | US | Frequency | Monthly |
| B.Median | | PX | | | | | Pay Date | 16th |
| PAC  35.92%  SUP  4.17% | | PAC  51.44%  SUP  6.59% | | | | | Pay Delay | Mixed |
| Beg Accrue | MIXED | Dated Date | MIXED | | | | Day Count | 30/360 |

9) Historical Paydown for Group ALL collateral                   10) Buyout (SEV)

| | Mar16 | Feb | Jan | Dec15 | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr15 | | VPR | Buyout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PSA | 225 | 206 | 252 | 264 | 298 | 341 | 348 | 349 | 363 | 271 | 317 | 273 | 1m | – | 2.36 |
| CPR | 13.5 | 12.4 | 15.1 | 15.9 | 17.9 | 20.5 | 20.9 | 20.9 | 21.8 | 16.2 | 19.0 | 16.4 | 3m | – | 3.02 |
| WAM | 273 | 274 | 275 | 276 | 277 | 278 | 280 | 281 | 282 | 283 | 284 | 285 | 6m | – | 3.57 |
| WAC | 5.45 | 5.45 | 5.45 | 5.45 | 5.44 | 5.44 | 5.44 | 5.44 | 5.44 | 5.43 | 5.43 | 5.43 | 12m | – | 3.05 |

---

| GNR 2011-66 FC Mtge ▾ | DES ▾ Related Functions Menu |  | Message ☆ |
|---|---|---|---|

> Page

| GNR 2011-66 FC Mtge | | Security Description | |
|---|---|---|---|

CUSIP 38377VUU8  5.500(272)77    GNSF 5 S        95) Buy      96) Sell

| 1) Bond Summary | 2) Group Summary | 3) Deal Summary | 4) Comments |
|---|---|---|---|

All Groups                                                    10 Groups

| Group Collateral Type | Classes | $Mln Outstanding | | 1 Month | | 3 Month | |
|---|---|---|---|---|---|---|---|
| | | Class | Collat | PSA | CPR | PSA | CPR |
| 11) 1: 15YR/5.0/GNMA/G1 | 6 • | 37.9 | 162.4 | 224 | 13.4 | 235 | 14.1 |
| 12) 2: REMIC | 24 • | 219.7 | 32.3 | 353 | 21.2 | 392 | 23.5 |
| 13) 3: REMIC | 11 • | 98.6 | 48.5 | 275 | 16.5 | 177 | 10.6 |
| 14) 4: REMIC | 11 • | 255.1 | 77.7 | 136 | 8.2 | 167 | 10.1 |
| 15) 5: 30YR/5.0/GNMA/G1A | 27 • | 537.1 | 85.4 | 138 | 8.3 | 185 | 11.1 |
| 16) 6: 30YR/5.0/GNMA/G1B | 24 • | 213.5 | 29.4 | 310 | 18.6 | 229 | 13.8 |
| 17) 7: 30YR/5.0/GNMA/G1C | 24 • | 128.1 | 19.0 | 452 | 27.1 | 381 | 22.8 |
| 18) 8: 30YR/5.0/GNMA/G1D | 24 • | 213.9 | 28.6 | 215 | 12.9 | 282 | 16.9 |
| 19) ALL collateral | 1 | 0.0 | 320.9 | 225 | 13.5 | 227 | 13.6 |
| 20) <<whole deal>> | 152 | 325.9 | 320.9 | 225 | 13.5 | 227 | 13.6 |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## STRUCTURED FINANCE NOTES SCREEN
### Lists the primary parties to the securitization transaction



### Trust show an issue date of May 27, 2011





**Certified Forensic Loan Auditors**

## VIEW ALL LOAN CLASSES SCREEN

Shows the splitting of the investment trust into separate investment classes
**(152 classes shown in the next 8 screens)**



| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) | CS | 64,800 | 0.050 | 6.98 | 0.5320 38377VUT1 | IO, INV, NTL, PT | 5: 30YR/5.0/GNMA/G1A |
| 2) | FC | 64,800 | 0.881 | 6.98 | 0.5320 38377VUU8 | FLT, PT | 5: 30YR/5.0/GNMA/G1A |
| 3) | FJ | 25,800 | 0.881 | 6.98 | 0.3029 38377VUV6 | FLT, PT | 7: 30YR/5.0/GNMA/G1C |
| 4) | FK | 28,200 | 0.881 | 6.98 | 0.4257 38377VUW4 | FLT, PT | 6: 30YR/5.0/GNMA/G1B |
| 5) | FM | 31,200 | 0.881 | 6.98 | 0.3713 38377VUX2 | FLT, PT | 8: 30YR/5.0/GNMA/G1D |
| 6) | JS | 25,800 | 0.050 | 6.98 | 0.3029 38377VUY0 | IO, INV, NTL, PT | 7: 30YR/5.0/GNMA/G1C |
| 7) | KS | 28,200 | 0.050 | 6.98 | 0.4257 38377VUZ7 | IO, INV, NTL, PT | 6: 30YR/5.0/GNMA/G1B |
| 8) | LA | 58,707 | 4.000 | 3.99 | 0.3792 38377VVA1 | PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 9) | LM | 9,128 | 4.000 | 10.99 | 1.0000 38377VVB9 | PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 10) | LN | 6,512 | 4.000 | 17.19 | 1.0000 38377VVC7 | PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 11) | MA | 25,548 | 4.000 | 3.99 | 0.3809 38377VVD5 | PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 12) | MB | 3,973 | 4.000 | 10.99 | 1.0000 38377VVE3 | PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 13) | MC | 2,834 | 4.000 | 17.20 | 1.0000 38377VVF0 | PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 14) | MS | 31,200 | 0.050 | 6.98 | 0.3713 38377VVG8 | IO, INV, NTL, PT | 8: 30YR/5.0/GNMA/G1D |
| 15) | NA | 23,374 | 4.000 | 3.99 | 0.2352 38377VVH6 | PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 16) | NB | 3,634 | 4.000 | 10.99 | 1.0000 38377VVJ2 | PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 17) | NC | 2,593 | 4.000 | 17.19 | 1.0000 38377VVK9 | PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 18) | QA | 28,266 | 4.000 | 3.99 | 0.3484 38377VVL7 | PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 19) | QB | 4,395 | 4.000 | 10.99 | 1.0000 38377VVM5 | PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |

GNR 2011-66 FC Mtge — VAC — Related Functions Menu
Message
) AC
<Menu> for series list
95) Options — Page 1/8   View All Classes
GNR 2011-66 GOVERNMENT NATIONAL MORTGAGE ASSOCIATION   152 Classes
Template Agency

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**



| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) | QC | 3,136 | 4.000 | 17.19 | 1.0000 38377VVN3 | PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 2) | SB | 64,800 | 5.570 | 6.98 | 0.5320 38377VVP8 | IO, INV, NTL, PT | 5: 30YR/5.0/GNMA/G1B |
| 3) | SG | 28,200 | 5.570 | 6.98 | 0.4257 38377VVQ6 | IO, INV, NTL, PT | 6: 30YR/5.0/GNMA/G1B |
| 4) | SH | 25,800 | 5.570 | 6.98 | 0.3029 38377VVR4 | IO, INV, NTL, PT | 7: 30YR/5.0/GNMA/G1C |
| 5) | SL | 31,200 | 5.570 | 6.98 | 0.3713 38377VVS2 | IO, INV, NTL, PT | 8: 30YR/5.0/GNMA/G1D |
| 6) | UA | 18,427 | 4.000 | 11.00 | 0.6598 38377VVT0 | SUP | 5: 30YR/5.0/GNMA/G1A |
| 7) | UB | 513 | 4.000 | 26.99 | 1.0000 38377VVU7 | SUP | 5: 30YR/5.0/GNMA/G1A |
| 8) | UC | 3,489 | 4.000 | 3.21 | 0.2509 38377VVV5 | PAC-2(22) | 5: 30YR/5.0/GNMA/G1A |
| 9) Pd | WA | 23,143 | 4.000 | 8.37 | 0.0000 38377VVW3 | SUP | 1: 15YR/5.0/GNMA/G1 |
| 10) Pd | WB | 2,624 | 4.000 | 21.11 | 0.0000 38377VVX1 | SUP | 1: 15YR/5.0/GNMA/G1 |
| 11) | WC | 2,006 | 4.000 | 25.35 | 0.4512 38377VVY9 | SUP | 1: 15YR/5.0/GNMA/G1 |
| 12) | WD | 2,698 | 4.000 | 3.50 | 0.3039 38377VVZ6 | PAC-2(22) | 1: 15YR/5.0/GNMA/G1 |
| 13) Pd | K | 46 | 4.500 | 6.40 | 0.0000 38377VWA0 | SC, SUP | 2: REMIC |
| 14) | PA | 167,668 | 4.500 | 3.99 | 0.0480 38377VWB8 | SC, PAC(11) | 2: REMIC |
| 15) | PV | 7,743 | 4.500 | 5.82 | 0.6299 38377VWC6 | SC, AD, PAC(11) | 2: REMIC |
| 16) | PZ | 12,051 | 4.500 | 11.17 | 1.2378 38377VWD4 | SC, Z, PAC(11) | 2: REMIC |
| 17) | VP | 5,690 | 4.500 | 9.64 | 1.0000 38377VWE2 | SC, AD, PAC(11) | 2: REMIC |
| 18) Pd | VA | 19,756 | 5.000 | 3.92 | 0.0000 38377VWF9 | SC, AD, SEQ | 3: REMIC |
| 19) | VL | 15,601 | 5.000 | 6.30 | 0.9565 38377VWG7 | SC, AD, SEQ | 3: REMIC |

| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) | Z | 27,135 | 5.000 | 12.91 | 1.2674 38377VWH5 | SC, Z, SEQ | 3: REMIC |
| 2) | VM | 25,081 | 5.000 | 4.09 | 0.5944 38377VWJ1 | SC, AD, SEQ | 4: REMIC |
| 3) | VN | 19,807 | 5.000 | 6.53 | 1.0000 38377VWK8 | SC, AD, SEQ | 4: REMIC |
| 4) | ZN | 34,448 | 5.000 | 13.08 | 1.2674 38377VWL6 | SC, Z, SEQ | 4: REMIC |
| 5) | RR | 0 | 0.000 | 0.00 | 0.0000 38377VWM4 | R, NPR | ALL collateral |
| 6) | LB | 58,707 | 2.000 | 3.99 | 0.3792 38377VWN2 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 7) | LC | 58,707 | 2.250 | 3.99 | 0.3792 38377VWP7 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 8) | LD | 58,707 | 2.500 | 3.99 | 0.3792 38377VWQ5 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 9) | LE | 58,707 | 2.750 | 3.99 | 0.3792 38377VWR3 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 10) | LG | 58,707 | 3.000 | 3.99 | 0.3792 38377VWS1 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 11) | LH | 58,707 | 3.250 | 3.99 | 0.3792 38377VWT9 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 12) | LI | 46,966 | 5.000 | 3.99 | 0.3792 38377VWU6 | IO, EXCH, NTL, PAC-1 | 5: 30YR/5.0/GNMA/G1A |
| 13) | LJ | 58,707 | 3.500 | 3.99 | 0.3792 38377VWV4 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 14) | LK | 58,707 | 3.750 | 3.99 | 0.3792 38377VWW2 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 15) | LO | 58,707 | 0.000 | 3.99 | 0.3792 38377VWX0 | EXCH, PO, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 16) | LQ | 52,184 | 4.500 | 3.99 | 0.3792 38377VWY8 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 17) | LT | 46,966 | 5.000 | 3.99 | 0.3792 38377VWZ5 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 18) | LU | 42,696 | 5.500 | 3.99 | 0.3792 38377VXA9 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 19) | LW | 39,138 | 6.000 | 3.99 | 0.3792 38377VXB7 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

| ◄ ► GNR 2011-66 FC Mtge ▾ VAC ▾ Related Functions Menu ▾ | | | | | Message ☆ ▪ ▪ ✿ ? |
|---|---|---|---|---|---|
| **▶ VAC** | | | | | |
| **‹Menu› for series list** | | | | | |
| 95) Options ▾ | | | | Page 4/8 | View All Classes |
| GNR 2011-66 GOVERNMENT NATIONAL MORTGAGE ASSOCIATION | | | | | 152 Classes |
| Template Agency ▾ | | | | | |

| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) | ● LX | 36,127 | 6.500 | 3.99 | 0.3792 38377VXC5 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 2) | ● LY | 33,547 | 7.000 | 3.99 | 0.3792 38377VXD3 | EXCH, PAC-1(11) | 5: 30YR/5.0/GNMA/G1A |
| 3) | ● MD | 25,548 | 2.000 | 3.99 | 0.3809 38377VXE1 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 4) | ● ME | 25,548 | 2.250 | 3.99 | 0.3809 38377VXF8 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 5) | ● MG | 25,548 | 2.500 | 3.99 | 0.3809 38377VXG6 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 6) | ● MH | 25,548 | 2.750 | 3.99 | 0.3809 38377VXH4 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 7) | ● MI | 20,438 | 5.000 | 3.99 | 0.3809 38377VXJ0 | IO, EXCH, NTL, PAC-1 | 6: 30YR/5.0/GNMA/G1B |
| 8) | ● MJ | 25,548 | 3.000 | 3.99 | 0.3809 38377VXK7 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 9) | ● MK | 25,548 | 3.250 | 3.99 | 0.3809 38377VXL5 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 10) | ● ML | 25,548 | 3.500 | 3.99 | 0.3809 38377VXM3 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 11) | ● MN | 25,548 | 3.750 | 3.99 | 0.3809 38377VXN1 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 12) | ● MO | 25,548 | 0.000 | 3.99 | 0.3809 38377VXP6 | EXCH, PO, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 13) | ● MQ | 22,709 | 4.500 | 3.99 | 0.3809 38377VXQ4 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 14) | ● MT | 20,438 | 5.000 | 3.99 | 0.3809 38377VXR2 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 15) | ● MU | 18,580 | 5.500 | 3.99 | 0.3809 38377VXS0 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 16) | ● MW | 17,032 | 6.000 | 3.99 | 0.3809 38377VXT8 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 17) | ● MX | 15,722 | 6.500 | 3.99 | 0.3809 38377VXU5 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 18) | ● MY | 14,599 | 7.000 | 3.99 | 0.3809 38377VXV3 | EXCH, PAC-1(11) | 6: 30YR/5.0/GNMA/G1B |
| 19) | ● ND | 23,374 | 2.000 | 3.99 | 0.2352 38377VXW1 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |

| ◄ ► GNR 2011-66 FC Mtge ▾ VAC ▾ Related Functions Menu ▾ | | | | | Message ☆ ▪ ▪ ✿ ? |
|---|---|---|---|---|---|
| **▶ VAC** | | | | | |
| **‹Menu› for series list** | | | | | |
| 95) Options ▾ | | | | Page 5/8 | View All Classes |
| GNR 2011-66 GOVERNMENT NATIONAL MORTGAGE ASSOCIATION | | | | | 152 Classes |
| Template Agency ▾ | | | | | |

| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) | ● NE | 23,374 | 2.250 | 3.99 | 0.2352 38377VXX9 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 2) | ● NG | 23,374 | 2.500 | 3.99 | 0.2352 38377VXY7 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 3) | ● NH | 23,374 | 2.750 | 3.99 | 0.2352 38377VXZ4 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 4) | ● NI | 18,699 | 5.000 | 3.99 | 0.2352 38377VYA8 | IO, EXCH, NTL, PAC-1 | 7: 30YR/5.0/GNMA/G1C |
| 5) | ● NJ | 23,374 | 3.000 | 3.99 | 0.2352 38377VYB6 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 6) | ● NK | 23,374 | 3.250 | 3.99 | 0.2352 38377VYC4 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 7) | ● NL | 23,374 | 3.500 | 3.99 | 0.2352 38377VYD2 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 8) | ● NM | 23,374 | 3.750 | 3.99 | 0.2352 38377VYE0 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 9) | ● NO | 23,374 | 0.000 | 3.99 | 0.2352 38377VYF7 | EXCH, PO, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 10) | ● NQ | 20,777 | 4.500 | 3.99 | 0.2352 38377VYG5 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 11) | ● NT | 18,699 | 5.000 | 3.99 | 0.2352 38377VYH3 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 12) | ● NU | 16,999 | 5.500 | 3.99 | 0.2352 38377VYJ9 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 13) | ● NW | 15,583 | 6.000 | 3.99 | 0.2352 38377VYK6 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 14) | ● NX | 14,384 | 6.500 | 3.99 | 0.2352 38377VYL4 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 15) | ● NY | 13,357 | 7.000 | 3.99 | 0.2352 38377VYM2 | EXCH, PAC-1(11) | 7: 30YR/5.0/GNMA/G1C |
| 16) | ✳ QD | 28,266 | 2.000 | 3.99 | 0.3484 38377VYN0 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 17) | ● QE | 28,266 | 2.250 | 3.99 | 0.3484 38377VYP5 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 18) | ● QG | 28,266 | 2.500 | 3.99 | 0.3484 38377VYQ3 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 19) | ● QH | 28,266 | 2.750 | 3.99 | 0.3484 38377VYR1 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

| | GNR 2011-66 FC Mtge ▾ | VAC ▾ | Related Functions Menu ▾ | | | Message ☆ ▣ ▣ ⚙ ? |

**VAC**

**<Menu> for series list**

| 99) Options ▾ | | | | Page 6/8 | View All Classes |

**GNR 2011-66 GOVERNMENT NATIONAL MORTGAGE ASSOCIATION** — 152 Classes

Template: Agency

| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) | ● QI | 22,613 | 5.000 | 3.99 | 0.3484 38377VYS9 | IO, EXCH, NTL, PAC-1 | 8: 30YR/5.0/GNMA/G1D |
| 2) | ● QJ | 28,266 | 3.000 | 3.99 | 0.3484 38377VYT7 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 3) | ● QK | 28,266 | 3.250 | 3.99 | 0.3484 38377VYU4 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 4) | ● QL | 28,266 | 3.500 | 3.99 | 0.3484 38377VYV2 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 5) | ● QM | 28,266 | 3.750 | 3.99 | 0.3484 38377VYW0 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 6) | ● QN | 25,125 | 4.500 | 3.99 | 0.3484 38377VYX8 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 7) | ● QO | 28,266 | 0.000 | 3.99 | 0.3484 38377VYY6 | EXCH, PO, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 8) | ● QT | 22,613 | 5.000 | 3.99 | 0.3484 38377VYZ3 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 9) | ● QU | 20,557 | 5.500 | 3.99 | 0.3484 38377VZA7 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 10) | ● QW | 18,844 | 6.000 | 3.99 | 0.3484 38377VZB5 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 11) | ● QX | 17,394 | 6.500 | 3.99 | 0.3484 38377VZC3 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 12) | ● QY | 16,152 | 7.000 | 3.99 | 0.3484 38377VZD1 | EXCH, PAC-1(11) | 8: 30YR/5.0/GNMA/G1D |
| 13) | ● FB | 64,800 | 0.931 | 6.98 | 0.5320 38377VZE9 | EXCH, FLT, PT | 5: 30YR/5.0/GNMA/G1A |
| 14) | ● SC | 64,800 | 5.620 | 6.98 | 0.5320 38377VZF6 | IO, EXCH, INV, NTL, PT | 5: 30YR/5.0/GNMA/G1A |
| 15) | ● FG | 28,200 | 0.931 | 6.98 | 0.4257 38377VZG4 | EXCH, FLT, PT | 6: 30YR/5.0/GNMA/G1B |
| 16) | ● SK | 28,200 | 5.620 | 6.98 | 0.4257 38377VZH2 | IO, EXCH, INV, NTL, PT | 6: 30YR/5.0/GNMA/G1B |
| 17) | ● FH | 25,800 | 0.931 | 6.98 | 0.3029 38377VZJ8 | EXCH, FLT, PT | 7: 30YR/5.0/GNMA/G1C |
| 18) | ● SJ | 25,800 | 5.620 | 6.98 | 0.3029 38377VZK5 | IO, EXCH, INV, NTL, PT | 7: 30YR/5.0/GNMA/G1C |
| 19) | ● FL | 31,200 | 0.931 | 6.98 | 0.3713 38377VZL3 | EXCH, FLT, PT | 8: 30YR/5.0/GNMA/G1D |

| | GNR 2011-66 FC Mtge ▾ | VAC ▾ | Related Functions Menu ▾ | | | Message ☆ ▣ ▣ ⚙ ? |

**VAC**

**<Menu> for series list**

| 99) Options ▾ | | | | Page 7/8 | View All Classes |

**GNR 2011-66 GOVERNMENT NATIONAL MORTGAGE ASSOCIATION** — 152 Classes

Template: Agency

| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) | ● SM | 31,200 | 5.620 | 6.98 | 0.3713 38377VZM1 | IO, EXCH, INV, NTL, PT | 8: 30YR/5.0/GNMA/G1D |
| 2) | ● KM | 21,130 | 4.000 | 10.99 | 1.0000 38377VZN9 | EXCH, PAC-1(11) | 1: 30YR/5.0/GNMA/G1 |
| 3) | ● KN | 15,075 | 4.000 | 17.19 | 1.0000 38377VZP4 | EXCH, PAC-1(11) | 1: 15YR/5.0/GNMA/G1 |
| 4) | ● PC | 167,668 | 2.000 | 3.99 | 0.0480 38377VZQ2 | SC, EXCH, PAC(11) | 2: REMIC |
| 5) | ● PD | 167,668 | 2.250 | 3.99 | 0.0480 38377VZR0 | SC, EXCH, PAC(11) | 2: REMIC |
| 6) | ● PE | 167,668 | 2.500 | 3.99 | 0.0480 38377VZS8 | SC, EXCH, PAC(11) | 2: REMIC |
| 7) | ● PG | 167,668 | 2.750 | 3.99 | 0.0480 38377VZT6 | SC, EXCH, PAC(11) | 2: REMIC |
| 8) | ● PH | 167,668 | 3.000 | 3.99 | 0.0480 38377VZU3 | SC, EXCH, PAC(11) | 2: REMIC |
| 9) | ● PI | 167,668 | 4.500 | 3.99 | 0.0480 38377VZV1 | SC, IO, EXCH, NTL, PAC | 2: REMIC |
| 10) | ● PJ | 167,668 | 3.250 | 3.99 | 0.0480 38377VZW9 | SC, EXCH, PAC(11) | 2: REMIC |
| 11) | ● PK | 167,668 | 3.500 | 3.99 | 0.0480 38377VZX7 | SC, EXCH, PAC(11) | 2: REMIC |
| 12) | ● PL | 167,668 | 3.750 | 3.99 | 0.0480 38377VZY5 | SC, EXCH, PAC(11) | 2: REMIC |
| 13) | ● PM | 167,668 | 4.000 | 3.99 | 0.0480 38377VZZ2 | SC, EXCH, PAC(11) | 2: REMIC |
| 14) | ● PN | 167,668 | 4.250 | 3.99 | 0.0480 38377VA22 | SC, EXCH, PAC(11) | 2: REMIC |
| 15) | ● PO | 167,668 | 0.000 | 3.99 | 0.0480 38377VA30 | SC, EXCH, PO, PAC(11) | 2: REMIC |
| 16) | ● PQ | 150,901 | 5.000 | 3.99 | 0.0480 38377VA48 | SC, EXCH, PAC(11) | 2: REMIC |
| 17) | ● PT | 137,183 | 5.500 | 3.99 | 0.0480 38377VA55 | SC, EXCH, PAC(11) | 2: REMIC |
| 18) | ● PW | 125,751 | 6.000 | 3.99 | 0.0480 38377VA63 | SC, EXCH, PAC(11) | 2: REMIC |
| 19) | ● PX | 116,078 | 6.500 | 3.99 | 0.0480 38377VA71 | SC, EXCH, PAC(11) | 2: REMIC |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**



| | CF Class | Orig(000) | Cpn | OWAL | Factor Cusip | Description | Group Des |
|---|---|---|---|---|---|---|---|
| 1) • | PY | 107,787 | 7.000 | 3.99 | 0.0480 38377VA89 | SC, EXCH, PAC(11) | 2: REMIC |
| 2) • | KH | 193,198 | 4.500 | 4.88 | 0.1736 38377VA97 | SC, EXCH, PT | 2: REMIC |
| 3) • | PB | 25,484 | 4.500 | 10.75 | 1.0000 38377VB88 | SC, EXCH, PAC(11) | 2: REMIC |
| 4) Pd | VB | 19,756 | 2.000 | 3.92 | 0.0000 38377VB96 | SC, EXCH, AD, SEQ | 3: REMIC |
| 5) Pd | VC | 19,756 | 2.500 | 3.92 | 0.0000 38377VC20 | SC, EXCH, AD, SEQ | 3: REMIC |
| 6) Pd | VD | 19,756 | 3.000 | 3.92 | 0.0000 38377VC38 | SC, EXCH, AD, SEQ | 3: REMIC |
| 7) Pd | VE | 19,756 | 3.500 | 3.92 | 0.0000 38377VC46 | SC, EXCH, AD, SEQ | 3: REMIC |
| 8) Pd | VG | 19,756 | 4.000 | 3.92 | 0.0000 38377VC53 | SC, EXCH, AD, SEQ | 3: REMIC |
| 9) Pd | VH | 19,756 | 4.500 | 3.92 | 0.0000 38377VC61 | SC, EXCH, AD, SEQ | 3: REMIC |
| 10) Pd | VI | 11,854 | 5.000 | 3.92 | 0.0000 38377VC79 | SC, IO, EXCH, NTL, AD, SEQ | 3: REMIC |
| 11) • | BC | 62,492 | 5.000 | 10.11 | 0.7891 38377VC87 | SC, EXCH, PT | 3: REMIC |
| 12) • | IV | 15,049 | 5.000 | 4.09 | 0.5944 38377VC95 | SC, IO, EXCH, NTL, AD, SEQ | 4: REMIC |
| 13) • | VQ | 25,081 | 2.000 | 4.09 | 0.5944 38377VD29 | SC, EXCH, AD, SEQ | 4: REMIC |
| 14) • | VT | 25,081 | 2.500 | 4.09 | 0.5944 38377VD37 | SC, EXCH, AD, SEQ | 4: REMIC |
| 15) • | VU | 25,081 | 3.000 | 4.09 | 0.5944 38377VD45 | SC, EXCH, AD, SEQ | 4: REMIC |
| 16) • | VW | 25,081 | 3.500 | 4.09 | 0.5944 38377VD52 | SC, EXCH, AD, SEQ | 4: REMIC |
| 17) • | VX | 25,081 | 4.000 | 4.09 | 0.5944 38377VD60 | SC, EXCH, AD, SEQ | 4: REMIC |
| 18) • | VY | 25,081 | 4.500 | 4.09 | 0.5944 38377VD78 | SC, EXCH, AD, SEQ | 4: REMIC |
| 19) • | BD | 79,336 | 5.000 | 10.38 | 0.9879 38377VD86 | SC, EXCH, PT | 4: REMIC |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

# MORTGAGE ELECTRONIC REGISTRATION SYSTEMS (MERS) ANALYSIS

- The Mortgage shows a MIN number of 1000525-5028679206-3 and the MERS SERVICER ID website https://www.mers-serviceid.org/sis/search indicates that the loan is serviced by Flagstar Bank, FSB and **"Guarantor - Ginnie Mae" is stated as investor**.

MERS ServicerID www.mers-serviceid.org

**The Mortgage Industry's Utility**

**1 record matched your search:**

*Need help?*

MIN: **1000525-5028679206-3** Note Date: **02/22/2011** MIN Status: **Inactive**

Servicer: Flagstar Bank, FSB
**Troy, MI**

Phone: **(800) 945-7700**

If you are a borrower on this loan, you can click here to enter additional information and display the Investor name.

Return to Search

For more information about Mortgage Electronic Registration Systems, Inc. (MERS) please go to www.mersinc.org

Copyright © 2016 by MERSCORP Holdings, Inc.

*Select borrower type and enter borrower information to see Investor for MIN 1000525-5028679206-3.*

**Investor for Individual Borrower**

*Your entries may be either upper or lower case.*

*Fields marked * are required.*

**Last Name:** Teague *

**SSN:** - - *

*By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.* *

Submit

**Investor for Corporation/Non-Person Entity Borrower**

Servicer: Flagstar Bank, FSB
**Troy, MI**

Phone: **(800) 945-7700**

Investor: **Guarantor - Ginnie Mae**

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

# SECURITIZING A LOAN

ξ  For traditional lending prior to Securitization, the original Deed recording was usually the only recorded document in the Chain of Title. That is because banks kept the loans, and did not sell the loan, hence, only the original recording being present in the banks name.

The advent of Securitization, especially through "Private Investors" and not Fannie Mae or Freddie Mac involved an entirely new process in mortgage lending. With Securitization, the Notes and Deeds were sold once, twice, three times or more. Using the traditional model would involve recording new Assignments of the Deed of Trust and Note as each transfer of the Note or Deed of Trust occurred. Obviously, this required time and money for each recording.

<span style="color:red">(The selling or transferring of the Note is not to be confused with the selling of Servicing Rights, which is simply the right to collect payment on the Note, and keep a small portion of the payment for Servicing Fees. Usually, when a homeowner states that their loan was sold, they are referring to Servicing Rights.)</span>

<span style="color:red">ξ Securitizing a Loan</span>

Securitizing a loan is the process of selling a loan to Wall Street and private investors. It is a method with many issues to be considered. The methodology of securitizing a loan generally followed these steps:

- A Wall Street firm would approach other entities about issuing a "Series of Bonds" for sale to investors and would come to an agreement. In other words, the WallStreet firm "pre-sold" the bonds.

- The Wall Street firm would approach a lender and usually offer them a warehouse Line of Credit.  The Warehouse Credit Line would be used to fund the loan.  The Warehouse Line would be covered by restrictions resulting from the initial Pooling & Servicing Agreement Guidelines and Mortgage Loan Purchase Agreement.  These documents outlined the procedures for the creation of the loans and the administering of the loans prior to, and after, the sale of the loans to Wall Street.

- The Lender, with the guidelines, essentially went out and found "buyers" for the loans, people who fit the general characteristics of the Purchase Agreement.  (Guidelines were very general and most people could qualify." The Lender would execute the loan and fund it, collecting payments until there were enough loansfunded to sell to the Wall Street firm who could then issue the bonds.

-  Once the necessary loans were funded, the lender would then sell the loans to the "Sponsor", usually either a subsidiary of the Wall Street firm, of a specially created Corporation of the lender.  At this point, the loans are separated into "tranches" of loans, where they will be eventually turned into bonds.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

- Next, the loans were "sold" to the "Depositor." This was a "Special Purpose Vehicle" designed with one purpose in mind. That was to create a "bankruptcy remote vehicle" where the lender or other entities are protected from what might happen to the loans, and/or the loans are "protected" from the lender. The "Depositor" would be, once again, created by the Wall Street firm or the lender.

- Then the "Depositor" would place the loans into the Issuing Entity, which is another entity created solely for the purpose of selling the bonds.

- Finally, the bonds would be sold, with a Trustee appointed to ensure that the bondholders received their monthly payments.

ξ **REGENT FINANCIAL GROUP INC.** was a "correspondent lender" that originated mortgage loans. These loans, in turn, may have been sold and transferred into a "federally-approved securitization" trust named the **GINNIE MAE REMIC TRUST 2011-066**.

ξ The Note and Deed have taken two distinctly different paths. The Note may have been securitized into the GINNIE MAE REMIC TRUST 2011-066.

ξ The loan was originally made by REGENT FINANCIAL GROUP INC. and may have been sold and transferred to GINNIE MAE REMIC TRUST 2011-066. There is no record of Assignments to either a Sponsor or Depositor as may be required by a Pooling and Servicing Agreement.

In Carpenter v. Longan 16 Wall. 271,83 U.S. 271, 274, 21 L.Ed. 313 (1872), the U.S. Supreme Court stated "The note and Deed of Trust are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the Deed of Trust with it, while assignment of the latter alone is a nullity."

An obligation can exist with or without security. With no security, the obligation is unsecured but still valid. A security interest, however, cannot exist without an underlying existing obligation. It is impossible to define security apart from its relationship to the promise or obligation it secures. The obligation and the security are commonly drafted as separate documents – typically a promissory note and a Deed of Trust. If the creditor transfers the note but not the Deed of Trust, the transferee receives a secured note; the security follows the note, legally if not physically. If the transferee is given the Deed of Trust without the note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the note as well, if such was the agreement. (Kelley v. Upshaw 91952) 39 C.2d 179, 246 P.2d 23; Polhemus v. Trainer (1866) 30C 685).

"Where the mortgagee has "transferred" only the Deed of Trust, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000).

By statute, assignment of the Deed of Trust carries with it the assignment of the debt. . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the Deed of Trust, with the Deed of Trust lying with some independent entity, the mortgage may become



**Certified Forensic Loan Auditors**

unenforceable. The practical effect of splitting the Deed of Trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the Deed of Trust is the agent of the holder of the note. Without the agency relationship, the person holding only the trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. The mortgage loan becomes ineffectual when the note holder did not also hold the Deed of Trust."

**Securitization Summary:**

1.   Generally, if the Deed of Trust and the Note are not together with the same entity, there can be no legal enforcement of the Note. The Deed of Trust enforces the Note and provides the capability for the lender to foreclose on the property. Thus, if the Deed of Trust and the Note are separated, foreclosure legally cannot occur. The Note cannot be enforced by the Deed of Trust if each contains a different mortgagee/beneficiary; and, if the Deed of Trust is not itself a legally enforceable instrument, there can be no valid foreclosure on the homeowners' property.

2.   No Entity can be a CREDITOR if they do not hold/own the asset in question (i.e. the NOTE and/or the property); a Mortgage Pass Through Trust (i.e. R.E.M.I.C., as defined in Title 26, Subtitle A, Chapter 1, Subchapter M, Part II §§ 850-862) cannot hold assets, for if they do, their tax exempt status is violated and the Trust itself is void ab initio.  This is an indication that either the Trust has either voided its intended Tax Free Status, or the asset is not in fact owned by it.

3.   In the event that the loan was sold, pooled and turned into a security, such event would indicate that the alleged holder can no longer claim that it is a real party of interest, as the original lender has been paid in full.

4.   Further said, once the Note was converted into a stock, or stock equivalent, that event would indicate that the Note is no longer a Note. If both the Note and the stock, or stock equivalent, exist at the same time, that is known as double dipping. Double dipping is a form of securities fraud.

5.   Once a loan has been securitized, which the aforementioned loan may have been done many times, that event would indicate that the loan forever loses its security component (i.e., the Deed of Trust), and the right to foreclose through the Mortgage is forever lost.

6.   The findings of this report indicate that the Promissory Note may have been converted into a stock as a permanent fixture. As a stock it is governed as a stock under the rules and regulations of the SEC; hence, the requirement for the filings of the registration statements, pooling and servicing agreements, form 424B-5, et.al. There is no evidence on Record to indicate that the Deed of Trust was ever transferred concurrently with the purported legal transfer of the Note, such that the Deed of Trust and Note has been irrevocably separated, thus making a nullity out of the purported security in a property, as claimed.

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

7. Careful review and examination reveals that this may have been a securitized loan. The Assignment of Deed of Trust pretended to be an A to D transaction when in fact the foreclosing party was hiding the A to B, B to C, and C to D facts of true sales, where A is the original lender, B the sponsor/seller, C any bankruptcy-remote depositor, and D, the issuing mortgage-backed securities trust. They also hid the legal SEC filings, governing the transaction according to our findings. But to be controlled by those SEC filings, the true original loan Note and Deed of Trust had to be provided by the Document Custodian certified to have been in possession of them by them **on or about May 27, 2011**. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established at law by agreement. I supply this report as written testimony and am available for oral testimony.

### DISCLAIMER

This report was based exclusively on the documentation provided. It also required that we make reasonable assumptions respecting disclosures and certain loan terms that, if erroneous, may result in material differences between our findings and the loan's actual compliance with applicable regulatory requirements. While we believe that our assumptions provide a reasonable basis for the review results, we make no representations or warranties respecting the appropriateness of our assumptions, the completeness of the information considered, or the accuracy of the findings. The contents of this report are being provided with the understanding that we are not providing legal advice, nor do we have any relationship, contractual or otherwise, with anyone other than the recipient. We do not, in providing this report, accept or assume responsibility for any other purpose.



**Certified Forensic Loan Auditors**

# EXHIBIT I

Voluntary Lien Search

**Transaction Details for**
**635 HIGHWAY 26 E, MORRILL NE 69358**
**APN: 010074473**

**History Record #: 1**
**Assignment:**
Recording Date: 11/30/2015      Orig Recording Date: 02/24/2011
Document Number: 6691      Orig Doc Number: 916
Document Type: ASSIGNMENT OF MORTGAGE
New Lender: PLANET HM LNDG LLC
Previous Lender: REGENT FINL GRP INC
Borrower: TEAGUE ED
Borrower2: SHOULTS DIANNA L

**History Record #: 2**
**Sale/Transfer:**
Recording Date: 02/24/2011      Sale Date: 02/03/2011
Document Number: 915      Sale Price: $119,000.00
Document Type: WARRANTY DEED      Sale Type:
Title Company: THALKEN TITLE CO
Buyer: TEAGUE ED
Seller: ANDERSON LYLE R & BARBARA A

**Finance:**
Recording Date: 02/24/2011      Finance Type: RESALE
Document Number: 916      Mortgage Loan Type: CONVENTIONAL
Document Type: DEED OF TRUST      Mortgage Term: 30 YEARS
Lender: REGENT FIN'L GRP INC      Mortgage Rate Type:
Loan Amount: $121,512.00      Mortgage Rate:
Borrower: TEAGUE ED
Borrower: SHOULTS DIANNA L

**History Record #: 3**
**Sale/Transfer:**
Recording Date: 12/18/2000      Sale Date: 12/18/2000
Document Number:      Sale Price: $115,000.00
Document Type: DEED (REG)      Sale Type:
Title Company:
Buyer: ANDERSON LYLE R
Seller: KLEPPER COVERT M

**Voluntary Lien Date Ranges for Scotts Bluff, NE**

|  | Sales | Mortgages | Assignments | Releases | Foreclosures |
|---|---|---|---|---|---|
| Start Date | 01/01/2005 | 01/01/2005 | 01/04/2005 | 01/03/2005 | 01/01/2005 |
| End Date | 03/03/2016 | 03/03/2016 | 03/02/2016 | 03/03/2016 | 02/11/2016 |

Source: www.datatree.com

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

1. Item 2.  ED TEAGUE & DIANNA L. SHOULTS acquired property for $121,512 on April 21, 2011.  Primary active loan, which is the subject of this report.

2. Item 1.  Foreclosure actions brought by foreclosing parties with impropriety as noted in body of report.  Assignment **made 4 after loan** execution without supporting detail by employee of foreclosure agent likely working for Assignee.  Examiner recommends immediate rescission of document for lawful foreclosure to occur pending review of purchase documents (e.g. bills of sale; verifiable proof of funds; note endorsements) among REGENT FINANCIAL GROUP INC., Wells Fargo Bank, Ginnie Mae, and any securitized trusts sponsored by Ginnie Mae, such as the qualified Ginnie Mae trust identified.

3. Item 1.  Foreclosure action related to primary active loan.

*Remaining item 3 relate to prior ownership*

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016*
*-All Rights Reserved-*

# Exhibit H



**Certified Forensic Loan Auditors**

## AFFIDAVIT OF FACTS

| | |
|---|---|
| **STATE OF CALIFORNIA** | ) |
| | ) sv.: **AFFIDAVIT** |
| **COUNTY OF LOS ANGELES** | ) |

### RE: Ed Teague & Dianna L. Shoults

I, MICHAEL CARRIGAN, a citizen of the United States and the State of California over the age of 21 years, and declare as follows, under penalty of perjury that the facts stated herein are true, correct and complete. The undersigned believes them to be true and admissible as evidence in a court of law, and if called upon as a witness, will testify as stated herein:

1. That I am a subscriber of the Bloomberg Professional Service, certified and licensed to use such service. I have completed the required training and engaged in continuing education with Bloomberg – both online and at Bloomberg live training events, to stay abreast with Bloomberg's latest progress and developments. I have the requisite knowledge and the trained ability to navigate and perform effective searches on the on the Bloomberg terminal.

2. I am a Certified Mortgage Securitization Auditor and my qualifications, expertise and experience provide me with the background necessary to certify the audit services and to be qualified as an expert in this field. I have produced approximately three thousand five hundred Securitized Analysis Reports in residential and commercial real estate mortgage investigation in 49 states, the District of Columbia and Puerto Rico, have testified as an expert witness, and have trained auditors in California, Florida, Nevada, New York, New Jersey and Virginia and via the Internet in webinar format. I have a Bachelor's degree with a concentration in Accounting in Business Administration from California State University, Fullerton; a Master's in Business Administration from the UCLA Anderson School of Management; and have had formal training and career experience in accounting; financial reporting; internal control; SEC reporting; financial planning and analysis; financial forecasting; initial public and secondary offerings; corporate tax; corporate finance; investment management; equity, fixed income and derivative securities; credit analysis; asset valuation; ethics; investment advisory services including Series 7 and 66 licensing; real estate investment; real estate finance; real estate principles; redevelopment; government accounting; and procurement.

3. I have the trained skills and qualifications to navigate and perform searches on the Bloomberg terminal in regards to the automated tracking and determination of mortgage and loan related documents and information.

4. The contents of this report are factual, but it is provided for information purposes only and is not to be construed as "legal advice."[1]

---

[1] The client has been strongly advised to seek legal consultation from a competent legal professional in connection with the contents of this report and how to properly use it.

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

5.    On March 14, 2016, I researched the Bloomberg online Database at the request of **Ed Teague & Dianna L. Shoults** whose property address is 635 Highway 26 E., Morrill, NE 69358.

6.    Based on the information I was provided, **Ed Teague & Dianna L. Shoults** signed a Promissory Note in favor of REGENT FINANCIAL GROUP INC. on April 21, 2011.

7.    The loan was not identified in any publically reporting trust.  **"Guarantor – Ginnie Mae" is stated on the Mortgage Electronic Registration Systems, Inc. web site as "Investor", which indicates a past or current purported ownership interest of the FHA loan.**  A qualifying trust formed shortly after the execution of the loan on **April 21, 2011** is the **GINNIE MAE REMIC TRUST 2011-066** with a **closing date of May 27, 2011.  The underwriters** are **NOMURA** and **Loop Capital Markets LLC**, the Sponsor is Ginnie Mae and **Trustee** is Wells Fargo Bank, NA.  There is no known connection between the original lender, REGENT FINANCIAL GROUP INC. and Flagstar Bank, FSB, to whom the Assignment of Deed of Trust was assigned.

By:

_____

Michael Carrigan
Certified Mortgage Securitization Auditor / Bloomberg Specialist

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-



**Certified Forensic Loan Auditors**

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    **CIVIL CODE § 1189**

> A Notary public or other completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**STATE OF CALIFORNIA**          )

                                 ) sv.: **AFFIDAVIT**

**COUNTY OF LOS ANGELES**   )

On *March 17* , 2016 before me,  *Francis Max Komine*
                                        (Notary Public)

personally appeared **Michael Carrigan**, who proved to me on the basis of satisfactory evidence to be the man whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTYOF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> FRANCIS MAX KOMINE
> Commission # 2110362
> Notary Public - California
> Los Angeles County
> My Comm. Expires May 7, 2019

Signature *Francis Max Komine* (Seal)

My commission Expires  *May 7, 2019*

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2016
-All Rights Reserved-

# Exhibit I



US 20030105713A1

(19) **United States**

(12) **Patent Application Publication**   (10) Pub. No.: **US 2003/0105713 A1**
Greenwald et al.                         (43) Pub. Date:        **Jun. 5, 2003**

(54) **SPECIAL PURPOSE ENTITY FOR HOLDERS OF FINANCIAL INSTRUMENTS**

(76) Inventors: **Joshua D. Greenwald**, St. Louis Park, MN (US); **William J. Putney**, Minneapolis, MN (US)

Correspondence Address:
**Damon L. Boyd**
**Snell & Wilmer L.L.P.**
**One Arizona Center**
**400 East Van Buren**
**Phoenix, AZ 85004-2202 (US)**

(21) Appl. No.:    **10/308,692**

(22) Filed:    **Dec. 3, 2002**

**Related U.S. Application Data**

(60) Provisional application No. 60/338,495, filed on Dec. 3, 2001.

**Publication Classification**

(51) **Int. Cl.**[7] ................................................ **G06F 17/60**
(52) **U.S. Cl.** ............................................................ **705/40**

(57)        **ABSTRACT**

The present invention provides systems and methods for carrying out financial transactions which protect assets and provide various other advantages comprising a financial institution which issues a payment obligation, a special purpose entity, which acquires a residual obligation to honor the payment obligation as well as funds from the financial institution to honor the obligation. In accordance with various aspects of the present invention, the special purpose entity invests the acquired funds prior to honoring the payment obligation.





Figure 1



Figure 2



Figure     3



Figure   4

US 2003/0105713 A1

Jun. 5, 2003

1

## SPECIAL PURPOSE ENTITY FOR HOLDERS OF FINANCIAL INSTRUMENTS

### CROSS REFERENCES TO RELATED APPLICATIONS

[0001]  This application claims the benefit of the filing date of U.S. Provisional Patent Application Serial No. 60/338, 495, filed Dec. 3, 2001.

### FIELD OF INVENTION

[0002]  The present invention relates generally to methods and systems for performing financial services, and, more particularly, to methods and systems for performing financial transactions relating to presenting and paying a financial instrument using an entity separate from the entity issuing the financial instrument.

### BACKGROUND OF THE INVENTION

[0003]  Many financial instruments issued by a bank or other financial institution are regulated and/or licensed by various laws. For example, cashier or teller checks are typically regulated under the banking laws of the various states. Such "regulated payment obligations" are often sold (along with the funds specified in the instrument) to entities who process payment of the instrument when it is eventually presented for payment. Because such instruments are backed by the assets and/or creditworthiness of the financial institution which issued the instrument, the purchasing entity must also back the instrument with its own financial standing.

[0004]  In this regard, various financial institutions, such as banks, often have concerns as to the stability of the entity honoring the check. For example, it is desirable for the entity to be protected from bankruptcy. Likewise, in fact, some states require the entity backing the security to maintain a minimum of a 100% reserve in assets of the total value of the checks held and as such, with some exceptions, must have both legal and equitable title to the assets backing the checks.

[0005]  Accordingly, novel business entities, systems, methods and relationships between those entities are desirable to protect various assets and provide other advantages over the prior art.

### SUMMARY OF THE INVENTION

[0006]  The present invention provides systems and methods for carrying out financial transactions which secure assets and ensure checks and other financial obligations are honored, as well as provide various other advantages. For example, in an exemplary embodiment of the present invention, a system for carrying out a financial transaction comprises a financial institution which issues a payment obligation and a special purpose entity which acquires: (i) a residual obligation to honor the payment obligation and (ii) funds from the financial institution to honor the obligation. In accordance with various aspects of the present invention, the special purpose entity is provided with the ability to invest the acquired funds prior to honoring the payment obligation.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0007]  Additional aspects of the present invention will become evident upon reviewing the non limiting embodi-

ments described in the following specification and claims taken in conjunction with the accompanying drawing figure, wherein like numerals designate like elements, and:

[0008]  **FIG. 1** is a block diagram of an exemplary embodiment of a special purpose entity configuration in accordance with the present invention;

[0009]  **FIG. 2** is a block diagram of another exemplary embodiment of a special purpose entity configuration in accordance with the present invention;

[0010]  **FIG. 3** is a block diagram of another exemplary embodiment of a special purpose entity configuration in accordance with the present invention; and

[0011]  **FIG. 4** is a block diagram of still another exemplary embodiment of a special purpose entity configuration in accordance with the present invention.

### DETAILED DESCRIPTION

[0012]  The following descriptions are exemplary embodiments only, and are not intended to limit the scope, applicability, or configuration of the invention in any way. Rather, the following description provides a convenient illustration for implementing various embodiments of the invention. Various changes may be made in the function and arrangement of elements described in the preferred embodiments without departing from the spirit and scope of the invention as set forth in the appended claims. That is, in this regard, the present invention may be described herein in terms of functional block components and various processing steps. It should be appreciated that such functional blocks may be realized by any number of hardware, firmware, and/or software components configured to perform the specified functions. For example, the present invention may employ various integrated circuit components, e.g., memory elements, digital and/or analog signal processing elements, look-up tables, and the like, which may carry out a variety of functions under the control of one or more microprocessors or other control devices. Such general techniques and components that are known to those skilled in the art are not described in detail herein.

[0013]  That being said, the present invention provides systems and methods for performing various financial transactions in a manner which gives the organizations involved in the transaction increased security. For example, in accordance with an exemplary embodiment of the present invention, a financial institution such as a bank **100** issues a regulated payment obligation **102**, such as a check **102** backed by that financial institution **100**. A payment processor **104** and a legally separate entity **106** from the payment processor **104** are provided. In accordance with various aspects of the present invention, separate entity **106** is a trust. For purposes herein, separate entity **106** is referred to as a "special purpose entity" or "SPE." However, in accordance with various alternative embodiments, SPE **106** may comprise various other legal entities which are suitably capable of performing various functions described herein.

[0014]  SPE **106** acquires from **100** financial institution funds sufficient to honor regulated payment obligation **102** and a contractual obligation to honor regulated payment obligation **102**. Payment processor **104** acquires from financial institution **100** a residual obligation to honor regulated payment obligation **102** if entity **106** does not or cannot pay the obligation.

US 2003/0105713 A1

Jun. 5, 2003

2

[0015]   As mentioned above, and with reference to **FIG. 1**, in the presently described embodiment and in accordance with various aspects of the present invention, financial institution **100** may be a bank, regulated payment obligation **102** is a check and SPE **106**, which honors check **102** is a special purpose entity trust. In accordance with various additional aspects of the present invention, the funds sufficient to honor check **102** and likewise cover any transaction costs created by payment processor **104** acquiring funds as well as the legally obligated amount of check **102**.

[0016]   Thus, special purpose entity **106** receives funds directly from bank **100** as a payment of receivables representing the legal obligation to honor the presented check **102**. Additionally, as will be described further herein, special purpose entity **106** is able to invest the funds pending payment of check **102**.

[0017]   That being said, with continuing reference to **FIG. 1**, an exemplary embodiment of systems in accordance with the present invention as illustrated. **FIG. 1** illustrates the interaction of bank **100**, payment processor **104**, SPE **106** and a check holder **108** through various computer networks and software operations. Though not described in detail herein, it should be appreciated that any number and type of network, cabling, telephone lines and computers, and various banking technology, now known or as yet unknown, may be used in accordance with the present invention.

[0018]   Typically, payment processor **104** provides check services to bank **100**, bank **100** issues checks **102** and remits the amounts of checks **102** to payment processor **104** on the business day following issuance of check **102**. Payment processor **104** pays check **102** when it is presented through a clearing bank. In the interim, between issuance of check **102** and payments on check **102**, payment processor **104** is permitted to invest the funds transferred from bank **100** to payment processor **104** in certain permissible investments. This amount or "float" can then accrue interest. Similarly, in accordance with various aspects of the present invention, in lieu of bank **100** transferring remittances to payment processor **104**, bank **100** may present remittances to SPE **106** for presentation.

[0019]   Preferably, in accordance with various embodiments of the present invention, SPE **106** is suitably contractually prohibited from making a voluntary bankruptcy filing without bank's **100** consent, while being permitted to invest the remittances it receives from bank **100**. Additionally, optionally, SPE **106** can be set up in such a way that it is a distinct entity from any other legal entities making SPE **106** a legally separate, bankruptcy remote entity.

[0020]   In accordance with another aspect of the present invention, to comply with various regulatory authorities, an additional entity may be formed which enters into various relationships with SPE **106**. For example, with reference now to **FIG. 2**, a similar system to that shown in **FIG. 1** comprising bank **100**, payment processor **104**, SPE **106** and a check holder **108** are again provided. Again, payment processor/SPE **104**, **106** provides check services to bank **100**, bank **100** issues checks **102** and remits the amounts of checks **102** to payment processor/SPE **104**, **106** on the business day following issuance of check **102**. Payment processor/SPE **104**, **106** pays check **102** when it is presented through a clearing bank. In the interim, between issuance of check **102** and payments on check **102**, payment processor/

SPE **104**, **106** is permitted to invest the funds transferred from bank **100** to payment processor/SPE **104**, **106** in certain permissible investments.

[0021]   Additionally, in accordance with this embodiment of the present invention, a legal title entity **107** is provided. Legal title entity **107** suitably comprises an entity in accordance with the present invention with the ability to perform various actions and have certain ownership rights with respect to checks **102** and the assets backing those checks **102**. For example, legal title entity **107** suitably has the ability to hold legal title to assets backing checks **102**, without likewise having equitable ownership of the same. In such instances, various advantages of legal entity **107** may be realized.

[0022]   For example, as mentioned above, while some states require SPE **106** to secure 100% of the value of checks **102** with various assets, including legal and equitable ownership of those assets, there are potential exceptions to the various state regulations which would require the same. Such exceptions include states which allow legal title entity **107** to act as a "designated nominee" for holding title to the relevant securities, while SPE **106** maintains all other ownership rights, including the right to invest funds relating to those assets. For example, in one non-limiting embodiment of the present invention, legal title entity **107** is in the form of a partnership (or other legal entity) which enters into a legal agreement with SPE **106** to act as the designated nominee of SPE **106**. In such forms, the various regulatory authorities deem the financial institutions in compliance with the applicable regulations, while allowing SPE **106** to function as described above (e.g., investing funds) which otherwise would not be permitted, thus providing distinct advantages over the prior art.

[0023]   That said, it should be appreciated that the term "designated nominee" is used for exemplary and illustrative purposes, but should not be construed as so limited. For example, many other designations which have a similar effect, i.e., provide legal title entity **107** with various rights on behalf of SPE **106**, should likewise be construed as falling within the scope of the present invention.

[0024]   In accordance now with various additional aspects of the present invention, SPE **106** may be provided with excess cash such as, for example, undistributed dividends. SPE **106** may also have a revolving credit loan program with a CAG. SPE **106** may hold liquid investments that may be sold. SPE **106** also may have the benefit of a letter of credit from another bank **112**. Thus, the foregoing capabilities allow SPE **106** to be able to pay a greater amount of checks presented on a given day even when the remittances received that day are less than those checks presented.

[0025]   With reference now to **FIG. 3**, an alternative embodiment of the present invention is illustrated. As shown, payment processor **104** creates SPE **106** which is 100% owned by a CAG **110**, preferably a wholly owned subsidiary of payment processor **104**. CAG **104** preferably makes an initial capital contribution to SPE **106**. SPE **106** then invests the total amount of cash provided to it in permissible investments held for the benefit of check holders **108**. In accordance with the present invention, SPE **106** suitably assumes contractual liability for payments on checks **102**. However, in accordance with various aspects of the present invention, if SPE **106** cannot or will not pay

3

checks 102, payment processor 104 remains liable for such payment. Thus, SPE 106 formalizes statutory requirements that permissible investments are held in trust for check holders 108.

[0026] With reference now to FIG. 4, an alternative embodiment of the present invention is illustrated. In accordance with this embodiment, remittances due from bank 100 with respect checks 102 are suitably sold or contributed as capital to SPE 106 in return for assumption of liability to check holders 108. These remittances are suitably a net of amounts due from payment processor 104 to bank 100. Payments on the remittances are suitably made to SPE 106. CAG 110 lends money to SPE 106 under a revolving credit note. To the extent the amount of cash remittances obtained by SPE 106 daily is greater than amounts paid on checks 102, the note are paid down into the extent the amount of cash is less, the note will be increased. In accordance with this exemplary embodiment, payment processor 104 acts as an administrator for the transactions. Collections and investments are made in accordance with payment processor's 104 usual procedures with the exception that the investments are identified as belonging to SPE 106. Thus, SPE 106 tracks in substantially the same manner investments made by payment processor 104 with respect to different remittances. As described above, in the event SPE 106 has insufficient money to pay check holders 108, a draw may be made on items such as letters of credit provided by other banks or through payment processor 104 itself.

[0027] Last, while the principles of the invention have been made clear by the non-limiting, illustrative embodiments described above, there will be immediately obvious to those skilled in the art many modifications of structure, arrangements, proportions, the elements, materials and components, used in the practice of the invention which are particularly adapted for a specific environment and operating requirements without departing from those principles and/or the cope of the invention as set forth in the appended claims.

We claim:

1. A network of legal entities for carrying out financial transactions, comprising:

a financial institution which issues a payment obligation;

a special purpose entity, wherein said special purpose entity acquires (a) a residual obligation to honor said payment obligation, and (b) funds from said financial institution to honor said payment obligation;

a payment processor, wherein said payment processor acquires a residual obligation to honor said payment obligation if said special purpose entity does not honor said payment obligation; and

assets which secure said payment obligation.

2. The system of claim 1, wherein said special purpose entity invests said funds acquired from said financial institution prior to honoring said payment obligation.

3. The system of claim 1, wherein said financial institution comprises a bank.

4. The system of claim 1, wherein said special purpose entity comprises a trust.

5. The system of claim 1, wherein said special purpose entity is a bankruptcy remote entity.

6. The system of claim 1, wherein legal title to said assets is held by said special purpose entity.

7. The system of claim 1, further comprising a legal title entity acting as a designated nominee of said special purpose entity, and legal title to said assets is held by said legal title entity.

8. The system of claim 6, wherein said legal title entity is a partnership.

9. An improved system for carrying out financial transactions, comprising:

a bank which issues a payment obligation;

a special purpose entity, wherein said special purpose entity acquires (a) a residual obligation to honor said payment obligation, (b) acquires funds from said bank to honor said payment obligation, and (c) invests said funds prior to honoring said payment obligation;

a legal title entity acting as a designated nominee of said special purpose entity and holding legal title to assets which secure said payment obligation; and

a payment processor, wherein said payment processor acquires a residual obligation to honor said payment obligation if said special purpose entity does not honor said payment obligation.

10. The system of claim 9, wherein said special purpose entity comprises a trust.

11. The system of claim 9, wherein said legal title entity comprises a partnership.

* * * * *